1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA,　　)
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　)
VS.　　　　　　　　　　　　)　　　NO. 1:12CR02
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
RYAN DANDRE HEARN,　　　　　)
　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
　　　　　Defendant.　　　　)

　　　　　BE IT REMEMBERED, that the above-captioned cause came on to be heard, on this, the 6th of September, 2012, beginning at approximately 10:00 a.m., before the HONORABLE MICHAEL P. MILLS, Chief Judge presiding, when and where the following proceedings were had, to wit:



ALPHA REPORTING CORPORATION
236 Adams Avenue
Memphis, TN 38103
901-523-8974
www.alphareporting.com

# A P P E A R A N C E S

FOR THE PLAINTIFF:

     ROBERT W. COLEMAN, II, ESQ.
     U.S. Attorney's Office
     Northern District of Mississippi
     900 Jefferson Avenue
     Oxford, Mississippi 38655
     662-234-3351

FOR THE DEFENDANT:

     ROBERT DAVIS, ESQ.
     Law Office of Robert Davis
     542 W. Jefferson Avenue
     Tupelo, Mississippi 38804
     662-842-2222

COURT REPORTING FIRM:

     ALPHA REPORTING CORPORATION
     AMY McCULLOUGH, CSR
     236 Adams Avenue
     Memphis, Tennessee 38103
     901-523-8974
     www.alphareporting.com

## EXAMINATION INDEX

WITNESS RICKY PAYNE:
 DIRECT BY MR. COLEMAN      7
 CROSS BY MR. DAVIS       23
 RE-DIRECT BY MR. COLEMAN    35

WITNESS DALE STALLINGS:
 DIRECT BY MR. COLEMAN      38
 CROSS BY MR. DAVIS       56
 RE-DIRECT BY MR. COLEMAN    60

WITNESS MARK BURROUGHS:
 DIRECT BY MR. COLEMAN      61
 CROSS BY MR. DAVIS       81
 RE-DIRECT BY MR. COLEMAN    87

WITNESS JAMES GILLENTINE:
 DIRECT BY MR. COLEMAN      90
 CROSS BY MR. DAVIS       111
 DIRECT BY MR. DAVIS       118
 CROSS BY MR. COLEMAN      120

## EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Photocopy of Driver's License | 21 |
| EXHIBIT 2 | Lineup Document | 48 |
| EXHIBIT 3 | Lineup Document | 50 |

COURT REPORTER'S CERTIFICATE   135

**Alpha Reporting Corporation**

```
1                    P R O C E E D I N G S
2                         10:00 A.M.
3              THE CLERK:   The Court calls Cause
4     Number 1:12CR02, United States of America versus
5     Ryan Dandre Hearn.   This is a motion hearing on
6     a Motion to Suppress.
7              THE COURT:   All right.   Who do we have
8     for the defendant?
9              MR. DAVIS:   Chip Davis, Your Honor.
10             THE COURT:   And you have your client
11    with you?
12             MR. DAVIS:   Yes, sir.   He's sitting at
13    the table.
14             THE COURT:   All right.   For the
15    Government?
16             MR. COLEMAN:   Rob Coleman, Your Honor.
17    And also sitting at counsel's table is -- with a
18    request for the Court's permission to allow
19    Special Agent Dale Stallings with the Bureau of
20    Alcohol, Tobacco and Firearms to be allowed --
21             THE COURT:   Okay.
22             MR. COLEMAN:   -- we request that he be
23    able to remain at counsel's table.
24             MR. DAVIS:   No objection, Your Honor.
25             THE COURT:   That would be fine.   All
```

 1    right.  This is a motion filed by the defendant,
 2    and I suppose the best way to proceed is to let
 3    the defendant -- excuse me -- let the Government
 4    put on its proof in response.
 5            MR. DAVIS:  Yes, sir.
 6            THE COURT:  And then I'll hear from
 7    both of you --
 8            MR. DAVIS:  Thank you.
 9            THE COURT:  -- if that will be
10    agreeable.
11            MR. COLEMAN:  That is agreeable, Your
12    Honor.
13            THE COURT:  All right.  Who are you
14    going to call first?
15            MR. COLEMAN:  Well, Your Honor, before
16    we get to the first witness, I would like to
17    state on the record that I've already provided
18    some documentation to Mr. Davis concerning the
19    prior criminal history of one of the witnesses.
20    It's not the first witness I'm going to call,
21    but it's Mr. James Gillentine, who will be
22    called as a witness here and through the course
23    of this hearing.
24            Mr. Gillentine does have a criminal
25    history.  I've known this for years.  I have

inquired as to the -- what I intend to do is to make the Court aware of the fact that the Government knows, and this dates back to 1982.

And due to the fact that it's that old, prior to the trial, the Government will be moving in limine to exclude any mention of his prior history at this juncture.

I wanted the Court and defense counsel to know that there is an issue with one of our witnesses, and he does have a criminal history.

THE COURT:  Any response?

MR. DAVIS:  No, Your Honor.  I guess we'll just address it as it comes up.

THE COURT:  Okay.  That will be fine.

MR. COLEMAN:  Thank you, Your Honor. At this time, the Government will call Monroe County Deputy Ricky Payne, who is located back there in the witness room to the left.

(SHORT PAUSE).

RICKY PAYNE,

having been first duly sworn by the Clerk, was examined and testified as follows:

MR. COLEMAN:  May I proceed, Your Honor?

THE COURT:  You may.

```
 1                    DIRECT EXAMINATION
 2   BY MR. COLEMAN:
 3       Q.   State your name for the record, please.
 4       A.   Ricky Payne.
 5       Q.   And, Mr. Payne, what is your current
 6   occupation or profession?
 7       A.   Deputy Sheriff of Monroe County.
 8       Q.   And how long have you served in that
 9   capacity?
10       A.   I have been in Monroe County since
11   April of this year.
12       Q.   And what are your duties with the
13   Monroe County Sheriff's Department?
14       A.   I am a patrol deputy.  I patrol the
15   county streets and answer calls from 911 and
16   also from the Sheriff's Department.
17       Q.   All right.  Deputy Payne, let me call
18   your attention back to July the 9th of the year,
19   2009.
20       What was -- what was your occupation or
21   profession at that time?
22       A.   I was the Chief of Police in Nettleton,
23   Mississippi.
24       Q.   And how long did you serve in that
25   capacity?
```

1     A.    From January of 2008 until December of

2   2010.

3     Q.    And what were your duties as Chief of

4   the Nettleton Police Department?

5     A.    To oversee all of the duties and make

6   sure all of the officers done their jobs

7   correctly and the payroll and stuff like that.

8     Q.    Now, I've already called your attention

9   to July 9th, 2009.

10    Do you recall anything unusual happening on

11  that date?

12    A.    Yes, sir.  There was a robbery at the

13  Gold Exchange on Will Robbins Highway in

14  Nettleton.

15    Q.    All right.  In Nettleton?

16    A.    Yes, sir.

17    Q.    Okay.  Now, the Gold Exchange is a

18  business that does what?

19    A.    It is a pawn shop that, you know, pawns

20  items and sales gold and jewelry and stuff like

21  that.

22    Q.    Okay.  To your knowledge, do they also

23  sell firearms?

24    A.    Yes, sir, they do.

25    Q.    So it is a -- what we would refer to as

1  a business operating under a Federal firearms
2  license?
3     A.   Yes.
4     Q.   Okay.  And I think there was an
5  adjoining business to the Gold Exchange.
6     What was that business?
7     A.   (No response).
8     Q.   Well, let me ask -- let me just -- let
9  me ask you this:  Were there two victims of
10 this -- this robbery, this crime that occurred
11 on that day?
12    A.   Yes.
13    Q.   Who were they?
14    A.   They were James Gillentine and Mark
15 Burroughs.
16    Q.   Now, when you -- I'm -- let me just ask
17 you this:  Were you on duty that day as Chief of
18 Nettleton?
19    A.   Yes, I was.
20    Q.   And did you receive word that a robbery
21 had occurred at the Gold Exchange?
22    A.   Yes.
23    Q.   What did you do based on that
24 information?
25    A.   Okay.  I went to the Gold Exchange, and

1    at that time, I secured the scene.  I helped the

2    officer that was on duty, Mr. Steve Cooper.  He

3    helped me secure the scene, and then at that

4    time, Officer Cooper started taking reports from

5    Mr. Gillentine and Mr. Burroughs.

6        Q.    Did you or Officer Cooper or any other

7    Nettleton police officer get a description of

8    the person who committed this crime and a

9    vehicle they fled in?

10       A.    Yes.

11       Q.    Now, were you present when Mr. James

12   Gillentine, one of the victims in this crime,

13   was interviewed there after the crime?

14       A.    I probably -- I probably was.  I was --

15   I was in and out of the scene at that time while

16   Officer Cooper was taking statements.

17       Q.    Okay.  Let me ask you this:  Are you

18   aware of any rewards being made -- or offers or

19   a reward being made by Gillentine?

20       A.    Yes.  The TV, 9 Live, was there, and I

21   done a little interview.  Then they done an

22   interview with Mr. Gillentine, and that's when

23   he offered a $1,000 reward for any information

24   -- for any information about the crime.

25       Q.    All right.  Now, a few days later --

1    the crime occurred on July 9th, correct?

2        A.    Correct.

3        Q.    All right.  On July 13th, do you

4    receive any additional information regarding the

5    robbery?

6        A.    Yes, I did.

7        Q.    From whom?

8        A.    Mr. Gillentine.

9        Q.    Did Mr. Gillentine, based on the

10   information he had been provided, take you to a

11   location in Verona, Mississippi?

12       A.    Yes, sir, he did.

13       Q.    All right.  Do you know why he took you

14   there?

15       A.    (No response).

16       Q.    Had he received information on --

17       A.    Yes, sir.  The information -- what he

18   told me the information that he had received was

19   that one of the suspects was at this home on

20   Panel Street (phonetic) in Verona.

21       Q.    And on that date, did you accompany

22   Mr. Gillentine, or did you and other officers go

23   to Panel Street in Verona, Mississippi?

24       A.    Yes, I did.  Mr. Gillentine did not.

25       Q.    Okay.  How did you know where to go?

1      A.    Mr. Gillentine drove by and pointed the
2    house out to me.
3      Q.    Okay.  He pointed it out to you.
4    And it was you and maybe one of your
5    officers?
6      A.    Yes.  It was me and Officer Steve
7    Cooper, Chief J.B. Malone (phonetic) with the
8    Verona Police Department, and there was another
9    Verona officer but I can't remember his name,
10   sir.
11     Q.    Okay.  But since you were out of your
12   jurisdiction, there were other --
13     A.    That belonged to the Chief.
14     Q.    So you said the -- Mr. Gillentine drove
15   passed and pointed the house out to you?
16     A.    Yes, sir.
17     Q.    All right.  What did you do?
18     A.    I went back to Verona Police
19   Department, and Chief Malone called in one of
20   his other officers to go with us.  So we went
21   back to the residence and knocked on the door.
22   There were several people in the residence.  We
23   got them out and started talking to them.
24     And everybody that had a legitimate ID
25   except for one, and he gave a false name but he

1    had no ID.

2         Q.    What was the -- what is your

3    description of the person that gave you the

4    false name?

5         A.    He was a slender black male with a

6    shaved head.

7         Q.    Okay.  Now, to your knowledge, the

8    person or persons who committed the robbery some

9    days earlier, did either of them have a shaved

10   head?

11        A.    Not that I was aware of.

12        Q.    Okay.  Did one of them have a dis- --

13   what I refer to as a distinctive hairstyle?

14        A.    The photos on the driver's license that

15   I received -- that I found in the vehicle after

16   we located the vehicle --

17        Q.    Well, let me ask you this:  Based on

18   the descriptions given to you by Mr. Gillentine

19   and Mr. Burroughs --

20        A.    Yes.  They had -- one of the suspects

21   had dreadlocks.

22        Q.    Okay.  Now, you said one of the

23   individuals did not give you -- or did not have

24   identification.

25        A.    Correct.

1      Q.    He gave you a false name.

2      A.    Correct.

3      Q.    All right.  Was he detained?

4      A.    Yes, he was.

5      Q.    And he was later found out to be whom?

6      A.    Ryan Hearn.

7      Q.    Okay.  Would you recognize Mr. Hearn if

8  you saw him today?

9      A.    Yes, sir.

10     Q.    Would you look around the courtroom and

11 see if you see the person that -- that you

12 detained that day.

13     A.    Yes, sir.  (Witness complies).

14     Q.    Okay.  Would you point to him and

15 describe what he's wearing, please.

16     A.    (Witness complies).  An orange jump

17 suit.

18     Q.    That's Mr. Hearn that you detained that

19 day?

20     A.    (Witness nodded head affirmatively).

21          MR. COLEMAN:  All right.  Your Honor, I

22 would ask the record to reflect the witness has

23 identified the defendant in this cause.

24          THE COURT:  All right.

25          MR. COLEMAN:  Thank you.

```
1    BY MR. COLEMAN:
2       Q.   Now, after Mr. Hearn was detained, did
3    you find anything at the residence?
4       A.   The only thing I found at the residence
5    was a Ford key that nobody made claim to, so I
6    took the key.  And afterwards -- excuse me.
7            THE WITNESS:  Is there water in there?
8            THE COURT:  You can get some water.
9    Just be careful pouring it out.
10           (SHORT PAUSE).
11           THE WITNESS:  I apologize.
12           (SHORT PAUSE).
13   BY MR. COLEMAN:
14      Q.   Better?
15      A.   (Witness nodded head affirmatively).
16           MR. COLEMAN:  All right.  May I
17   proceed, Your Honor?
18           THE COURT:  (Nodded head
19   affirmatively).
20   BY MR. COLEMAN:
21      Q.   Deputy Payne, you said you found a
22   key.
23      Had you already been told that the vehicle
24   used in the robbery was a Ford vehicle?
25      A.   Yes, sir, I had.
```

1      Q.   So did that mean anything to you when
2    you found this key to the Ford?
3      A.   Yes, sir.  It meant maybe that there
4    was a possibility that it might fit the vehicle
5    that I was looking for.
6      Q.   Okay.  And after Mr. Hearn had been
7    detained, I believe you said he was sent to the
8    Monroe County Sheriff's --
9      A.   Yes, sir.
10     Q.   -- Department --
11     A.   Yes, sir.
12     Q.   -- is that correct?
13     A.   Yes, sir.
14     Q.   What did you do with this key?  Where
15   did you go?
16     A.   Okay.  I got a cell phone call from
17   Mr. Gillentine stating that he had located the
18   vehicle.
19     Q.   And, again, was that based on
20   information provided to him by someone who came
21   forward for the?
22     A.   -- correct.
23     Q.   -- reward?
24     A.   Correct.
25     Q.   Okay.  And did you -- where -- where

1    did he -- where did he tell you to meet him?

2    Did he tell you where to go?

3        A.    I met him back at the Verona Police

4    Station, and from there we went to -- it was

5    County Road 814, which is what we call

6    Plantersville Richmond Road.  It runs from

7    Verona to Plantersville.

8        And we went to -- I can't remember the name

9    of the church on the -- County Road 814, but the

10   vehicle was located behind the church.

11       Q.    And when you got there, was

12   Mr. Gillentine and this person that was showing

13   him around -- was that person still there, or

14   was it just Mr. Gillentine?

15       A.    It was just Mr. Gillentine there.

16       Q.    Okay.  And when you got there, what did

17   you do?

18       A.    Okay.  The first thing is I looked over

19   the vehicle.  I run the tag number.  Then I

20   happened to think about the key that I had found

21   at the house on Panel Street, so I just put it

22   in the door on the driver's side and it opened

23   right up.

24       Q.    And once you opened the door, did you

25   see anything in the car?

1      A.    Not at that time.   Then I happened to
2  glance down on the door panel on the driver's
3  side.   Do you know how they have a pocket a lot
4  of times made in the door panel?
5      Q.    All right.   And this is a Ford Escape?
6      A.    Yes, sir.
7      Q.    What I refer to as a small SUV --
8      A.    Yes, sir.
9      Q.    -- a small sport's utility vehicle?
10     A.    Yes, sir.
11     Q.    Okay.   And it had a pocket on the door?
12     A.    Yes, sir.   On the door panel.
13     Q.    Okay.   What -- and what did you see?
14     A.    I seen a set of driver's license, so I
15  just reached and got the driver's license.   And
16  it was a -- it had a black male with dreadlocks
17  and with Ryan Hearn on the driver's license.
18     Q.    Now, did you recognize the person in
19  the photograph?
20     A.    (No response).
21     Q.    When you saw the photograph, did you
22  recognize -- did you know who it was?
23     A.    No, sir, not at that time.
24     Q.    Did you show it to Mr. Gillentine?
25     A.    Yes, sir.   He seen it.

1     Q.   And later that day, did you also show

2  it to Mr. Burroughs?

3     A.   Yes, I did.

4     Q.   That's Mr. Mark Burroughs, who is also

5  one of the victims of the -- of the crime?

6     A.   Correct.

7     Q.   Now, after you -- you retrieved this --

8  this driver's license, did you do a search of

9  the vehicle?

10     A.   Not at that time.

11     Q.   What did you do?

12     A.   It was a -- I called the wrecker

13  service, and they transported it to their

14  facility and put it in a secured building

15  overnight until I could get a warrant the next

16  morning.

17     Q.   What did -- you said you showed it to

18  Mr. Gillentine there, and I assume you meant

19  there at the scene.

20     A.   Yes, sir.

21     Q.   I mean, right after you found it --

22     A.   At the scene.

23     Q.   -- he's there at the --

24     A.   Yes, sir.

25     Q.   -- scene.

1      A.    He's there.   He seen me when I pulled

2    it out, so he automatically, you know, looked at

3    it.

4      Q.    Okay.   What did you eventually do with

5    that driver's license?

6      A.    After I was through with it, I give it

7    back to Mr. Hearn's mother.

8      Q.    Did you do anything with it before you

9    gave it to Mr. Hearn's mother?

10      A.    Other than make a photocopy of it.

11      Q.    Okay.   You did make a photocopy of it?

12      A.    Yes, sir.

13      Q.    I'm going to show you what's been

14    marked Government's Exhibit Number 1.

15          MR. COLEMAN:   Your Honor, please, it

16    may be easier for me just to hand it to him, if

17    the Court would rather.

18          MR. DAVIS:   Your Honor, if the

19    Government will put it on the display.

20          THE COURT:   Yeah, I think it would be

21    easier on the screen.   If you have any

22    objections to any of this, just let me know,

23    Mr. Davis; otherwise, we'll go ahead and admit

24    it.

25          MR. DAVIS:   Yes, sir.

1          MR. COLEMAN:  I think I got a little
2   assistance there.  I appreciate that.
3          (WHEREUPON, THE ABOVE-MENTIONED
4   DOCUMENT WAS MARKED AS EXHIBIT NO. 1 TO THE
5   TESTIMONY OF THE WITNESS AND RETAINED BY THE
6   COURT).
7   BY MR. COLEMAN:
8      Q.   Right on the screen in front of -- in
9   front of you is Government's Exhibit Number 1.
10     Do you recognize that?
11     A.   (Examining photocopy).  Yes, sir, I do.
12  That's --
13     Q.   What is that?
14     A.   Sir?
15     Q.   What is that on the screen?
16     A.   That is the driver's license of Ryan
17  Hearn.
18     Q.   Is that a fair and accurate depiction
19  of the -- of a photograph of the license that
20  you see you got out of that Ford Escape?
21     A.   Correct.
22     Q.   And this, in fact, is the driver's
23  license you took, showed to Mr. Gillentine and
24  then later returned to the defendant's mother
25  after making this photocopy; is this correct?

```
 1      A.    Correct.
 2      Q.     And it -- it appears to be just like
 3  the -- the license that you recovered that
 4  night.
 5      There's no material -- material alterations
 6  or deletions, any changes?
 7      A.    No, sir.
 8           MR. COLEMAN:  Your Honor, at this time
 9  we're going to move to introduce Government's
10  Exhibit Number 1.
11           THE COURT:  Let it be entered.
12           MR. COLEMAN:  Thank you, Your Honor.
13  BY MR. COLEMAN:
14      Q.    Let me ask you this.  I'm sorry.  I'm
15  going to put this back up here, Government's
16  Exhibit Number 1.
17      Can you describe the hairstyle of the person
18  in that photograph?
19      A.    (Examining photograph).  Yes, sir.  It
20  appears to be dreadlocks to me.
21      Q.    Thank you.  Deputy Payne, did you or
22  anyone else under your charge, under your chain
23  of command at Nettleton Police Department ever
24  show a photo display, photo lineup, photo array,
25  show it to any -- a group of photos to
```

1    Mr. Gillentine or Mr. Burroughs regarding this

2    robbery?

3        A.    Not to my knowledge, sir.

4        Q.    Okay.  To your knowledge, did anyone

5    ever do that?

6        A.    ATF agent, Dale Stallings.

7             MR. COLEMAN:  The Court's indulgence

8    one moment, Your Honor.

9             (SHORT PAUSE).

10            MR. COLEMAN:  Your Honor, we tender the

11   witness.

12            THE COURT:  All right.  Mr. Davis.

13            MR. DAVIS:  May I proceed, Your Honor?

14            THE COURT:  You may.

15                  CROSS EXAMINATION

16   BY MR. DAVIS:

17       Q.    Good morning, Deputy Payne.

18       A.    Good morning, sir.

19       Q.    My name is Chip Davis, and I represent

20   Mr. Hearn.  Now, let me ask you this question,

21   if I would, sir.

22       You say immediately after the robbery, you

23   and Mr. Gillentine got on the television and

24   Mr. Gillentine told essentially North

25   Mississippi that he was offering a $1,000

1    reward; is that right?

2        A.    Correct.

3        Q.    Would you consider $1,00 to be a fair

4    amount of money?

5        A.    That's a pretty good bit of money.

6        Q.    That's a pretty good bit of money.

7        As a matter of fact, it's -- if a person is

8    on disability, that's more than they bring in,

9    in a lot of cases; isn't that correct?

10        A.    You're correct.

11        Q.    And, in fact, if a person is working a

12    McDonald's-type job or a convenience store-type

13    job, that's more than they'll make in two-weeks

14    work; isn't that correct?

15        A.    You're correct, sir.

16        Q.    So somebody or anybody then would have

17    an incentive to try and get that $1,000; isn't

18    that correct?

19        A.    I would say so, sir.

20        Q.    All right.  Now, who was the person

21    that called Mr. Gillentine to say one of the

22    suspects was at the house in Verona?

23        A.    Okay.  On that, sir, I have -- I don't

24    have a clue who that person was.

25        Q.    Okay.  So you don't know this person.

```
 1   You don't know their character.
 2        A.    No, sir.
 3        Q.    You don't know whether they are
 4   criminals themselves, do you?
 5        A.    No, sir, I do not.
 6        Q.    You don't know if they're honest or
 7   dishonest.
 8        A.    No, sir, I do not.
 9        Q.    You don't know if maybe they had a
10   grudge against Mr. Hearn for some reason.
11        A.    I do not, sir.
12        Q.    Now, between the date of the robbery
13   and the date of, I call it, a show up -- a
14   one-person show up where the people -- tell me
15   exactly what happened.  All right.  You go to
16   the house in Verona.
17        A.    Correct.
18        Q.    All right.  Under what -- I mean, did
19   you have a search warrant?
20        A.    Not at that time.
21        Q.    Okay.  Did you have an arrest warrant
22   for anybody in the home?
23        A.    Not at that time.
24        Q.    Okay.  What legal authority did you
25   have to go to the home and ask the people in the
```

1    home to come out in the yard?

2       A.    Okay.  The reason I went in was because

3    of the knowledge, you know, that Mr. Gillentine

4    had passed on to me.

5       Q.    Okay.  Did Mr. Gillentine sign an

6    Affidavit?

7       A.    No.

8       Q.    All right.  So there's no Affidavit;

9    there's no arrest warrant; there's no search

10   warrant, correct?

11      A.    At that time what we done was we just

12   detained everybody.  I went and got the search

13   warrant --

14      Q.    Okay.

15      A.    -- and then came back.

16      Q.    You detained everybody?

17      A.    Not detained but, you know, when --

18      Q.    Okay.  Now --

19      A.    -- there were no handcuffs or nothing

20   like that.

21      Q.    Well, isn't that the word that you just

22   used, you detained everybody?

23            MR. COLEMAN:  Your Honor, I'm going to

24   object to the relevancy of this line of

25   questioning.  It has no bearing on the motion

 1    that's before the Court.  The Motion to Suppress

 2    is the identification of the photo lineup.

 3            THE COURT:  Overruled.

 4    BY MR. DAVIS:

 5       Q.   Now, the word you just used was, we

 6    detained everybody, correct?

 7       A.   Yes, sir.  What I meant by that -- I

 8    know where you're coming from, but detained a

 9    lot of times is when we put handcuffs on them

10    but they're not under arrest.  No handcuffs were

11    put on them at that time.

12       Q.   Okay.  Was anybody in that house free

13    to leave?

14       A.   I would say so, sir.  You know, that

15    wasn't --

16       Q.   Okay.  What would you have done if

17    Mr. Hearn or anybody else had said, no, thanks.

18    I'm not staying, and gotten in their car and

19    driven away -- drove away?

20       A.   There wouldn't have been much I could

21    have done.

22       Q.   Okay.  Why did you call it a detention

23    then?

24       A.   Just a mistake on my vocabulary, I

25    guess, sir.

1    Q.    Okay.  What legal authority did you

2  have to ask anybody inside that house to come

3  outside that house?

4    A.    Well, I was in the process of looking

5  for a suspect of this robbery.

6    Q.    Okay.  I understand what you were

7  doing.

8    My question, though, is:  What legal

9  authority under the law did you have to ask

10 people inside a house to walk outside the

11 house?

12   A.    Well, actually all of them didn't come

13 out because I was looking for a male.

14   Q.    Okay.  What legal authority did you

15 have to ask any of the males inside the house to

16 come outside the house?

17   A.    None, I don't guess, sir.

18   Q.    All right.  Now -- all right.  So you

19 got everybody out in the yard or at least all of

20 the males.

21   How did Mr. Gillentine know to drive past?

22   A.    Mr. Gillentine drove past before I ever

23 went to house.

24   Q.    All right.  When did he drive --

25   A.    He pointed -- he pointed it out to me.

```
1      Q.    When did he drive past again?

2      A.    Now, if he drove past again, sir, I

3  don't remember it.

4      Q.    Okay.  So he didn't identify anybody in

5  that yard?

6      A.    No.

7      Q.    So Mr. Gillentine at that time never

8  told you -- never made an identification of

9  anybody in that yard as a suspect?

10     A.    No.

11     Q.    Okay.  What authority did you have to

12 search that house looking for anybody much less

13 a key?

14     A.    The -- I went to the Judge and got the

15 search warrant.  I was looking for the money

16 that was taken from the robbery.

17     Q.    And what -- what were the -- well,

18 where did you find the key?

19     A.    It seems -- it seems, to the best of my

20 recollection, it was located in the front

21 bedroom on the north side of the house in the

22 closet.

23     Q.    So the information you used to obtain

24 the search warrant was that a confidential

25 person that you didn't know had told a third
```

1    person that somebody -- that a suspect lived in
2    that house?
3        A.    Correct.
4        Q.    Now, how long -- what -- on what date
5    did you go to that house?
6        A.    To the best of my knowledge, sir, I'm
7    thinking it was on the 13th.
8        Q.    That would have been four days after
9    the robbery?
10       A.    Correct.
11       Q.    Now, on what date did you -- did
12   Mr. Gillentine call you and tell you he had
13   found that truck?
14       A.    The same day.
15       Q.    On the 13th.  Who told him where to
16   look for the truck?
17       A.    I have no idea, sir.
18       Q.    Do you know or have any idea whether
19   that truck had been left there by the person
20   that had robbed the store or whether it had been
21   moved by somebody or whether it had been
22   tampered with in any way?
23       A.    No, sir.  I talked to some of the
24   neighbors there, and they said it was -- that he
25   had left it there.

```
 1        Q.    Who had left it there?

 2        A.    Mr. Hearn.

 3        Q.    Okay.  They told you Hearn had left it

 4   there?

 5        A.    Uh-huh (affirmative response).

 6        Q.    Who were those neighbors?

 7        A.    Sir, I can't -- I can't recall.

 8        Q.    Do you know whether or not those were

 9   the same neighbors who may have been looking for

10   that $1,000 reward?

11        A.    No, I do not.

12        Q.    Now, it was at this time that you

13   presented to or you showed to Mr. Gillentine

14   this driver's license photograph; is that

15   correct?

16        A.    Correct.

17        Q.    What was Mr. Gillentine's reaction

18   seeing the driver's license photograph?

19        A.    Sir, to be honest with you, I can't

20   recall --

21        Q.    So you --

22        A.    -- his expression or action.

23        Q.    Okay.  So you don't remember whether he

24   identified the person on that driver's license

25   as being the person that robbed him?
```

 1      A.    No, sir, I don't.

 2      Q.    Now, I cannot put my hands on it,

 3   unfortunately, right at this time, but I recall

 4   that in Mr. Gillentine's statement he keeps --

 5   he said repeatedly, one of them had a cornrow

 6   hairstyle.

 7      Do you recall that?

 8      A.    Yes, sir.

 9      Q.    And he identified the hairstyle as a

10   cornrow hairstyle?

11      A.    Correct.

12      Q.    Okay.  But we know that when you saw

13   Mr. Hearn at the house, he had a shaved head,

14   right?

15      A.    Correct.

16      Q.    And we know that on his driver's

17   license photograph, he had dreadlocks?

18      A.    Correct.

19      Q.    Have you ever seen Mr. Hearn with a

20   cornrow hairstyle?

21      A.    No, I have not.

22      Q.    Okay.  Have you ever seen a photograph

23   of Mr. Hearn with a cornrow hairstyle?

24      A.    The only photograph I've seen is the

25   one you showed a minute ago, sir.

1     Q.    Okay.   And even though I'm not an
2   expert in hairstyles, I know the difference
3   between cornrows and dreadlocks --
4     A.    Right.
5     Q.    -- and I'm assuming that you do as
6   well.
7     A.    I think I do, sir.
8     Q.    All right.  Is it true that cornrows
9   are where you braid your hair very close to your
10  head?
11    A.    To the scalp.
12    Q.    The hair is braided to the scalp;
13  whereas, dreadlocks, the hair is -- is matted --
14  I call it matted --
15    A.    Yes, sir.  It's sort of dangling down.
16    Q.    -- matted together and -- matted
17  together and hangs down.
18    A.    Yes, sir.
19    Q.    Those are very distinctive looking
20  hairstyles.
21    A.    Yes, sir.
22    Q.    And one really is not confusable with
23  the other --
24    A.    Correct.
25    Q.    -- correct?

```
1      How long had you been in law enforcement in
2  2009 -- July of 2009?
3      A.   I started law enforcement in May of
4  1996.
5      Q.   All right.  So four years or five
6  years?
7      A.   It's been longer than that.
8      Q.   I'm sorry.  My math is bad.  I'm not
9  going to do the math sitting here today.
10     You had been to the Academy, I'm assuming?
11     A.   Correct.
12     Q.   All right.  Why did you not do a
13  photographic array lineup as -- as we all know
14  should have been done?
15     A.   I'm going to be honest with you, sir,
16  just like I told Mr. Rob, that was ignorance on
17  my behalf.
18     Q.   So you acknowledge the fact that the
19  best procedure would have been to take that
20  driver's license photograph and put it in with
21  other similar looking photographs and show
22  Mr. Gillentine all of the photographs at one
23  lick?
24     A.   Correct, sir.
25          MR. DAVIS:  Your Honor, may I have a
```

```
 1    brief indulgence?
 2              (SHORT PAUSE).
 3              MR. DAVIS:  Your Honor, that's all I
 4    have.
 5              THE COURT:  All right.  Any re-direct?
 6              MR. COLEMAN:  Very briefly, Your Honor.
 7                   RE-DIRECT EXAMINATION
 8    BY MR. COLEMAN:
 9       Q.    Deputy Payne, you were asked questions
10    about whether or not Mr. Gillentine had told you
11    that he recognized the defendant coming out of
12    the house.  I know there's been some confusion
13    about that in reports or whatever.
14       Did you see the defendant that you
15    identified earlier in the courtroom there that
16    night?
17       A.    You're talking about at the house?
18       Q.    I'm sorry.  In Verona at -- on Panel
19    Street.
20       A.    Correct.
21       Q.    Okay.  You testified previously that
22    you -- when you saw him, what was your reaction?
23       A.    It's -- he just -- he just had a funny
24    look on his face.  I'll put it that way.  You
25    know, sometimes you can just tell when somebody
```

1    is lying to you.

2        Q.    And what did you think?

3        A.    I kind of figured that was the guy I

4    was looking for.

5        Q.    Okay.  So it was actually you that --

6    when you drove up, you saw him outside or he

7    came out?

8        A.    Correct.

9        Q.    Okay.  And as you stated -- and you

10   were asked questions on cross-examination about

11   your authority to be out there.

12       Were you out there to arrest everybody

13   there?

14       A.    No.

15       Q.    Okay.  You were out there looking for

16   information?

17       A.    Correct.

18       Q.    And you were asking the individuals to

19   come outside, and you said specifically males.

20       A.    Correct.

21       Q.    Okay.

22            MR. COLEMAN:  No additional questions,

23   Your Honor.

24            THE COURT:  All right.  You may step

25   down.  Is he free to go?

MR. COLEMAN:  Your Honor, I ask that he remain in the witness room, please.

(TESTIMONY CONCLUDED AT 10:30 A.M.)

THE COURT:  All right.  Who do you call next?

MR. COLEMAN:  Your Honor, at this time, I call Agent Dale Stallings.

DALE STALLINGS,

having been first duly sworn by the Clerk, was examined and testified as follows:

MR. COLEMAN:  Your Honor, I assume the rule is invoked.  I told the witnesses to remain in the --

THE COURT:  I thought you said you wanted them to remain in the courtroom.

MR. COLEMAN:  Oh, I'm sorry.

THE COURT:  My mistake.  I'm sorry.  Go ahead and swear him in.

THE CLERK:  I swore him.  You can take a seat on the witness stand.

MR. COLEMAN:  Your Honor, before I ask permission to proceed, if I could show these to counsel opposite, it may make this a little faster.

MR. DAVIS:  (Examining documents).

```
1              (SHORT PAUSE).
2              MR. COLEMAN:  May I proceed, Your
3    Honor?
4              THE COURT:  (Nodded head
5    affirmatively).
6                   DIRECT EXAMINATION
7    BY MR. COLEMAN:
8       Q.   State your name for the record,
9    please.
10      A.   Dale Stallings.
11      Q.   And, Mr. Stallings, what is your
12   present occupation or profession?
13      A.   I'm a special agent with the Bureau of
14   Alcohol, Tobacco, Firearms and Explosives.
15      Q.   And how long have you been so employed?
16      A.   For approximately four-and-a-half
17   years.
18      Q.   And what are your duties with ATF?
19      A.   I primarily investigate violations of
20   Federal firearms loss.
21      Q.   And you up until recently worked out of
22   the resident agency here in Oxford; did you not?
23      A.   That's correct.
24      Q.   And now you work out of the office in
25   Jackson?
```

1      A.    Yes, sir.

2      Q.    Now, back in June of 2009, you were

3  working out of the Oxford field office.

4      A.    That's correct.

5      Q.    And did you have the occasion to

6  investigate a robbery of a Federal fireman's

7  licensee in Nettleton, Mississippi?

8      A.    I did.

9      Q.    And what was the name of that -- that

10  business?

11      A.    The Gold Exchange.

12      Q.    And where did the crime occur?

13      A.    In Nettleton, Mississippi.

14      Q.    And are you familiar with the

15  jurisdictional boundaries of the Federal Courts

16  in the State of Mississippi?

17      A.    I am.

18      Q.    And, in fact, is Nettleton in the

19  Northern Judicial District of the State of

20  Mississippi?

21      A.    It is.

22      Q.    All right.  The crime having occurred

23  on July 9th, 2009, when did you actually become

24  involved in this investigation, and how did you

25  become involved in the investigation?

1     A.    The following Monday, my office

2     received a fax.  Whenever a Federal firearm's

3     licensee has a loss of inventory due to theft or

4     just improper documentation, they have to fill

5     out a form called a Theft Loss Report, and that

6     form is then faxed to the resident office.

7         I received that fax the following Monday

8     after the robbery.  I contacted Nettleton Police

9     Department to see if they needed any assistance

10    in the investigation, and they asked me to -- to

11    assist them.

12    Q.    During the -- during the course of your

13    investigation, did you prepare what is referred

14    to as a photographic lineup or photographic

15    display to show the victims of this crime?

16    A.    I did.

17    Q.    Who were the victims?  What were their

18    names?

19    A.    Mark Burroughs and James Gillentine.

20    Q.    Now, do you recall what date you

21    presented these photographic displays to

22    Mr. Gillentine and Mr. Burroughs?

23    A.    I do.  It was on July 20th, 2009.

24    Q.    Approximately 11 days -- or 11 days

25    after the robbery, right?

1     A.    Correct.

2     Q.    All right.  How many photos did you

3  display?  And, if you would, describe the nature

4  and type of photos and how they were presented

5  to Mr. Gillentine and Mr. Burroughs.

6     A.    I had two suspects, so I prepared a

7  photo lineup for each.

8     Q.    Who were those suspects?

9     A.    Ryan Hearn and Timothy Montgomery.

10  Each page had six photographs of -- of

11  individuals with similar characteristics in this

12  case, a young black male with a slender build.

13  They had similar hairstyles.

14     Q.    Okay.  Now, when you say, in this case,

15  you're referring to both of the suspects as

16  being young black males?

17     A.    Correct.

18     Q.    Okay.  You did one photo array for

19  Mr. Hearn and a separate one for

20  Mr. Montgomery.

21     Were there --

22     A.    Yes, sir.

23     Q.    -- any differences in the photos you

24  chose for either of the two?

25     A.    Yes.

1     Q.    And what were they?

2     A.    The photo lineup for Ryan Hearn had

3 individuals that had like characteristics as

4 him, and the photo lineup for Timothy Montgomery

5 had photos of individuals with similar

6 characteristics to him.

7     Q.    Okay.   Including differences in

8 hairstyle?

9     A.    Correct.

10     Q.    Okay.   And approximately the same age?

11     A.    Correct.

12     Q.    Race?

13     A.    Correct.

14     Q.    They were all males?

15     A.    Correct.

16     Q.    And the facial features similar?

17     A.    Correct.

18     Q.    Where did you obtain the photos that

19 you used in these photo lineups?

20     A.    Throughout our investigations, we end

21 up with driver's license photos of several

22 individuals that we come across, and we just

23 basically keep a log of each of these

24 individuals and use them in our lineups.

25     Q.    So -- well, let me ask you this:   Did

1    each of the photographs come from a database?

2        A.    They were initially obtained from

3    the -- I guess it would be the Mississippi

4    Department of --

5        Q.    Department of Public Safety?

6        A.    Correct.

7        Q.    Highway Patrol?

8        A.    Correct.

9        Q.    They are driver's license photos?

10       A.    Yes.    We always request driver's

11   licenses from the State of Mississippi.

12       Q.    So each of the photos were driver's

13   license photos of these individuals; is that

14   correct?

15       A.    That's correct.

16       Q.    Including the photograph of Mr. Hearn?

17       A.    Correct.

18       Q.    Now, where were the photos displayed to

19   Mr. Gillentine and Mr. Burroughs?

20       A.    I met them at their place of business

21   at the Gold Exchange and represented the lineups

22   of them there.

23       Q.    Were they presented to them in a

24   non-suggestive manner?

25       A.    They were.    Prior to showing them the

1     lineups, I have a coversheet that I put on top

2     of the lineups.  I explained to the two victims

3     that they needed to take their time, and if they

4     don't recognize an individual, they don't have

5     to pick somebody.

6         And that the -- the -- the case will not be

7     resolved solely on their lineup and that they

8     should feel no pressure.

9         Q.   Now, in -- and did you actually read

10    those, what I'll refer to as, instructions to

11    them?

12        A.    I did.

13        Q.    Did they have an opportunity to read

14    them?

15        A.    They did.  They read it and signed and

16    dated it.

17        Q.    Now, did you in any way influence or

18    suggest to either Mr. Gillentine or

19    Mr. Burroughs which photo to choose in dec- --

20    in deciding either of these defendants or either

21    page of the photo lineups?

22        A.    No, I didn't.  After I read the

23    coversheet to them, I took a step back and gave

24    them time to choose the photos.

25        Q.    Was anyone else present when they were

1    reviewing these photos?

2        A.    Not to my recollection.

3        Q.    Did either Mr. Burroughs or

4    Mr. Gillentine select photos from either of the

5    groups of photos or photo displays as being the

6    individuals who committed this robbery?

7        A.    They did.

8        Q.    When they chose in particular the

9    photograph of Mr. Hearn -- when each of them

10   chose his, did you notice any hesitation or any

11   deliberation on their part?

12       A.    There was absolutely no hesitation.

13   They immediately identified the photo.

14       Q.    And how did they do that?  How did each

15   one of them identify which photo in each spread

16   they chose?

17       A.    They would either circle the photo or

18   the number associated with it and then initial

19   and date it.

20       Q.    Now, do you recall whose photos were

21   marked by Mr. Gillentine?

22       A.    Yes.  He marked Ryan Hearn's photo and

23   Timothy Montgomery's photo.

24       Q.    And Mr. Burroughs, also?

25       A.    The same.

1    Q.    Did either of them select a photograph
2    of any individual who was later learned not to
3    be involved in this robbery?
4    A.    No.
5    Q.    Agent Stallings, I want to present to
6    you what has been marked as Government's Exhibit
7    Number 2.
8    Do you see it has the ATF letterhead at the
9    top; does it not?
10    A.    (Examining document).  It does.
11    Q.    And then what does this -- what does
12    this document say?
13    A.    This is the --
14    Q.    Well, let me ask you this:  Do you
15    recognize this document?
16    A.    I do.
17    Q.    And, actually, this is a composite
18    exhibit.  It's initially got the front page and
19    the second page.
20    Can you -- do you see the second page of the
21    exhibit?
22    A.    (Examining document).  I do.
23    Q.    All right.  And then the third page of
24    the composite exhibit.  Now, you've already
25    described the first page to us.

1      These are the instructions you testified to

2   previously, correct?

3      A.    That's correct.

4      Q.    And how do you recognize that

5   instructional page and also the second page,

6   being Page Number 2 of the composite exhibit of

7   the six individual photographs, and then the

8   third page, which I will show you again, as

9   being six individual photographs of other

10  individuals?  How do you recognize this

11  composite exhibit?

12     A.    I put it together.  And then it also

13  has my name as a witness, and I dated it as

14  well.

15     Q.    This is your name on the bottom

16  signature line?

17     A.    That's correct.

18     Q.    And what is the date on that?

19     A.    July 20th, 2009.

20         MR. COLEMAN:  Your Honor, at this time,

21  the Government will move to introduce

22  Government's Composite Exhibit Number 2 into

23  evidence as an exhibit to the witness's

24  testimony.

25         THE COURT:  Any objection?

1          MR. DAVIS:  No, sir.

2          THE COURT:  Let it be entered.

3          (WHEREUPON, THE ABOVE-MENTIONED

4    DOCUMENT WAS MARKED AS EXHIBIT NO. 2 TO THE

5    TESTIMONY OF THE WITNESS AND RETAINED BY THE

6    COURT.)

7    BY MR. COLEMAN:

8      Q.    Okay.  So in Government's Composite

9    Exhibit Number 2 there are four questions, and I

10   think you --

11         THE COURT:  Move on.  We've been over

12   that.

13   BY MR. COLEMAN:

14     Q.    On the second page of the Government's

15   composite exhibit, there is an individual whose

16   photograph is circled.

17     Do you know who that is?

18     A.    (Examining document).  That's Ryan

19   Hearn.

20     Q.    And this, in fact, is the composite

21   exhibit that contained the photographs that were

22   presented to whom?

23     A.    James Gillentine.

24     Q.    And then at the bottom of the

25   photograph, the top right-hand corner, Page 2 of

1    the composite exhibit, the photograph being

2    circled has initials and a date.

3        Do you know whose initials those are?

4        A.    (Examining document).   Those are James

5    Gillentine's initials.

6        Q.    Do you know who circled that

7    photograph?

8        A.    James Gillentine.

9        Q.    Were you present when he did that?

10       A.    I was.

11       Q.    Okay.   And he also dated it?

12       A.    That's correct.

13       Q.    And then the second page, being other

14   photos you presented to him, did you also

15   witness him circle and put his initials under

16   that photograph?

17       A.    I did.

18       Q.    And who is that?

19       A.    James Gillentine.

20       Q.    I'm sorry.

21       A.    James Gillentine.

22       Q.    Okay.   The initials are James

23   Gillentine's?

24       A.    Correct.

25       Q.    Okay.   Whose photograph did he circle?

```
 1      A.    Timothy Montgomery.
 2      Q.    And now I show you what's been marked
 3   as Government's Exhibit Number 3.
 4            THE COURT:  Is there any objection to
 5   this exhibit?
 6            MR. DAVIS:  No, sir.
 7            THE COURT:  Let it be entered.
 8            MR. COLEMAN:  Thank you, Your Honor.
 9            (WHEREUPON, THE ABOVE-MENTIONED
10   DOCUMENT WAS MARKED AS EXHIBIT NO. 3 TO THE
11   TESTIMONY OF THE WITNESS AND IS ATTACHED
12   HERETO.)
13   BY MR. COLEMAN:
14      Q.    All right.  This having been received
15   into evidence, do you recognize Government's
16   Composite Exhibit Number 3?
17      A.    (Examining document).  I do.
18      Q.    And it consists of three pages.  The
19   first page of which is on the screen in front of
20   you.
21      Again, that's the instructional page; is it
22   not?
23      A.    Correct.
24      Q.    And is it signed by either of the
25   individuals who reviewed these photographs?
```

1      A.    It is.

2      Q.    And who?

3      A.    Mark Burroughs.

4      Q.    All right.  And what date did

5    Mr. Burroughs sign this?

6      A.    July 20th, 2009.

7      Q.    And did you sign as a witness?

8      A.    I did.

9      Q.    On the second page of the Government's

10   Composite Exhibit Number 3, again, six

11   photographs.

12      Were you present to see Mr. Mark Burroughs

13   circle the photograph in the top right-hand

14   corner?

15      A.    I was.

16      Q.    And did he, in fact, initial and date

17   that photograph?

18      A.    He did.

19      Q.    And whose paragraph is that?

20      A.    Ryan Hearn.

21      Q.    Now, is that the driver's license photo

22   of Mr. Ryan Hearn?

23      A.    It is.

24      Q.    Is that the same photograph that

25   appears to be on the driver's license that was

1    seized out of the Ford Escape?

2        A.    It is.

3        Q.    Now we're reading Page 3 of

4    Government's Composite Exhibit Number 3.

5        And I will ask you again:  Were you present

6    when the photograph on the bottom -- excuse me

7    -- bottom middle photograph was marked?

8        A.    (Examining document).  Yes.

9        Q.    And who marked that photograph?

10       A.    Mark Burroughs.

11       Q.    And, in fact, his initials are under

12   the photograph.

13       A.    Correct.

14       Q.    And did he circle the Number 5?

15       A.    He did.

16       Q.    And he dated it?

17       A.    He did.

18       Q.    After July 20th, 2009, after you had

19   presented these photographic displays to both

20   Mr. Gillentine and Mr. Burroughs, did it come to

21   your attention that Mr. Burroughs and

22   Mr. Gillentine might have been shown an

23   individual photograph of both the individuals

24   identified in these photo spreads?

25       A.    It did.

1      Q.    How did that come to your attention?

2      A.    When I presented both Mr. Burroughs and

3   Mr. Gillentine with the lineups, I thought it

4   was usual how quickly they were able to identify

5   the photos.

6      After leaving the Gold Exchange, I contacted

7   Ricky Payne and asked him if --

8      Q.    And he was the police chief in

9   Nettleton.

10     A.    Correct.  I asked him if Mr. Burroughs

11  and Mr. Gillentine had been shown individual

12  photos, and he acknowledged that he had done so.

13     Q.    During the course of your

14  investigation, did you determine which photo of

15  Mr. Hearn had been showed -- shown do

16  Mr. Gillentine and Mr. Burroughs?

17     A.    I did.  I determined that Ricky Payne

18  had shown them a -- actually shown them

19  Mr. Hearn's driver's license.

20          MR. COLEMAN:  I tender the witness,

21  Your Honor.

22          THE COURT:  Let me ask one question

23  before you proceed.

24          Officer, when you showed Mr. Gillentine

25  and Mr. Burroughs the photo lineup, did you show

```
 1    it to them separately, or were they in each
 2    other's presence?
 3              THE WITNESS:  They were in each other's
 4    presence.
 5              MR. COLEMAN:  Based on your question,
 6    may I follow up, Your Honor?
 7              THE COURT:  (Nodded head
 8    affirmatively).
 9    BY MR. COLEMAN:
10       Q.   If you would, elaborate on that as far
11    as just the circumstances of them.
12       I know they were in the same room, but how
13    did it transpire, please?
14       A.   Well --
15              MR. COLEMAN:  If the Court will allow
16    it.
17              THE COURT:  That will be fine.
18       A.   They -- we were in the Gold Exchange,
19    and there is a long glass display case that they
20    were standing on one side of, and I was on the
21    other.
22       I had placed the lineups for each individual
23    on the -- on top of the glass case, and I had
24    separated them.  But when I stepped back to
25    allow them to -- to view the -- the lineups
```

1   themselves, they scooted right back up next to

2   each other.

3           MR. COLEMAN:  May I ask another

4   question, Your Honor?

5           THE COURT:  (Nodded head

6   affirmatively).

7   BY MR. COLEMAN:

8       Q.    Did they appear to be communicating

9   with one another or discussing which photograph

10  to choose?

11      A.    (No response).

12      Q.    You testified earlier that there was no

13  hesitation.

14      A.    Correct.

15      Q.    So describe that -- what you meant, if

16  you will.

17      A.    While they were looking at the

18  photographs, they didn't discuss with each

19  other -- you know, they didn't say, is this guy

20  it, or, is that guy it?  They did their

21  selections, and after their selections and after

22  I took the photo lineups back, they then

23  discussed it.

24      Q.    It wasn't until after they had both

25  marked the photos that they discussed who they

```
 1   had marked or which photograph --
 2       A.   Correct.
 3       Q.   -- is that correct?
 4       A.   That's correct.
 5            MR. COLEMAN:  Thank you, Your Honor.
 6            THE COURT:  Mr. Davis.
 7            MR. DAVIS:  May I proceed, Your Honor?
 8            THE COURT:  Uh-huh (affirmative
 9   response).
10                  CROSS EXAMINATION
11   BY MR. DAVIS:
12       Q.   Good morning, Agent Stallings.
13       A.   Good morning.
14       Q.   My name is Chip Davis.  I represent
15   Ryan Hearn.
16       Agent Stallings, I'm looking at Government's
17   Exhibits 2 and 3, and I notice that both are
18   dated January 20th, 2009; is that correct?
19       A.   July 20th, 2009.
20       Q.   July 20th, 2009.  And I'm also -- you
21   were in the courtroom when Mr. -- when Deputy
22   Payne testified; is that correct?
23       A.   That's correct.
24       Q.   You heard Deputy Payne testify that he
25   showed Mr. Burroughs and Mr. Gillentine the
```

1   driver's license photograph on July 13th; is
2   that correct?
3        A.   That's correct.
4        Q.   Approximately seven days prior to this
5   photo lineup.
6        A.   Correct.
7        Q.   Okay.  And this is the photograph that
8   was shown to them prior to the lineup, correct?
9        A.   Correct.
10       Q.   And that's the exact same photograph
11  that they identified in the spread.
12       A.   Correct.
13       Q.   All right.  Now, did -- were you also
14  present when Deputy Payne made the comment that
15  Mr. Hearn had a funny -- funny look on his face
16  and he just knew that was his man or something
17  to that effect?
18       A.   Yes, sir.
19       Q.   Okay.  And he just knew that was his
20  man earlier in the same day as to when he was
21  presenting the driver's license picture to
22  Mr. Burroughs and Mr. Hearn (sic); is that
23  correct?
24       A.   That's correct.
25       Q.   Okay.  And you would acknowledge that

1    that situation is simply rife with sub- --

2    subjectivity or, in other words, suggestiveness

3    as to who robbed the store.

4        A.    Well, I can't speak for Mr. Payne's

5    motives or what he did, but what other evidence

6    they had before then, I don't know.

7        Q.    You would not have done it that way.

8        A.    No, I would not have.

9        Q.    And you acknowledge that it's improper

10   police procedure to do it that way.

11       A.    In my opinion, it is.

12       Q.    Now, you testified that you were

13   surprised as to the speed with which

14   Mr. Burroughs and Mr. Gillentine picked out

15   Mr. Hearn's photograph, correct?

16       A.    Correct.

17       Q.    And you were so surprised, in fact, you

18   called Deputy Payne -- or at that time Chief

19   Payne and said, hey, Chief Payne, something is

20   going on, correct?

21       A.    Correct.

22       Q.    All right.  When the two men scooted

23   close back together -- you had obviously

24   separated them for a reason; is that correct?

25       A.    That's correct.

1      Q.    And the reason is, is so they wouldn't

2    see which photograph the other one was

3    circling --

4      A.    Uh-huh (affirmative response).

5      Q.    -- which is proper procedure?

6      A.    Correct.

7      Q.    When they scooted back together, one

8    could see which photograph the other was

9    circling.

10     A.    If they had looked.

11     Q.    If they had looked.  All right.  Now, I

12   wonder -- had you been in communication with

13   Deputy Payne prior to presenting this

14   photographic lineup to Mr. -- Mr. Gillentine and

15   Mr. Burroughs?

16     A.    Very briefly.

17     Q.    All right.  Why didn't he tell you that

18   they had already identified the guy's picture?

19     A.    I don't know.  I can't speak for him.

20     Q.    All right.  But he didn't give you that

21   piece of information, did he?

22     A.    No, he didn't.

23          MR. DAVIS:  Your Honor, that's all I

24   have.

25          THE COURT:  All right.  Any re-direct?

1          MR. COLEMAN:  Very, very brief, Your

2     Honor.

3                    RE-DIRECT EXAMINATION

4     BY MR. COLEMAN:

5        Q.   Agent Stallings, when you showed the

6     display to Mr. Gillentine and Mr. Burroughs, did

7     you ask them if they had been shown a photo of

8     the -- any of the suspects?

9        A.   I didn't.

10       Q.   Okay.  You didn't have any idea they

11    had been shown so you -- there was really no

12    reason --

13       A.   That's correct.

14       Q.   Okay.  You thought you were coming in

15    fresh with a photo display?

16       A.   That's right.

17       Q.   Okay.

18          MR. COLEMAN:  Thank you.

19          THE COURT:  You may step down.

20          (TESTIMONY CONCLUDED AT 10:50 A.M.)

21          THE COURT:  Who do you want to call

22    next?

23          MR. COLEMAN:  Your Honor, the

24    Government calls Mr. Mark Burroughs.

25          THE COURT:  All right.  Bring in

Mr. Burroughs.

(SHORT PAUSE).

MARK BURROUGHS,

having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COLEMAN:

Q.    Could you state your name for the record, please.

A.    Mark Burroughs.

Q.    Mr. Burroughs, have you ever testified in Federal Court before?

A.    No, sir.

Q.    All right.  Well, you're not nervous?

A.    No.

Q.    Okay.  Good.  Where do you live, Mr. Burroughs?

A.    Nettleton, Mississippi.

Q.    And what is your present occupation?

A.    I own a pawn shop in Nettleton.

Q.    All right.  And the -- a pawn shop by the name of?

A.    The Gold Exchange.

Q.    The Gold Exchange?

A.    Yes, sir.

```
 1       Q.    And you're the owner of it now?
 2       A.    Yes, sir.  Now, yes, sir.
 3       Q.    All right.  Now, back in July -- in
 4  particular July 9th, 2009, you weren't the owner
 5  of the Gold Exchange at that time, were you?
 6       A.    I just worked there.
 7       Q.    Okay.  I believe it was owned by your
 8  present wife; is that correct?
 9       A.    My wife and her partner, yes.
10       Q.    Okay.  And your wife's name?
11       A.    Angela Burroughs.
12       Q.    Okay.  At the time -- I'm sorry.  Back
13  in 2009 before you married, she was Angela --
14       A.    Galbreath.
15       Q.    Okay.  And her partner??
16       A.    Barb Christianson.
17       Q.    All right.  And they were the persons
18  who held the Federal Firearms' license,
19  correct?
20       A.    Yes, sir.
21       Q.    Okay.  So in July of 2009, you were
22  working as an employee of the store, which was a
23  Federal Firearms' licensee and business who was
24  selling firearms and pawning items; is that
25  correct?
```

```
 1        A.    Yes, sir.
 2        Q.    Now, are you related to Mr. James
 3   Gillentine?
 4        A.    I'm his son-in-law.
 5        Q.    Okay.  His daughter is one of the
 6   ladies you just mentioned.
 7        A.    That's right.
 8        Q.    Okay.  Who is now your wife.
 9        Now, back on July 9th, 2009, were you there
10   at the business with someone?
11        A.    Yeah, with my father-in-law, Mr. James.
12        Q.    Okay.  Now, I understand the way this
13   business is set up, you had two offices in a
14   building; is that correct?
15        A.    That's right, yes, sir.
16        Q.    One office for --
17        A.    The car lot -- we had G&G Auto
18   Exchange, and the other business is the pawn
19   shop.
20        Q.    You worked the pawn shop side and --
21        A.    I worked them both.
22        Q.    You worked -- okay.
23        A.    Yeah, whatever needed to be done.
24        Q.    All right.  So that morning, you were
25   in one of the offices with Mr. Gillentine; is
```

1   that correct?

2       A.   We were in the car lot office, yes,

3   sir.

4       Q.   Okay.  And what, if anything, usual

5   happened while y'all were there?

6       A.   Well, we were sitting there, and this

7   little SUV, little Ford Escape, charcoal color,

8   pulls up kind of over in front of the pawn

9   shop.  I looked around and thought it was my

10  nephew because he's got one that color.

11      I looked around and said, well, that's not

12  Logan, so they backed -- they weren't there.  In

13  no time, they backed out and left, and I said,

14  well, okay.  So I was just sitting there, and

15  we're sitting on a big picture window.

16      Q.   What kind of vehicle did you --

17      A.   It was a Ford Escape.

18      Q.   I'm sorry.

19      A.   A Ford Escape.

20      Q.   And that's what your nephew had?

21      A.   Yes, sir.

22      Q.   Okay.  So did you --

23      A.   That's why I thought it was him, you

24  know.

25      Q.   Okay.

1      A.    But, anyway, they backed out and left,

2   and I said, well, okay, you know.  It wasn't a

3   couple, three minutes that they come back and

4   pulled right up in front of the picture window.

5      And, of course, I'm sitting on a -- on the

6   sofa -- on the arm of the sofa just facing the

7   window.  My daddy-in-law was sitting in the

8   recliner right by the window, and, you know,

9   that's -- that's when they got out.

10      Q.    Okay.  Now, when a vehicle pulls in in

11   front of the business --

12      A.    Yes, sir.

13      Q.    -- how close would the individuals --

14   when they step out of the vehicle, how close

15   would they be to you?

16      A.    From here to that rail right there in

17   front of you.  Well, they're closer than that.

18      Q.    Approximately 5 or 6 feet?

19      A.    Just stand right there.  I would say

20   about right there.

21      Q.    Okay.

22          MR. COLEMAN:  Your Honor, I would ask

23   the record to reflect the witness has described

24   approximately 6 feet --

25          THE COURT:  Okay.

```
 1            MR. COLEMAN:  -- from the store
 2    window --
 3    BY MR. COLEMAN:
 4        Q.   Did the car pull right up to the
 5    sidewalk --
 6        A.   Right up --
 7        Q.   -- of the business; is that --
 8        A.   It pulled right up to the front of the
 9    business.
10        Q.   Okay.  So the vehicle pulls in, and
11    what happens?
12        A.   Well, the driver gets out, and I look
13    at him.  I just kind of noticed he had -- it was
14    the dreadlock look hair that kind of got my
15    attention.  He had on a shirt, and I was just
16    watching him go up.  Then the passenger was
17    getting out, and I said --
18        Q.   Let me get you to follow up real quick.
19    You said the dreadlock look.
20        Do you know the difference in cornrow and
21    dreadlock?
22        A.   I don't.
23        Q.   Does that mean anything to you?
24        A.   I don't.
25        Q.   Okay.  What is a dreadlock hairstyle to
```

1   you?

2       A.    It looked like it was just a -- it was

3   just like a -- it looked like it was that big

4   round of hair, and it just comes out, you know

5   -- (witness demonstrating).

6       Q.    Okay.  Is that something you -- is that

7   common in Nettleton?

8       A.    Uh-uh (negative response).

9       Q.    Was it common for your customers who

10  came into your store to have --

11      A.    No, sir.

12      Q.    -- that hairstyle?

13      A.    That was a rarity to me.  That's why it

14  kind of caught my attention, you know.

15      Q.    Okay.

16      A.    When he gets out and walks around, I'm

17  just staring at him, and I said, well, let me

18  see what these guys need.

19      Q.    All right.  What about the other -- the

20  passenger in the vehicle?

21      A.    Well, he -- I wasn't staring right dead

22  on him.  I was looking more at the driver.  When

23  he got out and walked passed -- the passenger

24  got out, he was kind of behind him and shut the

25  door and I just -- I looked at him, but I was

1   staring more at the driver.  You know, he just

2   -- like I said, he just got my attention.

3       Q.   Okay.  Are you still sitting there just

4   looking out this -- this window?

5       A.   Yeah, they were walking by, and I said,

6   well, let me go see what they're doing, when

7   they went by the window.

8       Q.   All right.  Would they have known you

9   were sitting there looking at them?

10      A.   No, uh-uh (negative response).

11      Q.   Why not?

12      A.   It was -- it's kind of weird.  The way

13  that it's shaded -- they had blinds, but they

14  were like this.  (Witness demonstrating).  Do

15  you know what I'm saying?

16      Q.   Okay.  Was the window tinted?

17      A.   Well, it's just kind of in that shaded

18  area.  You can't really see in, but in the

19  daytime when the sun hits it, you can see in.

20  So I'm going to say it was just a shaded --

21      Q.   Okay.

22      A.   -- shaded part of the morning.

23      Q.   All right.  So you say you're sitting

24  there, and you see them walking towards the pawn

25  shop?

1    A.    Yeah, uh-huh (affirmative response).

2    Q.    What are you doing?

3    A.    I'm just sitting there talking to my

4    daddy-in-law.

5    Q.    Did you have any paperwork with you?

6    A.    Well, I was holding onto a car lot

7    file.  I was sitting there holding it so I could

8    remember to write it down.

9    Q.    Okay.

10    A.    You know, I said, well, let me see what

11    they're doing, so I get up.  Between the car lot

12    office and the pawn shop, there's a little

13    kitchen.  You have to walk through the kitchen

14    to get into the pawn shop.

15    Okay.  So I just walked through there, and I

16    laid my file down on the glass and I started

17    working on it.  I heard the door open.  It had a

18    little ding there and it just -- and I said,

19    hey, fellows, what's going on, and that was it.

20    Q.    Okay.  All right.  You had paperwork.

21    Were you looking down?

22    A.    Yeah, uh-huh (affirmative response)?

23    Q.    All right.  You heard the bell?

24    A.    Yeah.

25    Q.    You actually spoke and --

```
 1        A.    Yeah, I just said -- I was like this,
 2   hey, fellows, what's going on?   (Witness
 3   indicating).
 4        Q.    And what do you next remember?
 5        A.    Waking up.
 6        Q.    Okay.
 7        A.    I remember --
 8        Q.    Do you know -- do you know who hit you?
 9        A.    Do I know who hit me?
10        Q.    Yeah, did you see who hit you?
11        A.    I did not see who hit me, no, sir, I
12   didn't.
13        Q.    All right.  Where were you hit?
14        A.    Where was I hit?
15        Q.    Yes, sir.
16        A.    On the right side right here.   (Witness
17   indicating).  I had my head down, and from what
18   happened -- as it looked, they hit me right here
19   because I had my head down.  They broke my
20   nose.  I had to have stitches put over my eye,
21   and they knocked my orbit (phonetic) loose in my
22   eye.  It's my eyeball, actually.
23        I don't know what that is, but they said
24   they knocked it loose.  I went to the eye doctor
25   and he looked at it, and he said it was one of
```

1     those fence straddling deals.  He said, I

2     wouldn't do surgery.  Let's see what's going to

3     happen.  He said, we're trying not to do surgery

4     on it.

5          Q.    Okay.  But, I mean, I -- you were out?

6          A.    Yeah.

7          Q.    Did it knock you out?

8          A.    Yeah.

9          Q.    Did you go to the floor?

10         A.    Oh, yeah.

11         Q.    Okay.  Where did you fall?

12         A.    If I was standing here, we have a

13    filing cabinet right behind me in a little bitty

14    concave, a little spot right there, with some

15    drawers, and I fell between them.  It wasn't

16    real wide.  How I got between them, I don't

17    know, but, I mean, that's where I fell.

18         Q.    Okay.  When you came to, what do you

19    remember?

20         A.    The first thing I remember when I woke

21    up was the door -- the drawer was open right

22    over my head.  That thing never stays open, and

23    it was open when I got up.

24         Q.    What did you keep in the drawer?

25         A.    We've got money in it.

1    Q.    Okay.   The drawer was open, and what
2  else?
3    A.    Well, I got up, and I was looking
4  around.   And, like I said, I was hollering for
5  James, my father-in-law.   I went back in through
6  the kitchen to the -- to the car lot where he
7  was sitting, and I couldn't find him.
8    Okay.   I was like, he don't know where
9  anybody is at, so I go back into the pawn shop
10  and I'm just standing there kind of thinking,
11  what in the world?
12    I kept seeing blood on the floor, and
13  finally I realized it was mine.   It kind of got
14  me like, okay.   Here we are, you know.   I was
15  just standing there trying to compose myself, I
16  guess you would say, when he come running
17  through the door.   My daddy-in-law come running
18  through the front door.
19    Q.    What did he say?
20    A.    He was hollering, my gun.   My gun.
21  And, me, I remember this because I was standing
22  there propped up.   He said, my gun.   My gun, and
23  I said, that's right.   He said, give me my gun,
24  and I said, oh, okay.
25    You know, I was still out of gear there for

1    a minute.  So I went over and grabbed the gun

2    and handed it to him, and he runs out of the

3    door.  And I'm still like, what's going on, you

4    know.

5        Q.   Did you hear -- okay.  After you gave

6    him the pistol, did you hear shots fired?

7        A.   I did.

8        Q.   And then did some other people

9    arrive --

10       A.   Yeah, the --

11       Q.   -- shortly after?

12       A.   -- law enforcement showed up.  The

13   ambulance showed up.  TV4 showed up.  I don't

14   know how they got there that quick, but they

15   showed up.  I think TV9.  You know, it was just

16   packed in there for a minute, and I couldn't

17   figure it out.  But, yeah, there was some people

18   coming on up there shortly after.

19       Q.   All right.  On a later date, do you

20   remember Chief Ricky Payne bringing a driver's

21   license or a driver's license with a photo to

22   you and showing it to you?

23       A.   Yes, sir.

24       Q.   Do you remember what date that was?

25       A.   It was a few days after it happened.

1    I'm trying to think of the date.

2        Q.    Just a few -- within a week?

3        A.    Yeah, yeah, it was within -- less than

4    a week, sure, yes.

5        Q.    Let me show you what's been marked

6    Government's Exhibit Number 1.

7        Can you see that --

8        A.    (Examining document).  Yeah.

9        Q.    -- on the screen in front of you?

10       A.    Yes, sir.

11       Q.    All right.  What is that?

12       A.    That's a Mississippi driver's license.

13       Q.    Okay.  Can you see the photograph well

14   enough to --

15       A.    Yes, sir.

16       Q.    -- to testify as to whether or not this

17   is, in fact, a photocopy of the driver's license

18   that was shown to you by Officer Payne?

19       A.    Yes, sir, that's it.

20       Q.    When he showed you that photograph, did

21   you recognize the person in the photograph?

22       A.    Oh, yeah.

23       Q.    How did you recognize him; from what

24   circumstance?

25       A.    Well, just the way he looked from the

```
 1   hair.  That got me right off the bat.  I said,

 2   that's him.  I said, I know that's him.

 3       Q.   Anything other than his hair?

 4       A.   I mean, just the hair and just, you

 5   know -- I mean, like I said, when he walked in

 6   front of the picture window, I was just staring

 7   at him like, my goodness, so I -- it just caught

 8   my eye.  I remembered him.

 9       Q.   Did you have an opportunity to see that

10   he was a black male?

11       A.   Oh, yeah.

12       Q.   Okay.

13       A.   Yeah.

14       Q.   And facial features, did you notice

15   anything?

16       A.   Not really, no, sir.

17       Q.   But you recognize the person in the

18   photograph as the person who came up to the

19   store in the Ford Escape and walking passed the

20   window the --

21       A.   That's right, yes, sir.

22       Q.   -- the morning that this occurred?

23       A.   Yes, sir.

24            MR. COLEMAN:  The Court's indulgence

25   for one moment.
```

```
 1              (SHORT PAUSE).
 2    BY MR. COLEMAN:
 3       Q.   Now, approximately 11 days after the
 4    robbery -- seven days -- about a week after you
 5    had been shown the photo by -- by Chief Payne on
 6    July 20th, 2009, do you recall being shown a
 7    group of photographs by Agent Dale Stallings?
 8       A.   Yes, sir.
 9       Q.   Who was -- well, let me ask you this:
10    Where were you, at the Gold Exchange?
11       A.   Yes, sir.
12       Q.   And you were there with Mr. Gillentine
13    --
14       A.   Yes, sir.
15       Q.   -- just the two of you and
16    Mr. Stallings -- Agent Stallings; is that
17    correct?
18       A.   Yes, sir.
19       Q.   On the screen in front of you, I want
20    to show you what's been marked as Government's
21    Exhibit Number 3.  It is a composite exhibit
22    consisting of three pages.
23       Do you recognize that first page?
24       A.   (Examining document).  Yes, sir, I do.
25       Q.   How do you recognize that?
```

```
 1        A.    Well, it's got my signature on it, and
 2   I dated it the day that I saw it.  I was asked
 3   to look at that and read it over before he
 4   showed me some pictures.
 5        Q.    Okay.  And was it read to you, or did
 6   you read it yourself?
 7        A.    I read it myself, yes, sir.
 8        Q.    On the second page of that composite,
 9   there is a series of six photographs.  The top
10   right-hand photograph has been circled.
11        Do you know who circled that photograph?
12        A.    (Examining document).  I did.
13        Q.    How do you know that?
14        A.    Because he asked me to pick out the man
15   that I saw getting out of the car that day, and
16   I -- I said, that's him right there, and I
17   circled it and put my initials on it and dated
18   it.
19        Q.    Did you hesitate any?
20        A.    No.  I didn't have to.
21        Q.    Now, I understand this was after you
22   had been shown what I previously showed you as
23   Government's Exhibit Number 1, the driver's
24   license by Deputy Payne.
25        A.    Okay.
```

1    Q.    Was your identification of Mr. Hearn on

2    July 20th based on your -- on what you remember

3    seeing the date of the robbery?

4    A.    Yes.

5    Q.    As was your identification of him from

6    the driver's license that was shown to you

7    previously; is that correct?

8    A.    Right.

9    Q.    The third page of Government's Exhibit

10   Number 3 is another set of photos.

11   Did you also mark that photograph?

12   A.    (Examining document).  Yes, sir, I did.

13   Q.    And you marked that as being the person

14   that you also identified from being at the Gold

15   Exchange the date of the robbery?

16   A.    Yes, sir.  I circled it and initialed

17   it and dated it, yes, sir.

18   Q.    Thank you.  When you chose the photos

19   of both individuals as the ones being there on

20   the date of the robbery, did Agent Stallings or

21   anyone else suggest to you or in any way

22   indicate you should circle a particular

23   photograph?

24   A.    No, sir.  No, sir.

25   Q.    So based on your memory of the events

1    of that day and seeing the individuals who came

2    in the store and committed this robbery, was

3    that what you used in selecting these

4    photographs?

5       A.    That's right.

6       Q.    Now, I just showed you the photographs

7    of two individuals.  One in particular that you

8    said you identified was a photograph of Ryan

9    Hearn.

10      Do you -- if you looked around the

11   courtroom, have you seen an individual that you

12   would identify as Ryan Hearn here in the

13   courtroom today?

14      A.    Yes, sir.

15      Q.    Okay.  Where is he seated?

16      A.    He's sitting right over there.

17   (Witness indicating).

18      Q.    And you're pointing to --

19      A.    The man in the orange shirt.

20      Q.    The man in the orange shirt?

21      A.    Orange suit.

22      Q.    Orange suit, okay.

23         MR. COLEMAN:  Your Honor, I would ask

24   the record to reflect the witness has identified

25   the defendant.

```
1         THE COURT:  That's fine.
2    BY MR. COLEMAN:
3       Q.   When you selected Mr. Hearn's
4    photograph, Government's Exhibit -- Composite
5    Exhibit Number 3, Page 2, referred to previously
6    that had your initials and the date, did you
7    base your identification of him on the
8    opportunity you had to review him on the date
9    this crime occurred?
10      A.   Yes.
11      Q.   And what degree of attention were you
12   giving him on the date that this occurred?
13      A.   On a scale from 1 to 10, probably a 9
14   because, like I said, the hairdo just wasn't
15   something commonly you would see running around
16   town, you know.
17      It just caught me because of the fact they
18   pulled up and backed out.  You know, I'm like,
19   what -- what's going on, you know, and then they
20   come back.  I go, huh, did you -- and he's
21   walking a little fast.  You know, I was looking
22   at him.  I was like, okay.  What's up here?  So,
23   yeah, I'm going to say that done it.
24      Q.   And as you testified previously, there
25   was no hesitation.
```

1      When Agent Stallings showed you these

2  photographs, you did not hesitate?

3      A.    Oh, no.  I didn't have to, no, sir.

4      Q.    I'm sorry.

5      A.    I didn't have to hesitate, no, sir.

6      Q.    Okay.

7            MR. COLEMAN:  The Court's indulgence

8  one moment, Your Honor.

9            (SHORT PAUSE).

10           MR. COLEMAN:  We tender the witness,

11  Your Honor.

12           THE COURT:  All right.  Any cross?

13           MR. DAVIS:  May I proceed, Your Honor?

14           THE COURT:  You may.

15                   CROSS EXAMINATION

16  BY MR. DAVIS:

17     Q.    Good morning, Mr. Burroughs.

18     A.    Hey, how you doing?

19     Q.    I'm doing well.  My name is Chip

20  Davis.  I represent Mr. Hearn.

21     A.    All right.

22     Q.    Mr. Burroughs, when you were first

23  sworn in to testify, you testified that the

24  individuals who robbed you pulled up in a

25  charcoal colored Ford Escape.

1     A.    Yes, sir.

2     Q.    Is that correct?

3     A.    Yes, sir.

4     Q.    And you were able to get a clear and

5   good look at that Ford Escape?

6     A.    Yes, sir.

7     Q.    All right.  Now, you also testified

8   that your father-in-law came in afterwards and

9   asked for his gun.

10    A.    That's right.

11    Q.    All right.  What type of gun was it?

12    A.    I believe it was a 45.

13    Q.    All right.  A revolver or automatic?

14    A.    It's an automatic.

15    Q.    All right.  How -- do you recall how

16  many bullets it had?

17    A.    I have no idea.

18    Q.    Okay.  Do you recall hearing your

19  father-in-law fire shots after that vehicle?

20    A.    I did.

21    Q.    Is your father-in-law a pretty good

22  shot?

23    A.    I guess.  I don't know.

24    Q.    Do you recall hearing your father-in-

25  law tell the police or hearing your father-in-

1    law tell anybody else that he had hit that

2    vehicle several times and that the vehicle

3    should have bullet holes in it?

4        A.    I don't remember that.

5        Q.    All right.  Do you recall either

6    yourself or your father-in-law -- and I can't

7    put my hands on the statement right now.

8        But do you recall either yourself or your

9    father-in-law giving a statement identifying the

10   individual who struck you as having a cornrow

11   hairstyle?  Do you recall that?

12       A.    I don't know who hit me.

13       Q.    You don't know who hit you?

14       A.    No, sir.  I didn't see the man who hit

15   me.

16       Q.    All right.  I thought you were giving

17   him a 9 on a 9 to 10 scale.

18       A.    On a 9 to 10 -- of him coming from my

19   picture window, that's where I saw him.

20       Q.    Well, you knew he was about to come in

21   the store, didn't you?

22       A.    Sir?

23       Q.    You knew he was about to come into the

24   store.

25       A.    Yes, sir.  Yes, sir.

1      Q.    Okay.  And if you were this concerned

2    and if you were giving him that level of

3    attention, what took your attention off of him?

4      A.    Well, when I just walked in -- when I

5    walked in with that file, I just laid it down,

6    and I started working.  I've done it many of

7    times when people come in.  You know, when I'm

8    working on a file, people walk in, and so that's

9    just what I done.

10     Q.    Okay.  So your testimony today then is

11   that you saw an individual cross in front of

12   your picture window, and that individual was so

13   unusual and that individual was so unique and it

14   caused you so much concern that you were giving

15   him a 9 level of attention on a 10 scale.

16     You were paying attention to him and what's

17   going on here, and then as he was coming, you

18   then start working and looking down and not

19   paying attention.

20     Is that your -- is that your testimony?

21     A.    Yeah, when I walked in, I just laid the

22   file down and started working.

23     Q.    You didn't think it would be useful to

24   continue giving that individual your attention?

25     A.    I was just -- he was just a unique-

 1    looking person with a hairdo.  I mean, I had no

 2    idea to think that he was going to do anything,

 3    period.

 4        Q.    Okay.

 5        A.    It was just the hairdo that caught my

 6    attention.

 7        Q.    And, I believe, you also testified, did

 8    you not, that you primarily identified the

 9    photograph based upon the cornrow -- or based

10    upon the dreadlock style hair?

11        A.    Okay.  Yes, sir.

12        Q.    Okay.  And, I believe, your testimony

13    was that you noticed primarily the hair and did

14    not notice any facial features.

15        A.    Okay.

16        Q.    No, sir.  Was that your testimony?

17        A.    Oh, okay, yeah.

18        Q.    Now, Mr. Burroughs, when -- do you

19    recall Agent Stallings coming to your place of

20    business and presenting you with the two -- or

21    presenting you and your father-in-law with the

22    two photographic lineups?

23        A.    Yes, sir.

24        Q.    All right.  And tell -- tell the Court,

25    if you would, did Agent Stallings -- did he just

```
1    hand them to you?  Did he hand them to you and
2    give you specific instructions?  Did he hand you
3    one and tell you to go in an office?  What
4    happened?
5         A.    When he walked in, he handed me the
6    paperwork and told me to read that over before I
7    look at some pictures.  He said, I'm going to
8    see if you can pick the guy out, and I said,
9    okay.  My daddy-in-law -- and I believe I'm
10   right -- he moved him down that way so we
11   wouldn't be standing beside each over.  (Witness
12   indicating).
13        Q.    Okay.
14        A.    Okay.  Well, I read over it.  I signed
15   it, and I dated it.  I flipped it over and
16   looked at it, and I said, there he is.
17        Q.    Okay.  And how far away was your daddy-
18   in-law?
19        A.    Oh, he was down the showcases.  It was
20   probably the third or fourth front row chair,
21   however you want to -- you want to figure that
22   thing.
23        Q.    And did he stay down there while he
24   marked his photograph?
25        A.    Yes, sir.
```

1      Q.    Okay.   Did he move next to you before

2   he marked his photograph?

3      A.    No, sir.

4      Q.    Did he move next to you before you

5   marked your photograph?

6      A.    No, sir.   He was sitting on a chair

7   when Mr. Stallings come in.   We were just

8   separated in general.

9      Q.    So your testimony here today is that

10  Agent Stallings separated the two of you, and

11  the two of you stayed separated while you marked

12  your photographs?

13     A.    Yes, sir.

14          MR. DAVIS:   Your Honor, that's all I

15  have.

16          THE COURT:   All right.   Any re-direct?

17          MR. COLEMAN:   Very briefly, Your Honor.

18              RE-DIRECT EXAMINATION

19  BY MR. COLEMAN:

20     Q.    You were asked some cross examination

21  about your level of attentiveness to Mr. Hearn

22  because of the hairstyle you described him as

23  having.

24     You said it was dreadlocks, correct?

25     A.    Yes, sir.

1    Q.    All right.  And you kind of described

2    what those were.

3    A.    Right.

4    Q.    Other people wear their hair like that,

5    don't they?

6    A.    Okay.  Yes, sir, I'm sure.

7    Q.    I mean -- okay.  You've seen other

8    people with dreadlocks like --

9    A.    Yeah, I sure have.

10   Q.    Okay.  I mean, it may not be common in

11   Nettleton, but you have seen it.

12   A.    Yes, sir.

13   Q.    And you wouldn't just pick his photo

14   out because he had that hairstyle, would you?

15   A.    No, sir.

16   Q.    Then was it based on other --

17   A.    Well, I just saw --

18   Q.    -- characteristics?

19   A.    -- I just -- I just saw his face.  I

20   knew him when I saw him.  Okay?  You know, I

21   don't know if the hair had something to do with

22   it, but when I saw his face go in front of me

23   and he showed me those pictures, that hit me

24   that that was him.

25   Q.    Okay.  Well, I just want to make sure

because on cross examination it -- well, let me just say this:  It wasn't solely based on the dreadlocks, but your identification of him was also based on your having seen his facial features.

    Is that a fair statement?

    A.   Yes, sir.

        MR. COLEMAN:  Thank you.  Nothing -- nothing further, Your Honor.

        THE COURT:  All right.  You can step down.

        THE WITNESS:  Thank you.

        (TESTIMONY CONCLUDED AT 11:20 A.M.)

        THE COURT:  Let's take a short recess, about five minutes.

        (WHEREUPON, THERE WAS A SHORT BREAK, AND THE PROCEEDINGS THEN CONTINUED AS FOLLOWS:)

        THE COURT:  Who would you call next?

        MR. COLEMAN:  Your Honor, the Government will call Mr. James Gillentine.

        (SHORT PAUSE).

            JAMES GILLENTINE,

having been first duly sworn by the Clerk, was examined and testified as follows:

        MR. COLEMAN:  May I proceed, Your

```
1    Honor?
2              THE COURT:  You may.
3              MR. COLEMAN:  Thank you.
4                   DIRECT EXAMINATION
5    BY MR. COLEMAN:
6        Q.   State your name for the record, please.
7        A.   Pardon.
8        Q.   State your name.
9        A.   James Gillentine.
10       Q.   Okay.  Mr. Gillentine, where do you
11   live?
12       A.   I live in Aberdeen.
13       Q.   And what is your current occupation?
14       A.   I run a grocery store right now.
15       Q.   Okay.  Is that in Monroe County?
16       A.   No.  It's in Lee County.
17       Q.   Lee County, Richmond.
18       A.   That's correct.
19       Q.   Now, Mr. Gillentine, let me call your
20   attention back to July 9th, 2009.
21       And let me ask you:  What were you doing at
22   that time as far as your occupation or your
23   business?
24       A.   G&G Auto Exchange, a car lot.
25       Q.   And was that located in Nettleton,
```

1   Mississippi?

2       A.    It was.

3       Q.    And was it also a business that had

4   adjoining offices with the Gold Exchange Gun and

5   --

6       A.    Side-by-side.

7       Q.    Side-by-side?

8       A.    Uh-huh (affirmative response).

9       Q.    Did they have an adjoining door?

10      A.    They did.

11      Q.    Okay.  And, I believe, the Gold

12  Exchange was at that time owned by your

13  daughter; is that correct?

14      A.    That's correct.

15      Q.    And she has since sold it to her

16  husband, who she is now married to,

17  Mr. Burroughs, who just testified before this

18  Court.

19      A.    I think so.

20      Q.    Okay.  Now, on July 9th, 2009 in the

21  morning hours, were you there with

22  Mr. Burroughs?

23      A.    I was.

24      Q.    And what were y'all doing?

25      A.    We was sitting in the car lot office.

```
1       Q.    And did anything unusual happen?

2       A.    Yes.

3       Q.    And what was that?

4       A.    Two black males pulled up right in

5   front of the car lot office.

6       Q.    Okay.  What -- what was unusual about

7   that?

8       A.    They got out and started in the pawn

9   shop.

10      Q.    Okay.  Let me say:  It wasn't unusual

11  that they drove up and they got out --

12      A.    No, sir.

13      Q.    -- but did you see them drive up?

14      A.    I did.

15      Q.    All right.  And were they driving a

16  Ford Escape?

17      A.    They was.

18      Q.    And did you see the driver as he got

19  out of the vehicle?

20      A.    Yes, sir.  It is all glass there.  You

21  can see through the mirror glass.  They couldn't

22  see me, but I could see them.

23      Q.    Okay.  And did you -- when you were

24  sitting in the office of the auto sales, when

25  you say you saw them pull up, how far were you
```

1    from them when they got out of the vehicle?

2        A.    When they got out of the vehicle, it

3    was -- they walked right by the door.

4        Q.    Okay.  Well, let me ask you this:  The

5    vehicle itself -- when they pulled up in the

6    parking space and you're sitting there looking

7    at it, how close is it to you?

8        A.    I would say less than 10 foot.

9        Q.    Okay.  Less than 10 feet.  They get out

10   of the vehicle and --

11       A.    Real close.

12       Q.    Real close?

13       A.    (Witness nodded head affirmatively).

14       Q.    Okay.  Can you describe the driver of

15   the vehicle?

16       A.    Well, he had long Jheri curls and

17   probably around 6 foot and kind of thin, not

18   heavyset.

19       Q.    Okay.  Now, let me ask you this:  When

20   you say, Jheri curls, do you also refer to that

21   hairstyle as cornrow?

22            MR. DAVIS:  Your Honor, I object to

23   leading.

24   BY MR. COLEMAN:

25       Q.    Did you say --

```
 1            THE COURT:  Sustained.  You're leading
 2    the witness.
 3    BY MR. COLEMAN:
 4        Q.   You said he had Jheri curls.
 5        A.   Well, he had the long hair, and it was
 6    plaided -- or braided on there, and there was
 7    bunches of them.
 8        Q.   All right.  Was it close to his head?
 9    Were you describing a hairstyle that would be
10    close to your head or something kind of --
11        A.   Hanging down.
12        Q.   Hanging down kind of like ponytails?
13        A.   It wasn't like ponytails, but they was
14    plaided.
15        Q.   Okay.  Was it all over his head?
16        A.   Yes, sir.
17        Q.   Did you see the other -- the passenger
18    of the vehicle get out?
19        A.   I did.
20        Q.   And I think you stated earlier that
21    they walked right passed the window.
22        A.   Right by me.
23        Q.   All right.  And were you -- were you
24    watching them as they walked by?
25        A.   I was.
```

1    Q.   Was your attention called to them for
2  any particular reason?
3    A.   What do you mean?
4    Q.   I mean, was there some reason -- was
5  there any reason you were watching them more
6  closely than you normally would of somebody that
7  had just pulled up?
8    A.   I really wasn't watching them that
9  close.  I mean, they just right -- were right in
10  their face -- right in my face there.  When they
11  got out, they walked right up to the door, and
12  nothing was said.  They walked over to the pawn
13  shop.
14    Q.   All right.  Now, you said they walked
15  -- they walked into the pawn shop.
16    Did you go --
17    A.   They started over to the pawn shop --
18    Q.   Okay.
19    A.   -- and Mark, my son-in-law, said, I
20  better go wait on them.
21    Q.   And what did he do then?
22    A.   Well, he screamed, James, and fell
23  against the filing cabinet, and I knew something
24  had happened.  So I run to the door, and this
25  guy with all of those Jheri curls or whatever

1    you call them hanging on his face was jumping

2    over the counter.

3        Q.   All right.   Jumping over the counter?

4        A.   Back over the showcase.   And he had --

5    he had the money in his hand, a wad like that,

6    and he started out the front door.   (Witness

7    indicating).

8        And I know there was another guy in there,

9    so I was afraid to run up in there.   I run back

10   in the car lot office, and he come right by the

11   door.   I'm talking about right by the door.

12       Q.   Now, when you say, right by the door,

13   this is a door --

14       A.   In the car lot office.

15       Q.   -- that goes out onto the -- where the

16   car is parked out onto the street?

17       A.   Out where his car was parked.

18       Q.   Okay.   Not the adjoining door to the

19   business?

20       A.   No, sir.

21       Q.   Okay.   And so you exited the building?

22       A.   And when he come by the door, I

23   attacked him because he didn't know I was in

24   there.

25       Q.   Okay.

```
 1        A.    I opened the door, and I turned around
 2   and tackled him.
 3        Q.    All right.  Tackled him?
 4        A.    Yeah, we fought face-to-face.
 5        Q.    Okay.  And did you actually go to the
 6   ground?
 7        A.    We did.
 8        Q.    Were you holding on to him?
 9        A.    We fist fought, and I got him by the
10   Jheri curls.  We got on the ground, and we
11   was -- we was fighting out there.
12        Q.    Okay.  And --
13        A.    The other guy is the one that got me
14   off of him.
15        Q.    All right.  While y'all were on the
16   ground, did you have an opportunity again to
17   look at him?
18        A.    Well, I could have hit him, or he could
19   me either one.  We was that close.  (Witness
20   indicating).
21        Q.    Okay.  You just held your hand up to
22   your face.
23        Y'all were just face-to-face; is that what
24   you're --
25        A.    Face-to-face.
```

```
1       Q.      Pardon.

2       A.      We was face-to-face --

3       Q.      Okay.

4       A.      -- all over each other.

5       Q.      And then what happened?

6       A.      Well, the -- the little guy come out

7    there and hit me and got me off of him, and I

8    rolled off out of the way.  They got in the car

9    and left.

10      Q.      You said he -- let me back up just a

11   minute.  You had mentioned that when you saw the

12   person with the hair that you described as being

13   Jheri curls or the one with the hair that was

14   different -- a different hairstyle, you said he

15   jumped over the counter with money in his hand?

16      A.      That's right.

17      Q.      Where was the money when the fight was

18   going on?

19      A.      It was in -- oh, he had throwed it in

20   the car.

21      Q.      Okay.  You saw him do that?

22      A.      Yes, sir.

23      Q.      Okay.  And that was right before you

24   tackled him?

25      A.      That's when I attacked him.
```

1      Q.    When you tackled him?

2      A.    Uh-huh (affirmative response).

3      Q.    Okay.  All right.  Now, you said that

4  this other person got -- got -- got him off of

5  you?

6      A.    That's right.

7      Q.    And what did you do?

8      A.    I didn't do nothing but I had a -- they

9  got in the car and left, and I run up in the

10  shop and got a gun out there in the pawn shop.

11  And I fired a couple of shots at them, but they

12  had done got on the highway.

13      Q.    Okay.  When you fired the shots, were

14  they -- were they a pretty good distance from

15  you?

16      A.    (No response).

17      Q.    Well, let me just ask you:  How far

18  would you estimate they were when you fired the

19  shots?

20      A.    Well, they had done backed out on the

21  highway, so I would say 50 foot, maybe more, 75

22  or 100.  I don't know exactly.

23      Q.    You weren't there -- they weren't still

24  sitting in the parking space, though?

25      A.    No.

1    Q.    They had already pulled out?

2    A.    Yes, sir.

3    Q.    Okay.  Now, after you fired the shots,

4  did you go in to check on Mr. Burroughs?

5    A.    I did.

6    Q.    And who else arrived there on the

7  scene?

8    A.    Well, the police and all of the

9  neighbors and the news people and, I think, the

10 ambulance.

11   Q.    All right.  You mentioned the news

12 people.

13   Did you offer a $1,000 reward for

14 information?

15   A.    I did.

16   Q.    Some time after the date this occurred,

17 did -- did anyone respond to that offer for a

18 reward?

19   A.    Yes.  This guy come to me -- come to my

20 house, as a matter of fact, and told me he knew

21 who did it.  He was up in the house with them,

22 and he knew who did it, that they were bragging

23 about it and all.

24   Q.    Okay.  And what information did this

25 individual provide to you?

1        A.    Well, he took me and showed me where

2    they was at.

3        Q.    All right.

4        A.    He showed me the house they was in.

5        Q.    He took you where?

6        A.    To Verona.

7        Q.    And after you went to Verona, what did

8    you do?

9        A.    I called Ricky Payne and told him about

10   it, and they come up there and met with Verona

11   police.  And they went over -- I took them by

12   there and showed them where the house was and --

13       Q.    All right.  When you took them by

14   there, did you see anybody that -- that you

15   thought was one of the people that had been in

16   the store?

17       A.    No, sir.

18       Q.    Okay.  So you took Ricky Payne and

19   other law enforcement officers to the house on

20   Panel Street.

21       Did you stay there while they questioned the

22   individuals?

23       A.    I did not.

24       Q.    What did you do?

25       A.    Well, the guy told me where the car

1   was, and I went over to Plantersville where the

2   car was.  He showed me where the car was, and I

3   called Ricky Payne.  And after all of this was

4   over with, he -- he come on over there, and they

5   searched the car.

6       Q.    Now, when Chief Payne got to where

7   the -- the car, that would be the Ford Escape --

8   that was in Plantersville; is that correct?

9       A.    It was.

10      Q.    And you were there at the scene.

11      When Chief Payne got there, did he have a --

12  did you notice if he had a key to the vehicle?

13      A.    I don't remember.

14      Q.    Okay.  Do you recall him getting in the

15  vehicle --

16      A.    He did.

17      Q.    -- opening the door to the vehicle?

18      A.    He did.

19      Q.    All right.  To your knowledge, did he

20  retrieve anything from the vehicle?

21      A.    He found some driver's license in

22  there, and when he showed me those driver's

23  license, I told him that was the guy that I got

24  in the fight with that robbed us.

25      Q.    Okay.  I'm going to show you -- on the

1    screen in front of you, you should see what's

2    been marked Government's Exhibit Number 1.

3        What is -- what is that?  Do you recognize

4    that photograph?

5        A.    (Examining document).  That's the

6    driver's license.

7        Q.    Is it a photocopy of the driver's

8    license that was shown to you?

9        A.    Yes, sir.

10       Q.    Now, is that the -- the hairstyle or

11   the type of hairstyle that you've been referring

12   to?

13       A.    That's right, yes, sir.

14       Q.    The person in that photograph has that

15   type of hairstyle?

16       A.    That's right.

17       Q.    Now, after -- after that incident, the

18   occasion where you were shown the driver's

19   license, a few days later, July 20th, 2009,

20   which would be, I believe, 7 days after you were

21   shown the driver's license photo and 11 days

22   after the actual robbery, were you shown a

23   series of photographs by ATF Agent Dale

24   Stallings?

25       A.    I was.

1    Q.   Where were you when he showed you those

2    photographs?

3    A.   At the Gold Exchange.

4    Q.   And that was a little less than a --

5    what did -- I believe it was 11 days after the

6    robbery had occurred; is that correct?

7    A.   I don't know that for sure.

8    Q.   Okay.  Well, let me just ask you this:

9    Was it within a couple of weeks?

10    A.   Yes, sir.

11    Q.   Okay.  It wasn't too long a period of

12    time?

13    A.   Just a little bit after.

14    Q.   And who else was present at the Gold

15    Exchange with you?

16    A.   Mark Burroughs, my son-in-law.

17    Q.   Were you given any instructions by

18    Agent Stallings before -- any written

19    instructions before you looked at the

20    photographs?

21    A.   Yes, sir.

22    Q.   Do you remember what those instructions

23    told you to do?

24    A.   I don't remember it all, but he was

25    telling us to be careful and -- well, I couldn't

1    tell you all that was said.

2        Q.    Okay.  But you did read the

3    instructions?

4        A.    Yes, sir.

5        Q.    Okay.  And do you recall how many

6    photos you were shown for each suspect?

7        A.    I think six.

8        Q.    Okay.  Do you remember how they were

9    displayed; how they looked when they were in

10   front of you on a piece of paper?

11       A.    They were just there on the top and

12   there on the bottom.

13       Q.    Let me just show you an exhibit,

14   Government's Exhibit -- Composite Exhibit Number

15   2.

16       Is this the document that you were referring

17   to when I was asking you about the instructions?

18       A.    (Examining document).  Yes, sir.

19       Q.    And, in fact, it has four statements on

20   there about how you should view the photographic

21   lineup.

22       Do you see your signature on that page?

23       A.    Yes, sir.

24       Q.    And it's dated July 20th, 2009; is it

25   not?

1      A.   I remember reading it.  I just didn't
2   know what it said.
3      Q.   I understand.  But you do recognize
4   your signature?
5      A.   Yes, sir.
6      Q.   And you signed this after you read it?
7      A.   I did.
8      Q.   On Page 2 of that document or that
9   exhibit, there are six photographs.  One of them
10  is circled.
11     Did you circle that photograph?
12     A.   (Examining document).  I did.
13     Q.   How do you know that you circled that?
14     A.   Pardon.
15     Q.   How do you know that you circled that
16  photograph?
17     A.   Well, that's my initials right there.
18     Q.   And did you also date it?
19     A.   I did.
20     Q.   And the same with the third page of
21  that exhibit.  There are six photographs; one of
22  which is circled with initials.
23     Are those your initials again?
24     A.   (Examining document).  They are.
25     Q.   Now, on the second page, the one that

1    you circled, is that the same individual that --
2    that you saw at your store the day of the crime?
3        A.    That's correct.
4        Q.    And the same individual who was in the
5    photograph on the driver's license that was
6    shown to you by Ricky Payne?
7        A.    Yes, sir.
8        Q.    Now, your identification of Mr. Hearn,
9    was that based on what you remember seeing or
10   your memory from watching him get out of the car
11   and walk passed and then your later struggle
12   with him as you had fallen on the ground?
13       A.    I couldn't have picked him out without
14   looking at those driver's license.
15       Q.    Okay.  But when you --
16       A.    I was face-to-face with him.
17       Q.    Okay.  But when you first saw the
18   driver's license, you knew that was him?
19       A.    Oh, yes, sir.
20       Q.    Okay.  When you were shown these photos
21   by Agent Stallings, did you have any reason to
22   hesitate?  Did you have to think about it, or
23   did you just mark it?
24       A.    I just marked it, is how I did it.
25       Q.    And you -- as I understand it, you and

```
 1    Mr. Burroughs were both present in the same
 2    room.  I believe the photos were placed on a
 3    glass display case --
 4        A.   That's correct.
 5        Q.   -- by Agent Stallings for you to look
 6    at.
 7        Did either of you -- did y'all talk to one
 8    another before you marked which photograph was
 9    Mr. Hearn or which photograph you thought was
10    Mr. Montgomery?
11        A.   No, sir.
12        Q.   You marked it independently of one
13    another?
14        A.   That's right.
15        Q.   Did Agent Stallings in any way suggest
16    to you which photos you should mark?
17        A.   No, sir.
18        Q.   Now, you've been here in the
19    courtroom.  I haven't really noticed.
20        Have you had an opportunity to look around
21    the courtroom, and have you -- have you seen the
22    person who you identified as being Mr. Hearn,
23    one of the suspects or one of the robbers?
24        A.   Yes, sir.
25        Q.   Okay.  Do you see him in the courtroom?
```

1    A.    Yes, sir.

2    Q.    Would you point to him and describe

3    what he's wearing, please.

4    A.    Back over yonder.  (Witness

5    indicating).

6    Q.    Okay.  You're pointing to whom?  Can

7    you describe what he's wearing?

8    A.    Well, he's wearing an orange jumper

9    suit of some kind.

10    Q.    Okay.

11         MR. COLEMAN:  Your Honor, I would ask

12    the record to reflect the witness has identified

13    the defendant in this case.

14         THE COURT:  All right.

15    BY MR. COLEMAN:

16    Q.    When you chose the photograph of

17    Mr. Hearn; when you circled his photo in that

18    photographic lineup or display, did you do that

19    based on your opportunity to see him at your

20    store the day of this crime?

21    A.    Yes, sir.

22    Q.    Okay.  Did you also do it -- the

23    attention that you paid to him as he got out of

24    the car and that you had an opportunity to see

25    him then and then later as you struggled with

1    him?

2        A.    Yes, sir.

3            MR. DAVIS:  Your Honor --

4            THE COURT:  You're leading the

5    witness.  You've been over this territory

6    before, Mr. Coleman.

7            MR. COLEMAN:  Yes, Your Honor.

8    BY MR. COLEMAN:

9        Q.    Mr. Gillentine, did -- did the physical

10   description of the persons that you chose in the

11   photo lineups match the descriptions that you

12   had given law enforcement of those that robbed

13   you that day?

14       A.    I think so.

15           MR. COLEMAN:  The Court's indulgence,

16   Your Honor.

17           (SHORT PAUSE).

18           MR. COLEMAN:  We tender the witness.

19           MR. DAVIS:  May I proceed, Your Honor?

20           THE COURT:  You may.

21                    CROSS EXAMINATION

22   BY MR. DAVIS:

23       Q.    Good morning, Mr. Gillentine.

24       A.    Good morning.

25       Q.    My name is Chip Davis.  I represent

1   Mr. Hearn.
2        Mr. Gillentine, have you -- isn't it true,
3   sir, you've given obviously statements in the
4   past on this case?  Well, not --
5        A.    I've given one.
6        Q.    -- statements.  You've given statements
7   to law enforcements about this -- law
8   enforcement about this case.
9        A.    I think so.
10       Q.    All right.  And isn't it true, sir,
11  that in those statements you describe the person
12  you fought with as having cornrow style hair; is
13  that true?
14       A.    What is cornrow?
15       Q.    I don't know, sir.  That's -- isn't
16  that -- wasn't that your description?
17       A.    No, sir.  I don't -- I didn't know they
18  had hair plaided all over like that.
19       Q.    You don't recall telling law
20  enforcement that their hair was cornrowed?
21       A.    I don't remember -- believe I ever said
22  cornrow.
23       Q.    Okay.
24       A.    I may not -- I may have said Jheri
25  curl, but I didn't say cornrow, I don't think.

```
1       Q.    All right.  Now, do you recall having
2    made a statement regarding shooting at this
3    vehicle, that the vehicle should have bullet
4    holes in the back of it?
5       A.    I did.
6       Q.    All right.  You're certain that you hit
7    the vehicle?
8       A.    I thought I did.
9       Q.    You're a pretty good shot?
10      A.    No, sir.  My face was bleeding.
11      Q.    All right.  But you were certain at
12   that time that a few of your shots had struck
13   the vehicle?
14      A.    I thought they had.
15      Q.    Now, tell me about this individual who
16   came to your house and gave you information.
17   Who was that individual?
18      A.    I don't know who he was.
19      Q.    Have you ever seen him before?
20      A.    No, sir.
21      Q.    Did he give you his name?
22      A.    He did.
23      Q.    Okay.  What was that name?
24      A.    I don't remember.
25      Q.    Have you seen him since?
```

1    A.    No, sir.

2    Q.    Okay.  Did you tell law enforcement how

3    to contact him?

4    A.    I did.

5    Q.    Okay.  Do you know whether they

6    contacted him or not?

7    A.    I think they did.

8    Q.    All right.  Any explanation then as to

9    why Deputy Payne would not know who the

10   individual was that you gave the information to?

11   A.    No.

12   Q.    Okay.

13   A.    I don't know about that now.  I don't

14   know.  I think I told the ATF agent.

15   Q.    Okay.  Now, do you know whether that

16   individual was reliable or not reliable?

17   A.    No, sir.

18   Q.    Do you know whether that person was a

19   convicted felon or not a convicted felon?

20   A.    No, sir.

21   Q.    Do you know whether that person maybe

22   had a grudge against Mr. Hearn or didn't?

23   A.    No, sir.

24   Q.    Did you give him his $1,000?

25   A.    I did.

1      Q.   So your testimony earlier was that when

2    Chief -- at that time that Chief Payne showed

3    you the driver's license, you said, that's the

4    guy, or something to that effect.

5      A.   I told him that was the guy.

6      Q.   Okay.  Any reason why Deputy Payne

7    would not remember you having made that

8    statement?

9      A.   I don't know.

10     Q.   Do you recall any details about that --

11   that vehicle, the vehicle that the men who

12   robbed the store drove away in?

13     A.   What do you mean?

14     Q.   What kind of vehicle was it?

15     A.   It was a Ford Escape.

16     Q.   Okay.  What color was it?

17     A.   I think it was kind of gray looking.

18     Q.   Kind of gray looking?

19     A.   (Witness nodded head affirmatively).

20     Q.   Now, do you recall Agent Stallings

21   coming to your place of business and showing you

22   these photographs?

23     A.   Agent --

24     Q.   The -- the ATF agent.

25     A.   What kind of photographs?

1    Q.    The photographic lineup.

2    A.    Oh, yeah, I do.

3    Q.    Now, tell the Court what happened.

4    Did -- did he put -- did Agent Stallings put

5    you in an office or -- and then show them to you

6    by yourself?  How -- physically how did that go?

7    A.    He didn't.

8    Q.    Okay.  How did -- how did you look at

9    them?  Where were you physically placed when you

10   were looking at them?

11   A.    My son-in-law was on one side of the

12   showcase down there, and I was back up here.

13   (Witness indicating).  He come in and asked us

14   to do that, and we identified them.  That's what

15   we did.  I did -- I identified them.

16   Q.    Okay.  Did your son-in-law do the same?

17   A.    He did.

18   Q.    Okay.  And did you stay at your end of

19   the showcase, and did your son-in-law stay at

20   his end of the showcase?

21   A.    We wasn't right next to one another, if

22   that's what you mean.

23   Q.    Okay.  Well, I guess my question is:

24   Agent Stallings put you in one place and put

25   your son-in-law in another place; is that

1    correct?

2        A.    Yeah, I would say so.

3        Q.    Okay.  So while y'all were marking the

4    photographs, did you stay where Agent Stallings

5    put you?

6        A.    Yeah.

7        Q.    You didn't move together before you

8    marked the photographs?

9        A.    No.

10            MR. DAVIS:  Your Honor, that's all I

11   have.

12            THE COURT:  All right.  Do you have

13   anything further, Mr. Coleman?

14            MR. COLEMAN:  No additional questions,

15   Your Honor.

16            THE COURT:  Okay.  You may step down.

17            THE WITNESS:  Thank you.

18            (TESTIMONY CONCLUDED AT 11:50 A.M.)

19            THE COURT:  Does the Government have

20   any further witnesses?

21            MR. COLEMAN:  No, Your Honor.  The

22   Government rests.

23            THE COURT:  Okay.  Do you have any

24   witnesses, Mr. Davis?

25            MR. DAVIS:  Your Honor, may I have a

```
 1    brief indulgence?
 2              THE COURT:  You may.
 3              (SHORT PAUSE).
 4              MR. DAVIS:  Your Honor, may I speak
 5    with the U.S. Attorney's office for one moment?
 6              THE COURT:  You may.  Well, let me say
 7    this:  It's almost noon.  I'm going to recess
 8    until 1:00.  If you need to put on proof or you
 9    want to make an argument at that time, we will,
10    but you go ahead and talk to him and
11    announcement it.  You just let me know.
12              MR. DAVIS:  Yes, sir.
13              MR. COLEMAN:  Okay.
14              THE COURT:  Do y'all want to confer?
15              MR. DAVIS:  Yes, sir.
16              THE COURT:  Would you rather go ahead
17    and recess?
18              MR. DAVIS:  Yes, sir.
19              THE COURT:  Okay.  Well, we'll take our
20    noon recess, and we'll start back at 1:00.
21              (WHEREUPON, THERE WAS A SHORT BREAK,
22    AND THE PROCEEDINGS THEN CONTINUED AS FOLLOWS:)
23              MR. DAVIS:  Your Honor, if it pleases
24    the Court, I call Agent Stallings to the stand,
25    please.
```

THE COURT:  All right.

MR. DAVIS:  May I proceed, Your Honor?

THE COURT:  You may.

DALE STALLINGS,

having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DAVIS:

Q.    Good afternoon.

A.    Good afternoon.

Q.    Agent Stallings, during the break you and I spoke just for a moment; did we not?

A.    Yes, we did.

Q.    All right.  And do you see the photograph that is currently displayed on the screen?

A.    (Examining document).  I do.

Q.    All right.  And is that a photograph that was presented to you as part of this investigation by then Chief of Police Payne, now Deputy Payne?

A.    It is.  He provided me a -- several photos on a CD of the vehicle that was taken that we discussed earlier.

Q.    All right.  And was it represented to

1    you by then Chief of Police Payne that these

2    photographs were of the vehicle that he found

3    pursuant to Mr. Gillentine's information?

4        A.    That's correct.

5            MR. DAVIS:  Your Honor, I'm just going

6    to display the remainder of these photographs,

7    if I can.

8    BY MR. DAVIS:

9        Q.    Now, that appears to be the rear of the

10   photograph?

11       A.    (Examining document).  Yes.

12       Q.    I'm sorry.  The rear of the vehicle?

13       A.    Yes.

14       Q.    And there's a photo in here where it

15   looks like some sun is hitting part of the

16   vehicle.

17       Do you see that?

18       A.    I do.

19       Q.    And that looks like a pretty close up

20   of the door.

21       A.    Yes.

22       Q.    Okay.  And, again, that is the vehicle

23   that the deputy represented to you he sees

24   pursuant to Mr. Gillentine's information.

25       A.    Yes.

1      Q.    Okay.   Now, did you hear Mr. Gillentine

2  and the other witness testify that the -- the

3  thieves drove up in a gray vehicle?

4      A.    I did.

5      Q.    All right.   That vehicle is green,

6  isn't it?

7      A.    It is.

8      Q.    It's not gray?

9      A.    It doesn't appear to be.

10          MR. DAVIS:   Your Honor, I tender the

11  witness.

12          THE COURT:   Mr. Coleman.

13          MR. COLEMAN:   Very briefly, Your Honor.

14                CROSS EXAMINATION

15  BY MR. COLEMAN:

16      Q.    Agent Stallings, Mr. Davis mentioned

17  about the sun hitting the vehicle.

18      We really don't know exactly what the

19  conditions were out there the day of this

20  robbery, do we, I mean, as far as what the --

21  what Mr. Gillentine and what Mr. Burroughs were

22  seeing parked out in the front?

23      Whether it was in the shade or in the

24  daylight or what have you, we don't know.

25      A.    That's correct.

1      Q.    Okay.  And the color --

2            THE COURT:  Mr. Coleman, this truck was

3   not in the lineup.  I wouldn't worry about it.

4            MR. COLEMAN:  No further questions.

5            THE COURT:  Do you have any further

6   questions for this witness?

7            MR. DAVIS:  Nothing for this Court.

8            THE COURT:  Do you rest?

9            MR. DAVIS:  Your Honor, the defendant

10  will rest subject to brief argument.

11           THE COURT:  Okay.  Would you like to go

12  first?

13           MR. DAVIS:  Yes, sir, if it pleases the

14  Court.

15           THE COURT:  Okay.

16           MR. DAVIS:  May I proceed, Your Honor?

17           THE COURT:  You may.

18           MR. DAVIS:  Your Honor, in the

19  Government's brief, the Government responded to

20  our Motion to Suppress the in-court -- or the

21  out-of-court and the in-court identifications by

22  acknowledging that the out-of-court

23  identification procedure, specifically the

24  driver's license presentation of the single

25  photograph, was suggestive and was unnecessarily

1    suggestive.  I think that has been confirmed by
2    the in-court testimony.
3         If it pleases the Court, Your Honor,
4    the Government responded that even though this
5    was an unnecessarily suggestive procedure, the
6    in-court identification and the out-of-court
7    identification testimony should not be
8    suppressed because there were other indications,
9    given the totality of the circumstances, that
10   the identification was reliable.
11        I submit to the Court that the evidence
12   today has shown just the opposite.  To begin
13   with, the -- the existence of this -- the way
14   Mr. Hearn was identified as being the individual
15   with the cornrows was through a $1,000 offer
16   reward.
17        In other words, Mr. Gillentine got on
18   the television shortly after the robbery and
19   said, anybody who tells me who did this, I'll
20   give you $1,000, or words to that effect.
21        Well, shortly thereafter, he was
22   contacted by a person who is now unknown to
23   Mr. Gillentine.  He was unknown at that time.  I
24   asked the deputy who the person was, then the
25   Chief of Police of Nettleton, and he didn't know

 1    who the person was.

 2          He didn't know anything about their

 3    reliability.  He didn't know anything about

 4    their credibility.  All he knew was that they

 5    responded directly to Mr. Gillentine on the

 6    promise of a $1,000 reward, which they were

 7    ultimately paid.

 8          So to begin with, the identification of

 9    Mr. Hearn as being this person should be suspect

10    because there was a financial reward involved.

11    We don't know if this person -- who this person

12    is or whether this person had a grudge against

13    Mr. Hearn or whether this person was, perhaps,

14    just needing the money.  We don't have any of

15    that information.

16          Setting that aside, we know that

17    initially, according to the deputy's testimony,

18    Mr. Gillentine and Mr. Burroughs identified the

19    person who struck Mr. Burroughs or one of the

20    participants in the robbery as having a cornrow

21    hairstyle.

22          Well, even though they identified him

23    at first as having a cornrow hairstyle, today

24    Mr. Burroughs talked about dreadlocks, and

25    Mr. Gillentine talked about Jheri curls.

1          Well, we know that Mr. Hearn, his
2     driver's license photo when it was taken, had
3     dreadlocks rather than cornrows.  We also know
4     that when he was seen a few days after the
5     robbery, he had a shaved head.  He didn't have
6     any hair at all.
7          So the person who robbed them was at
8     first described as having one hairstyle, and
9     then when it turned out that Mr. Hearn, the
10    person identified by this anonymous informant
11    who received $1,000, had a different hairstyle.
12    Now we hear about dreadlocks and corn- -- or
13    dreadlocks and Jheri curls.
14          Add to that, Your Honor, the issue of
15    the vehicle itself.  Both witnesses identified
16    the vehicle that the robbers and assailant drove
17    up in as being charcoal or gray.
18          This vehicle that was seized pursuant
19    to the informant's testimony is green.  This was
20    the vehicle, if the Court will recall, when the
21    officer opened the door, he found -- or says he
22    found Mr. Hearn's driver's license in the door
23    pocket.  Well, that's not a gray vehicle.
24    That's a green vehicle.
25          Shortly after the robbery,

```
 1    Mr. Gillentine told -- or was heard to say that
 2    he had fired at the vehicle as it was driving
 3    away and believed that he had hit it and
 4    believed that that vehicle should have bullet
 5    holes in it.  Well, the Court saw pictures of
 6    the rear end of that vehicle.  There were no
 7    bullet holes in that -- in that vehicle.
 8            So, Your Honor, not only was the
 9    procedure used in these identifications
10    suggestive and suggestive in another way; not
11    only was he shown the driver's license and not
12    only was he given this information by some
13    unknown source who was then paid $1,000, but
14    beyond that, if the Court will recall the
15    testimony of Agent Stallings.
16            When Agent Stallings went to show them
17    the proper photographic lineup, he put one
18    gentleman at one end of a counter and the other
19    gentleman at the other end of the counter, and
20    he said then they slid back together and marked
21    their -- marked their sheets.  Well, when I
22    asked those gentlemen, is that what you did,
23    they both denied it and said that they did not
24    do any such thing.
25            So, if it please the Court, not only do
```

1     we have a suggestive identification process that

2     is admittedly suggestive by the Government, but

3     we also have several indicia, a hairstyle and

4     the color of the vehicle, that show the --

5     the -- not only was it suggestive, but the

6     identification of Mr. Hearn as the person is

7     unreliable.

8              And for that reason, if it pleases the

9     Court, we move that both the out-of-court

10    identification as well as the in-court

11    identification be suppressed at trial.

12             THE COURT:  All right.  Thank you.

13    Mr. Coleman.

14             MR. COLEMAN:  Your Honor, if it pleases

15    the Court, the Government's response did set out

16    a couple of cases that lead the Government to

17    the opinion that the Court could find that the

18    identification and procedure in this case was

19    both suggestive and unnecessary, which I think

20    the Court probably would come to that

21    conclusion.

22             However, as the Court is aware, there

23    are cases going back to, as cited in the

24    Government's response, the Neil versus Biggers

25    case from 1972, a United States Supreme Court

1    case, which sets -- sets forth the proposition

2    that the -- the defendant's due process rights

3    were not violated unless the -- the lineup or

4    the photo show up, what have you, was

5    unnecessary, suggestive and unreliable.

6           And the Government contends that based

7    on the testimony presented in court today, that

8    the identification was, in fact, reliable.  The

9    Government went to great lengths to have the

10   witnesses testify about the opportunity both

11   witnesses had to -- to see, to view, to witness

12   these indiv- -- these two individuals who were

13   later identified.

14          Now, counsel opposite makes much ado

15   over whether it's referred to as a cornrow or a

16   dreadlock or a Jheri curl, I think it was

17   called.

18          What we do know is that both of the

19   victims, the witnesses in this case, have

20   identified the individual in the photograph, the

21   driver's license that was shown to them in this

22   show up and also from photographic display that

23   was provided to them by Agent Stallings.

24          They identified that person with that

25   particular hairstyle as being the individual or

```
 1    one of the individuals that -- that committed
 2    the robbery that day.
 3            So I think that speaks to -- you know,
 4    whether they want to call it cornrows or Jheri
 5    curls or whatever, they both said, that's the
 6    person, and that's --
 7            THE COURT:  Well --
 8            MR. COLEMAN:  -- the style hair.
 9            THE COURT:  -- you said in your brief
10    that there was a drive-by identification.  I
11    don't -- I didn't hear any proof today of any
12    drive-by identification.
13            MR. COLEMAN:  Your Honor, there was --
14            THE COURT:  That would be what I think
15    of as show up.
16            MR. COLEMAN:  Well, there's -- when I
17    refer to the show up, what I'm referring to is
18    the driver's license that was shown by Chief
19    Payne to both of the individuals.  I think there
20    was some confusion as to whether --
21            THE COURT:  When you say in your brief
22    that, the Government expects the proof to show
23    that law enforcement did not arrange the drive-
24    by identification, there's been no proof of
25    drive-by identification.
```

```
1              MR. COLEMAN:  Your Honor, that is what
2    the Government expected to prove but then --
3              THE COURT:  You didn't prove that, did
4    you?
5              MR. COLEMAN:  No, sir, I did not.
6    Actually --
7              THE COURT:  All right.
8              MR. COLEMAN:  -- I proved that there
9    was no such --
10             THE COURT:  I've heard enough.  I've
11   heard enough, I think, Mr. Coleman.  Well, you
12   can -- you can --
13             MR. COLEMAN:  I just want to -- if I
14   can point out the factors that are set forth in
15   the Biggers -- Neil v. Biggers case.
16             THE COURT:  I'm not interested in the
17   factors of the case.
18             MR. COLEMAN:  Your Honor, when I first
19   heard it in, I believe it was, 1984, I thought
20   it was interesting, and it still today kind of
21   brings a chuckle.
22             That Court said the central question
23   was, whether under the totality of the
24   circumstances, the identification was reliable
25   even though the confrontation procedure was
```

1    suggestive.

2              And then it says, as indicated by our

3    case, the factors to be considered in evaluating

4    the likelihood of misidentification include,

5    first, the opportunity of the witness to view

6    the criminal at the time of the crime.  Second,

7    the witness's degree of intention.

8              Third, the accuracy of the witness's

9    prior description of the criminal.  Fourth, the

10   level of the certainty demonstrated by the

11   witness at the confrontation, and, fifth, the

12   length of time.

13             And, of course, other cases cited in

14   the Government's response also set forth the

15   Neil or -- Neil v. Biggers factors; one being

16   Mattson versus Brathwaite, and then more

17   recently the Heffron case, which is a Fifth

18   Circuit case in 2002, and the Annador Quarterman

19   (phonetic) case, a 2006 case, which sets forth

20   those same factors.

21             And the witnesses testified that they

22   did have ample opportunity.  Their intention was

23   on both of these individuals.  They testified as

24   to why their attention was drawn to these

25   individuals.

```
 1              Especially Mr. Gillentine, who had an
 2     opportunity not only to see them as they entered
 3     his store, but as he wrestled, as he referred to
 4     it, face-to-face with Mr. Hearn or the
 5     individual with the distinctive hairstyle.
 6              Again, Your Honor, the Government's
 7     position in this matter is that the
 8     identification, even though having been shown
 9     this -- this photograph, this show-up type
10     identification, the display -- or the
11     identification of the photos in the display, was
12     reliable due to their opportunity to -- to view
13     and to -- to see these two individuals prior to
14     being shown that iden- -- that driver's license
15     photo.
16              THE COURT:  All right.
17              MR. COLEMAN:  So with that, the
18     Government would argue that the defendant's --
19              THE COURT:  Go sit down.
20              MR. COLEMAN:  Yes, sir.  That his due
21     process rights have not been violated.
22              THE COURT:  Okay.  Do you have anything
23     else,
24              MR. DAVIS:  No, Your Honor.
25              THE COURT:  All right.  I have heard
```

```
 1   the proof offered in this case.  I have read the
 2   brief and the motion.  It seems like the
 3   critical issue to me is whether or not
 4   Mr. Gillentine confirmed his identification of
 5   Hearn to the officer at the time he was shown
 6   the driver's license the first time.
 7            I heard Mr. Gillentine testify from the
 8   stand.  He stated -- if I wrote it down --
 9   (short pause) -- quote, I could pick him out
10   without looking at the license.
11            He also testified that when he was
12   shown the license by the police chief, Payne, at
13   that time he said, that was the man that robbed
14   me.
15            So prior to the photographic lineup as
16   set forward by Agent Stallings, Mr. Gillentine
17   had already identified the defendant, and that
18   identification is sufficient to withstand the
19   challenge.
20            I'm satisfied having heard the witness
21   that he knows what he's talking about and that
22   he knows who he identified.  He had a wrestling
23   match with the defendant.  They were face-to-
24   face.  I find his testimony credible and
25   believable.
```

1          As to the -- as to the Motion to Strike

2     the identification in the lineup, I'm going to

3     grant that because I don't find any fault with

4     how the ATF agent, Agent Stallings, handled it,

5     but he didn't know that the license had already

6     been shown to, at least, one of the witnesses

7     or, perhaps, both.  I don't recall.

8          But to the extent that that could be

9     suggestive or influences that identification,

10    then I'm going to strike that identification

11    because I see no need for it.  And I also think

12    it was an unfortunate accident that the police

13    chief had already shown the license to

14    Mr. Gillentine.

15         So your -- your motion is granted as to

16    any reference to that identification, Mr. Davis,

17    but I'm not going to strike any of the other

18    evidence because I don't know that there was any

19    other evidence that came forward from it.  I

20    don't know what evidence that applies to.

21         They already had the key.  They already

22    had the car.  They had already identified the

23    defendant prior to the lineup photo so -- or the

24    photo lineup.

25         Is there anything further?

1        MR. COLEMAN:  Not on behalf of the

2   Government, Your Honor.

3        MR. DAVIS:  Did I understand the Court

4   to say that Mr. Gillentine will be allowed to

5   identify the defendant at trial?

6        THE COURT:  He will because the

7   testimony, as I heard it, established that he

8   already identified the defendant before there

9   was -- there was a photo lineup, so he will be

10  allowed to so testify.

11       MR. DAVIS:  Yes, sir.

12       THE COURT:  But any -- any testimony as

13  to that photo lineup, I'm going to -- I'm

14  granting your motion.

15       MR. DAVIS:  Yes, sir.

16       THE COURT:  All right, anything

17  further?

18       MR. COLEMAN:  No, Your Honor.

19       MR. DAVIS:  Nothing from the defendant.

20       THE COURT:  The Court will be in

21  recess.

22            (PROCEEDING CONCLUDED AT 1:20 P.M.)

23

24

25

# C E R T I F I C A T E

STATE OF TENNESSEE        )
                          )
COUNTY OF Shelby          )

I, Amy D. McCullough, LCR #537, CSR #1653, Licensed Court Reporter, in and for the State of Tennessee and State of Mississippi do hereby certify that the above hearing was reported by me, and the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting and National Court Reporting Association as a Licensed Court Reporter as evidenced by the LCR and CSR numbers and expiration date following my name below.

I further certify that this transcript is the work product of this court reporting agency and any unauthorized reproduction and/or transfer of it will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

AMY D. McCULLOUGH, 537
Expiration Date 7-1-2014
ALPHA REPORTING
CORPORATION
236 Adams Avenue
Memphis, Tennessee 38103

**Alpha Reporting Corporation**

**$**

**$1,00 (1)**
24:3
**$1,000 (11)**
10:23;23:25;24:17;31:10;
100:13;113:24;122:15,20;
123:6;124:11;125:13

**A**

**Aberdeen (1)**
90:12
**able (3)**
4:23;53:4;82:4
**ABOVE-MENTIONED (3)**
21:3;48:3;50:9
**absolutely (1)**
45:12
**Academy (1)**
34:10
**accident (1)**
133:12
**accompany (1)**
11:21
**according (1)**
123:17
**accuracy (1)**
130:8
**accurate (1)**
21:18
**acknowledge (3)**
34:18;57:25;58:9
**acknowledged (1)**
53:12
**acknowledging (1)**
121:22
**across (1)**
42:22
**action (1)**
31:22
**actual (1)**
103:22
**actually (10)**
28:12;36:5;39:23;44:9;
46:17;53:18;69:25;70:22;
97:5;129:6
**Add (1)**
124:14
**additional (3)**
11:4;36:22;116:14
**adjoining (4)**
9:5;91:4,9;96:18
**admit (1)**
20:23
**admittedly (1)**
126:2
**ado (1)**
127:14
**Affidavit (2)**
26:6,8
**affirmative (7)**

**31:5;56:8;59:4;69:1,22;**
**91:8;99:2**
**affirmatively (8)**
14:20;15:15,19;38:5;
54:8;55:6;93:13;114:19
**afraid (1)**
96:9
**afterwards (2)**
15:6;82:8
**again (11)**
16:19;29:1,2;47:8;50:21;
51:10;52:5;97:16;106:23;
119:22;131:6
**against (4)**
25:10;95:23;113:22;
123:12
**age (1)**
42:10
**agency (1)**
38:22
**Agent (34)**
4:19;23:6;38:13;46:5;
56:12,16;60:5;76:7,16;
78:20;81:1;85:19,25;87:10;
103:23;104:18;107:21;
108:5,15;113:14;114:20,23,
24;115:4,24;116:4;117:24;
120:16;125:15,16;127:23;
132:16;133:4,4
**ago (1)**
32:25
**agreeable (2)**
5:10,11
**ahead (3)**
20:23;117:10,16
**Alcohol (2)**
4:20;38:14
**allow (3)**
4:18;54:15,25
**allowed (3)**
4:20;134:4,10
**almost (1)**
117:7
**alterations (1)**
22:5
**always (1)**
43:10
**ambulance (2)**
73:13;100:10
**America (1)**
4:4
**amount (1)**
24:4
**ample (1)**
130:22
**Angela (2)**
62:11,13
**Annador (1)**
130:18
**announcement (1)**
117:11
**anonymous (1)**
124:10

**apologize (1)**
15:11
**appear (2)**
55:8;120:9
**appears (4)**
22:2,20;51:25;119:9
**applies (1)**
133:20
**appreciate (1)**
21:2
**approximately (7)**
38:16;40:24;42:10;57:4;
65:18,24;76:3
**April (1)**
7:11
**area (1)**
68:18
**argue (1)**
131:18
**argument (2)**
117:9;121:10
**arm (1)**
65:6
**around (11)**
14:10;17:13;64:9,11;
67:16;72:4;79:10;80:15;
93:17;97:1;108:20
**arrange (1)**
128:23
**array (3)**
22:24;34:13;41:18
**arrest (4)**
25:21;26:9;27:10;36:12
**arrive (1)**
73:9
**arrived (1)**
100:6
**aside (1)**
123:16
**assailant (1)**
124:16
**assist (1)**
40:11
**assistance (2)**
21:2;40:9
**associated (1)**
45:18
**assume (1)**
19:18
**assuming (2)**
33:5;34:10
**ATF (7)**
23:6;38:18;46:8;103:23;
113:14;114:24;133:4
**ATTACHED (1)**
50:11
**attacked (2)**
96:23;98:25
**attention (19)**
7:18;8:8;52:21;53:1;
66:15;67:14;68:2;80:11;
84:3,3,15,16,19,24;85:6;
90:20;95:1;109:23;130:24

**attentiveness (1)**
87:21
**Attorney's (1)**
117:5
**authority (6)**
25:24;28:1,9,14;29:11;
36:11
**Auto (3)**
63:17;90:24;92:24
**automatic (2)**
82:13,14
**automatically (1)**
20:2
**aware (3)**
10:18;13:11;126:22
**away (3)**
27:19,19;86:17;114:12;
125:3

**B**

**back (31)**
7:18;12:18,21;17:3;20:7;
22:15;26:15;39:2;44:23;
54:24;55:1,22;58:23;59:7;
62:3,12;63:9;65:3;72:5,9;
80:20;90:20;96:4,9;98:10;
109:4;112:4;115:12;
117:20;125:20;126:23
**backed (5)**
64:12,13;65:1;80:18;
99:20
**bad (1)**
34:8
**Barb (1)**
62:16
**base (1)**
80:7
**based (13)**
9:23;11:9;13:17;16:19;
54:5;78:2,25;85:9,9;88:16;
107:9;109:19;127:6
**basically (1)**
42:23
**bat (1)**
75:1
**bearing (1)**
26:25
**become (2)**
39:23,25
**bedroom (1)**
29:21
**begin (2)**
122:12;123:8
**behalf (2)**
34:17;134:1
**behind (3)**
17:10;67:24;71:13
**believable (1)**
132:25
**bell (1)**
69:23
**belonged (1)**

12:13
**beside (1)**
86:11
**best (4)**
5:2;29:19;30:6;34:19
**Better (2)**
15:14;95:20
**beyond (1)**
125:14
**big (2)**
64:15;67:3
**Biggers (4)**
126:24;129:15,15;130:15
**bit (3)**
24:5,6;104:13
**bitty (1)**
71:13
**black (6)**
13:5;18:16;41:12,16;
75:10;92:4
**bleeding (1)**
112:10
**blinds (1)**
68:13
**blood (1)**
72:12
**both (20)**
5:7;41:15;52:19,23;53:2;
55:24;56:17;63:21;78:19;
108:1;124:15;125:23;
126:9,19;127:10,18;128:5,
19;130:23;133:7
**bottom (5)**
47:15;48:24;52:6,7;
105:12
**boundaries (1)**
39:15
**bragging (1)**
100:22
**braid (1)**
33:9
**braided (2)**
33:12;94:6
**Brathwaite (1)**
130:16
**BREAK (1)**
117:21
**brief (8)**
35:1;60:1;117:1;121:10,
19;128:9,21;132:2
**briefly (4)**
35:6;59:16;87:17;120:13
**bring (2)**
24:8;60:25
**bringing (1)**
73:20
**brings (1)**
129:21
**broke (1)**
70:19
**build (1)**
41:12
**building (3)**

19:14;63:14;96:21
**bullet (4)**
83:3;112:3;125:4,7
**bullets (1)**
82:16
**bunches (1)**
94:7
**Bureau (2)**
4:19;38:13
**Burroughs (42)**
9:15;10:5;13:19;19:2,4;
23:1;40:19,22;41:5;43:19;
44:19;45:3,24;51:3,5,12;
52:10,20,21;53:2,10,16,25;
56:25;57:22;58:14;59:15;
60:6,24;62:11;81:17,22;
85:18;91:17,22;100:4;
104:16;108:1;120:21;
123:18,19,24
**business (18)**
8:18;9:1,5,6;39:10;43:20;
62:23;63:10,13,18;65:11;
66:7,9;85:20;90:23;91:3;
96:19;114:21

## C

**cabinet (2)**
71:13;95:23
**call (14)**
5:14,20;7:17;16:16;17:5;
25:13;27:22;30:12;33:14;
60:21;90:19;96:1;117:24;
128:4
**called (11)**
5:22;8:8;12:19;19:12;
24:21;40:5;58:18;95:1;
101:9;102:3;127:17
**calls (3)**
4:3;7:15;60:24
**came (10)**
16:20;26:15;36:7;67:10;
71:18;75:18;79:1;82:8;
112:16;133:19
**can (15)**
15:8;22:17;35:25;46:20;
68:19;74:7,13;86:8;92:21;
93:14;109:6;119:7;129:12,
12,14
**capacity (2)**
7:9,25
**car (27)**
17:25;27:18;63:17;64:2;
66:4;69:6,11;72:6;77:15;
90:24;91:25;92:5;96:10,14,
16,17;98:8,20;99:9;101:25;
102:2,2,5,7;107:10;109:24;
133:22
**careful (2)**
15:9;104:25
**case (21)**
41:12,14;44:6;54:19,23;
108:3;109:13;111:4,8;

126:18,25;127:1,19;129:15,
17;130:3,17,18,19,19;132:1
**cases (4)**
24:9;126:16,23;130:13
**caught (4)**
67:14;75:7;80:17;85:5
**Cause (2)**
4:3;14:23
**caused (1)**
84:14
**cell (1)**
16:16
**central (1)**
129:22
**certain (2)**
112:6,11
**certainty (1)**
130:10
**chain (1)**
22:22
**chair (2)**
86:20;87:6
**challenge (1)**
132:19
**changes (1)**
22:6
**character (1)**
25:1
**characteristics (4)**
41:11;42:3,6;88:18
**charcoal (2)**
64:7;81:25;124:17
**charge (1)**
22:22
**check (1)**
100:4
**Chief (20)**
7:22;8:3;9:17;12:7,13,19;
53:8;58:18,19;73:20;76:5;
102:6,11;114:2,2;119:1;
122:25;128:18;132:12;
133:13
**Chip (5)**
4:9;23:19;56:14;81:19;
110:25
**choose (3)**
44:19,24;55:10
**chose (7)**
41:24;45:8,10,16;78:18;
109:16;110:10
**Christianson (1)**
62:16
**chuckle (1)**
129:21
**church (2)**
17:9,10
**circle (7)**
45:17;49:15,25;51:13;
52:14;78:22;106:11
**circled (13)**
48:16;49:2,6;77:10,11,
17;78:16;106:10,13,15,22;
107:1;109:17

**circling (2)**
59:3,9
**Circuit (1)**
130:18
**circumstance (1)**
74:24
**circumstances (3)**
54:11;122:9;129:24
**cited (2)**
126:23;130:13
**claim (1)**
15:5
**clear (1)**
82:4
**CLERK (1)**
4:3
**client (1)**
4:10
**close (12)**
33:9;58:23;65:13,14;
93:7,11,12;94:8,10;95:9;
97:19;119:19
**closely (1)**
95:6
**closer (1)**
65:17
**closet (1)**
29:22
**clue (1)**
24:24
**Coleman (88)**
4:16,16,22;5:11,15;7:2;
14:21,25;15:1,13,16,20;
20:15;21:1,7;22:8,12,13;
23:7,10;26:23;35:6,8;
36:22;38:2,7;47:20;48:7,
13;50:8,13;53:20;54:5,9,15;
55:3,7;56:5;60:1,4,18,23;
65:22;66:1,3;75:24;76:2;
79:23;80:2;81:7,10;87:17,
19;90:3,5;93:24;94:3;
109:11,15;110:6,7,8,15,18;
116:13,14,21;117:13;
120:12,13,15;121:2,4;
126:13,14;128:8,13,16;
129:1,5,8,11,13,18;131:17,
20;134:1,18
**color (5)**
64:7,10;114:16;121:1;
126:4
**colored (1)**
81:25
**coming (8)**
27:8;35:11;60:14;73:18;
83:18;84:17;85:19;114:21
**command (1)**
22:23
**comment (1)**
57:14
**committed (5)**
10:8;13:8;45:6;79:2;
128:1
**common (3)**

Case: 1:12-cr-00002-MPM-DAS Doc #: 50 Filed: 04/23/13 138 of 149 PageID #: 222
United States of America vs.
Ryan Hearn

Proceeding
September 6, 2012

67:7,9;88:10
**commonly (1)**
  80:15
**communicating (1)**
  55:8
**communication (1)**
  59:12
**complies (2)**
  14:13,16
**compose (1)**
  72:15
**composite (16)**
  46:17,24;47:6,11,22;48:8,
  15,20;49:1;50:16;51:10;
  52:4;76:21;77:8;80:4;
  105:14
**concave (1)**
  71:14
**concern (1)**
  84:14
**concerned (1)**
  84:1
**concerning (1)**
  5:18
**CONCLUDED (3)**
  60:20;116:18;134:22
**conclusion (1)**
  126:21
**conditions (1)**
  120:19
**confer (1)**
  117:14
**confidential (1)**
  29:24
**confirmed (2)**
  122:1;132:4
**confrontation (2)**
  129:25;130:11
**confusable (1)**
  33:22
**confusion (2)**
  35:12;128:20
**consider (1)**
  24:3
**considered (1)**
  130:3
**consisting (1)**
  76:22
**consists (1)**
  50:18
**contact (1)**
  113:3
**contacted (4)**
  40:8;53:6;113:6;122:22
**contained (1)**
  48:21
**contends (1)**
  127:6
**continue (1)**
  84:24
**CONTINUED (1)**
  117:22
**convenience (1)**

24:12
**convicted (2)**
  113:19,19
**Cooper (5)**
  10:2,4,6,16;12:7
**corn- (1)**
  124:12
**corner (1)**
  48:25;51:14
**cornrow (15)**
  32:5,10,20,23;66:20;
  83:10;85:9;93:21;111:12,
  14,22,25;123:20,23;127:15
**cornrowed (1)**
  111:20
**cornrows (5)**
  33:3,8;122:15;124:3;
  128:4
**correctly (1)**
  8:7
**counsel (1)**
  127:14
**counsel's (2)**
  4:17,23
**counter (5)**
  96:2,3;98:15;125:18,19
**County (10)**
  7:7,10,13,15;16:8;17:5,9;
  90:15,16,17
**couple (4)**
  65:3;99:11;104:9;126:16
**course (5)**
  5:22;40:12;53:13;65:5;
  130:13
**Court (105)**
  4:3,7,10,14,21,25;5:6,9,
  13;14:24;15:8,18;20:17,20;
  21:6;22:11;23:12,14;27:1,
  3;35:5;36:24;38:4;47:25;
  48:2,6,11;50:4,7;53:22;
  54:7,15,17;55:5;56:6,8;
  59:25;60:19,21,25;65:25;
  80:1;81:12,14;85:24;87:16;
  90:2;91:18;94:1;109:14;
  110:4,20;115:3;116:12,16,
  19,23;117:2,6,14,16,19,24;
  120:12;121:2,5,7,8,11,14,
  15,17;122:3,11;124:20;
  125:5,14,25;126:9,12,15,17,
  20,22,25;127:7;128:7,9,14,
  21;129:3,7,10,16,22;
  131:16,19,22,25;134:3,6,12,
  16,20,20
**courtroom (8)**
  14:10;35:15;56:21;79:11,
  13;108:19,21,25
**Courts (1)**
  39:15
**Court's (5)**
  4:18;23:7;75:24;81:7;
  110:15
**coversheet (2)**
  44:1,23

**credibility (1)**
  123:4
**credible (1)**
  132:24
**crime (14)**
  9:10;10:8,12,13,24;11:1;
  19:5;39:12,22;40:15;80:9;
  107:2;109:20;130:6
**criminal (4)**
  5:19,24;130:6,9
**criminals (1)**
  25:4
**critical (1)**
  132:3
**CROSS (8)**
  23:15;56:10;81:12,15;
  84:11;87:20;110:21;120:14
**cross-examination (1)**
  36:10
**curl (2)**
  111:25;127:16
**curls (9)**
  93:16,20;94:4;95:25;
  97:10;98:13;123:25;
  124:13;128:5
**current (2)**
  7:5;90:13
**customers (1)**
  67:9

**D**

**daddy- (1)**
  86:17
**daddy-in-law (4)**
  65:7;69:4;72:17;86:9
**Dale (5)**
  4:19;23:6;38:10;76:7;
  103:23
**Dandre (1)**
  4:5
**dangling (1)**
  33:15
**database (1)**
  43:1
**date (23)**
  8:11;11:21;25:12,13;
  30:4,11;40:20;45:19;47:18;
  49:2;51:4,16;73:19,24;
  74:1;78:3,15,20;80:6,8,12;
  100:16;106:18
**dated (10)**
  44:16;47:13;49:11;52:16;
  56:18;77:2,17;78:17;86:15;
  105:24
**daughter (2)**
  63:5;91:13
**Davis (56)**
  4:9,9,12,24;5:5,8,18;
  20:18,23,25;23:12,13,16,
  19;27:4;34:25;35:3;48:1;
  50:6;56:6,7,11,14;59:23;
  81:13,16,20;87:14;93:22;

110:3,19,22,25;116:10,24,
  25;117:4,12,15,18,23;
  119:5,8;120:10,16;121:7,9,
  13,16,18;131:24;133:16;
  134:3,11,15,19
**day (15)**
  9:11,17;14:12,19;19:1;
  30:14;57:20;77:2,15;79:1;
  107:2;109:20;110:13;
  120:19;128:2
**daylight (1)**
  120:24
**days (14)**
  10:25;13:9;30:8;40:24,
  24;57:4;73:25;76:3,4;
  103:19,20,21;104:5;124:4
**daytime (1)**
  68:19
**dead (1)**
  67:21
**deals (1)**
  71:1
**dec- (1)**
  44:19
**December (1)**
  8:1
**deciding (1)**
  44:20
**defendant (15)**
  4:8;5:1,3;14:23;35:11,14;
  79:25;109:13;121:9;
  132:17,23;133:23;134:5,8,
  19
**defendants (1)**
  44:20
**defendant's (3)**
  21:24;127:2;131:18
**degree (2)**
  80:11;130:7
**deletions (1)**
  22:6
**deliberation (1)**
  45:11
**demonstrated (1)**
  130:10
**demonstrating (2)**
  67:5;68:14
**denied (1)**
  125:23
**Department (10)**
  7:13,16;8:4;12:8,19;
  16:10;22:23;40:9;43:4,5
**depiction (1)**
  21:18
**Deputy (17)**
  7:7,14,17;15:21;22:21;
  23:17;35:9;56:21,24;57:14;
  58:18;59:13;77:24;113:9;
  114:6;119:23;122:24
**deputy's (1)**
  123:17
**describe (8)**
  14:15;22:17;41:3;55:15;

93:14;109:2,7;111:11
**described (6)**
46:25;65:23;87:22;88:1;
98:12;124:8
**describing (1)**
94:9
**description (5)**
10:7;13:3;110:10;111:16;
130:9
**descriptions (2)**
13:18;110:11
**details (1)**
114:10
**detained (11)**
14:3,12,18;15:2;16:7;
26:12,16,17,22;27:6,8
**detention (1)**
27:22
**determine (1)**
53:14
**determined (1)**
53:17
**difference (2)**
33:2;66:20
**differences (2)**
41:23;42:7
**different (3)**
98:14,14;124:11
**ding (1)**
69:18
**DIRECT (3)**
7:1;38:6;90:4
**directly (1)**
123:5
**dis- (1)**
13:12
**disability (1)**
24:8
**discuss (1)**
55:18
**discussed (2)**
55:23,25
**discussing (1)**
55:9
**dishonest (1)**
25:7
**display (13)**
20:19;22:24;40:15;41:3;
54:19;60:6,15;108:3;
109:18;119:6;127:22;
131:10,11
**displayed (2)**
43:18;105:9
**displays (3)**
40:21;45:5;52:19
**distance (1)**
99:14
**distinctive (3)**
13:13;33:19;131:5
**District (1)**
39:19
**doctor (1)**
70:24

**DOCUMENT (22)**
21:4;46:10,12,15,22;48:4,
18;49:4;50:10,17;52:8;
74:8;76:24;77:12;78:12;
103:5;105:16,18;106:8,12,
24;119:11
**documentation (2)**
5:18;40:4
**done (15)**
8:6;10:21,21;26:11;
27:16,21;34:14;53:12;58:7;
63:23;80:23;84:6,9;99:12,
20
**door (29)**
12:21;17:22,24;18:2,4,11,
12;67:25;69:17;71:21;
72:17,18;73:3;91:9;93:3;
95:11,24;96:6,11,11,12,13,
18,22;97:1;102:17;119:20;
124:21,22
**down (22)**
18:2;33:15,17;36:25;
60:19;69:8,16,21;70:17,19;
84:5,18,22;86:10,19,23;
94:11,12;115:12;116:16;
131:19;132:8
**drawer (3)**
71:21,24;72:1
**drawers (1)**
71:15
**drawn (1)**
130:24
**dreadlock (6)**
66:14,19,21,25;85:10;
127:16
**dreadlocks (12)**
13:21;18:16;22:20;32:17;
33:3,13;87:24;88:8;123:24;
124:3,12,13
**drive (4)**
28:21,24;29:1;92:13
**drive- (1)**
128:23
**drive-by (3)**
128:10,12,25
**driven (1)**
27:19
**driver (5)**
66:12;67:22;68:1;92:18;
93:14
**driver's (48)**
13:14;17:22;18:2,14,15,
17;19:8;20:5;21:16,22;
31:14,18,24;32:16;34:20;
42:21;43:9,10,12;51:21,25;
53:19;57:1,21;73:20,21;
74:12,17;77:23;78:6;
102:21,22;103:6,7,18,21;
107:5,14,18;114:3;121:24;
124:2,22;125:11;127:21;
128:18;131:14;132:6
**driving (2)**
92:15;125:2

**drove (10)**
12:1,14;27:19;28:22;
29:2;36:6;92:11;114:12;
120:3;124:16
**due (4)**
40:3;127:2;131:12,20
**during (3)**
40:12,12;53:13
**duties (4)**
7:12;8:3,5;38:18
**duty (2)**
9:17;10:2

**E**

**earlier (6)**
13:9;35:15;55:12;57:20;
94:20;114:1
**easier (2)**
20:16,21
**effect (3)**
57:17;114:4;122:20
**either (14)**
13:9;41:24;44:18,20,20;
45:3,4,17;46:1;50:24;83:5,
8;97:19;108:7
**elaborate (1)**
54:10
**else (9)**
22:22;27:17;44:25;72:2;
78:21;83:1;100:6;104:14;
131:23
**employed (1)**
38:15
**employee (1)**
62:22
**end (6)**
42:20;115:18,20;125:6,
18,19
**enforcement (9)**
34:1,3;73:12;101:19;
110:12;111:8,20;113:2;
128:23
**enforcements (1)**
111:7
**enough (3)**
74:14;129:10,11
**entered (4)**
22:11;48:2;50:7;131:2
**Escape (12)**
18:5;21:20;52:1;64:7,17,
19;75:19;81:25;82:5;92:16;
102:7;114:15
**Especially (1)**
131:1
**essentially (1)**
23:24
**established (1)**
134:7
**estimate (1)**
99:18
**evaluating (1)**
130:3

**even (5)**
33:1;122:4;123:22;
129:25;131:8
**events (1)**
78:25
**eventually (1)**
20:4
**everybody (7)**
12:24;26:12,16,22;27:6;
28:19;36:12
**evidence (7)**
47:23;50:15;58:5;122:11;
133:18,19,20
**exact (1)**
57:10
**exactly (3)**
25:15;99:22;120:18
**EXAMINATION (12)**
7:1;23:15;35:7;38:6;
56:10;60:3;81:15;87:18,20;
90:4;110:21;120:14
**Examining (17)**
21:11;22:19;46:10,22;
48:18;49:4;50:17;52:8;
74:8;76:24;77:12;78:12;
103:5;105:18;106:12,24;
119:11
**except (1)**
12:25
**Exchange (18)**
8:13,17;9:5,21,25;39:11;
43:21;53:6;54:18;62:5;
63:18;76:10;78:15;90:24;
91:4,12;104:3,15
**excuse (3)**
5:3;15:6;52:6
**Exhibit (37)**
20:14;21:4;9:22:10,16;
46:6,18,21,24;47:6,11,22,
23;48:4,9,15,21;49:1;50:3,
5,10,16;51:10;52:4;74:6;
76:21,21;77:23;78:9;80:4,
5;103:2;105:13,14,14;
106:9,21
**Exhibits (1)**
56:17
**existence (1)**
122:13
**exited (1)**
96:21
**expected (1)**
129:2
**expects (1)**
128:22
**expert (1)**
33:2
**explained (1)**
44:2
**explanation (1)**
113:8
**Explosives (1)**
38:14
**expression (1)**

Case 1:12-cr-00002-MPM-DAS Doc #: 50 Filed: 04/23/13 140 of 149 PageID #: 224
United States of America vs.
Ryan Hearn
Proceeding
September 6, 2012

31:22
**extent (1)**
  133:8
**eye (4)**
  70:20,22,24;75:8
**eyeball (1)**
  70:22

## F

**face (10)**
  35:24;57:15;88:19,22;
  95:10,10;96:1;97:22;
  112:10;132:24
**face-to- (1)**
  132:23
**face-to-face (6)**
  97:4,23,25;98:2;107:16;
  131:4
**facial (3)**
  42:16;75:14;85:14
**facility (1)**
  19:14
**facing (1)**
  65:6
**fact (14)**
  21:22;24:7,11;34:18;
  39:18;48:20;51:16;52:11;
  58:17;74:17;80:17;100:20;
  105:19;127:8
**factors (5)**
  129:14,17;130:3,15,20
**fair (2)**
  21:18;24:3
**fall (1)**
  71:11
**fallen (1)**
  107:12
**false (3)**
  12:25;13:4;14:1
**familiar (1)**
  39:14
**far (6)**
  54:10;86:17;90:22;92:25;
  99:17;120:20
**fast (1)**
  80:21
**father-in- (2)**
  82:24,25
**father-in-law (8)**
  63:11;72:5;82:8,19,21;
  83:6,9;85:21
**fault (1)**
  133:3
**fax (2)**
  40:2,7
**faxed (1)**
  40:6
**features (3)**
  42:16;75:14;85:14
**Federal (7)**
  9:1;38:20;39:6,15;40:2;
  62:18,23

**feel (1)**
  44:8
**feet (3)**
  65:18,24;93:9
**fell (3)**
  71:15,17;95:22
**fellows (2)**
  69:19;70:2
**felon (2)**
  113:19,19
**fence (1)**
  71:1
**few (6)**
  10:25;73:25;74:2;103:19;
  112:12;124:4
**field (1)**
  39:3
**fifth (2)**
  130:11,17
**fight (2)**
  98:17;102:24
**fighting (1)**
  97:11
**figure (2)**
  73:17;86:21
**figured (1)**
  36:3
**file (5)**
  69:7,16;84:5,8,22
**filed (1)**
  5:1
**filing (2)**
  71:13;95:23
**fill (1)**
  40:4
**finally (1)**
  72:13
**financial (1)**
  123:10
**find (6)**
  15:3;29:18;72:7;126:17;
  132:24;133:3
**fine (3)**
  4:25;54:17;80:1
**fire (1)**
  82:19
**Firearms (6)**
  4:20;8:23;9:1;38:14,20;
  62:24
**firearm's (1)**
  40:2
**Firearms' (2)**
  62:18,23
**fired (6)**
  73:6;99:11,13,18;100:3;
  125:2
**fireman's (1)**
  39:6
**first (16)**
  5:14,16,20;17:18;46:25;
  50:19;71:20;76:23;81:22;
  107:17;121:12;123:23;
  124:8;129:18;130:5;132:6

**fist (1)**
  97:9
**fit (1)**
  16:4
**five (1)**
  34:5
**fled (1)**
  10:9
**flipped (1)**
  86:15
**floor (2)**
  71:9;72:12
**follow (2)**
  54:6;66:18
**following (2)**
  40:1,7
**FOLLOWS (1)**
  117:22
**foot (3)**
  93:8,17;99:21
**Ford (15)**
  15:5,24;16:2;18:5;21:20;
  52:1;64:7,17,19;75:19;
  81:25;82:5;92:16;102:7;
  114:15
**form (2)**
  40:5,6
**forth (4)**
  127:1;129:14;130:14,19
**forward (3)**
  16:21;132:16;133:19
**fought (3)**
  97:4,9;111:12
**found (12)**
  13:15;14:5;15:4,21;16:2;
  17:20;19:21;30:13;102:21;
  119:2;124:21,22
**four (4)**
  30:8;34:5;48:9;105:19
**four-and-a-half (1)**
  38:16
**fourth (2)**
  86:20;130:9
**free (2)**
  27:12;36:25
**fresh (1)**
  60:15
**front (22)**
  21:8,9;29:20;46:18;
  50:19;64:8;65:4,11,17;
  66:8;72:18;74:9;75:6;
  76:19;84:11;86:20;88:22;
  92:5;96:6;103:1;105:10;
  120:22
**funny (3)**
  35:23;57:15,15
**further (6)**
  116:13,20;121:4,5;
  133:25;134:17

## G

**G&G (2)**

**fist (1)**
  63:17;90:24
**Galbreath (1)**
  62:14
**gave (8)**
  12:25;13:3;14:1;20:9;
  44:23;73:5;112:16;113:10
**gear (1)**
  72:25
**general (1)**
  87:8
**gentleman (2)**
  125:18,19
**gentlemen (1)**
  125:22
**gets (2)**
  66:12;67:16
**Gillentine (78)**
  5:21,24;9:14;10:5,12,19,
  22;11:8,9,22,24;12:1,14;
  13:18;16:17;17:12,14,15;
  18:24;19:18;21:23;23:1,23,
  24;24:21;26:3,5;28:21,22;
  29:7;30:12;31:13;34:22;
  35:10;40:19,22;41:5;43:19;
  44:18;45:4,21;48:23;49:8,
  19,21;52:20,22;53:3,11,16,
  24;56:25;58:14;59:14;60:6;
  63:3,25;76:12;90:9,10,19;
  110:9,23;111:2;120:1,21;
  122:17,23;123:5,18,25;
  125:1;131:1;132:4,7,16;
  133:14;134:4
**Gillentine's (6)**
  31:17;32:4;49:5,23;
  119:3,24
**given (8)**
  13:18;104:17;110:12;
  111:3,5,6;122:9;125:12
**giving (6)**
  80:12;83:9,16;84:2,14,24
**glance (1)**
  18:2
**glass (6)**
  54:19,23;69:16;92:20,21;
  108:3
**goes (1)**
  96:15
**Gold (17)**
  8:13,17,20;9:5,21,25;
  39:11;43:21;53:6;54:18;
  62:5;76:10;78:14;91:4,11;
  104:3,14
**Good (13)**
  23:17,18;24:5,6;56:12,
  13;81:17;82:5,21;99:14;
  110:23,24;112:9
**goodness (1)**
  75:7
**Government (17)**
  4:15;5:3;20:19;47:21;
  60:24;116:19,22;121:19;
  122:4;126:2,16;127:6,9;
  128:22;129:2;131:18;134:2

**Government's (25)**
20:14;21:9;22:9,15;46:6;
47:22;48:8,14;50:3,15;
51:9;52:4;56:16;74:6;
76:20;77:23;78:9;80:4;
103:2;105:14;121:19;
126:15,24;130:14;131:6
**grabbed (1)**
73:1
**grant (1)**
133:3
**granted (1)**
133:15
**granting (1)**
134:14
**gray (6)**
114:17,18;120:3,8;
124:17,23
**great (1)**
127:9
**green (3)**
120:5;124:19,24
**grocery (1)**
90:14
**ground (4)**
97:6,10,16;107:12
**group (2)**
22:25;76:7
**groups (1)**
45:5
**grudge (3)**
25:10;113:22;123:12
**guess (6)**
27:25;28:17;43:3;72:16;
82:23;115:23
**gun (10)**
72:20,20,22,22,23;73:1;
82:9,11;91:4;99:10
**guy (13)**
36:3;55:19,20;86:8;
95:25;96:8;97:13;98:6;
100:19;101:25;102:23;
114:4,5
**guys (1)**
67:18
**guy's (1)**
59:18

## H

**hair (20)**
33:9,12,13;66:14;67:4;
75:1,3,4;85:10,13;88:4,21;
94:5;98:12,13;111:12,18,
20;124:6;128:8
**hairdo (3)**
80:14;85:1,5
**hairstyle (26)**
13:13;22:17;32:6,9,10,20,
23;42:8;66:25;67:12;83:11;
87:22;88:14;93:21;94:9;
98:14;103:10,11,15;123:21,
23;124:8,11;126:3;127:25;

131:5
**hairstyles (3)**
33:2,20;41:13
**hand (7)**
20:16;86:1,1,2;96:5;
97:21;98:15
**handcuffs (3)**
26:19;27:9,10
**handed (2)**
73:2;86:5
**handled (1)**
133:4
**hands (2)**
32:2;83:7
**Hanging (3)**
94:11,12;96:1
**hangs (1)**
33:17
**happen (2)**
71:3;92:1
**happened (10)**
17:20;18:1;25:15;64:5;
70:18;73:25;86:4;95:24;
98:5;115:3
**happening (1)**
8:10
**happens (1)**
66:11
**head (19)**
13:6,10;14:20;15:15,18;
32:13;33:10;38:4;54:7;
55:5;70:17,19;71:22;93:13;
94:8,10,15;114:19;124:5
**hear (6)**
5:6;73:5,6;120:1;124:12;
128:11
**heard (11)**
56:24;69:17,23;125:1;
129:10,11,19;131:25;132:7,
20;134:7
**hearing (5)**
4:5;5:23;82:18,24,25
**Hearn (47)**
4:5;14:6,7,18;15:2;16:6;
18:17;21:17;23:20;25:10;
27:17;31:2,3;32:13,19,23;
41:9,19;42:2;43:16;45:9;
48:19;51:20,22;53:15;
56:15;57:15,22;78:1;79:9,
12;81:20;87:21;107:8;
108:9,22;109:17;111:1;
113:22;122:14;123:9,13;
124:1,9;126:6;131:4;132:5
**Hearn's (7)**
20:7,9;45:22;53:19;
58:15;80:3;124:22
**heavyset (1)**
93:18
**Heffron (1)**
130:17
**held (2)**
62:18;97:21
**helped (2)**

10:1,3
**HERETO (1)**
50:12
**hesitate (4)**
77:19;81:2,5;107:22
**hesitation (4)**
45:10,12;55:13;80:25
**hey (4)**
58:19;69:19;70:2;81:18
**Highway (4)**
8:13;43:7;99:12,21
**history (2)**
5:19,25
**hit (16)**
70:8,9,10,11,13,14,18;
83:1,12,13,14;88:23;97:18;
98:7;112:6;125:3
**hits (1)**
68:19
**hitting (2)**
119:15;120:17
**holding (3)**
69:6,7;97:8
**holes (4)**
83:3;112:4;125:5,7
**hollering (2)**
72:4,20
**home (4)**
11:19;25:22,25;26:1
**honest (3)**
25:6;31:19;34:15
**Honor (67)**
4:9,16,24;5:12,15;14:21;
15:17;20:15,18;22:8,12;
23:8,10,13;26:23;34:25;
35:3,6;36:23;38:3;47:20;
50:8;53:21;54:6;55:4;56:5,
7;59:23;60:2,23;65:22;
79:23;81:8,11,13;87:14,17;
90:1;93:22;109:11;110:3,7,
16,19;116:10,15,21,25;
117:4,23;119:5;120:10,13;
121:9,16,18;122:3;124:14;
125:8;126:14;128:13;
129:1,18;131:6,24;134:2,18
**hours (1)**
91:21
**house (26)**
12:2,15;17:21;24:22;
25:16;27:12;28:2,3,10,11,
15,16,23;29:12,21;30:2,5;
32:13;35:12,17;100:20,21;
104:12,19;112:16
**huh (1)**
80:20
**husband (1)**
91:16

## I

**ID (2)**
12:24;13:1
**idea (5)**

30:17,18;60:10;82:17;
85:2
**iden- (1)**
131:14
**identification (32)**
13:24;27:2;29:8;78:1,5;
80:7;107:8;121:23;122:6,7,
10;123:8;126:1,5,6,10,11,18;
127:8;128:10,12,24,25;
129:24;131:8,10,11;132:4,
18;133:2,9,10,16
**identifications (2)**
121:21;125:9
**identified (28)**
14:23;31:24;32:9;35:15;
45:13;52:24;57:11;59:18;
78:14;79:8,24;85:8;108:22;
109:12;115:14,15;122:14;
123:18,22;124:10,15;
127:13,20,24;132:17,22;
133:22;134:8
**identify (5)**
29:4;45:15;53:4;79:12;
134:5
**identifying (1)**
83:9
**ignorance (1)**
34:16
**immediately (2)**
23:22;45:13
**improper (2)**
40:4;58:9
**incentive (1)**
24:17
**incident (1)**
103:17
**include (1)**
130:4
**Including (2)**
42:7;43:16
**in-court (5)**
121:20,21;122:2,6;
126:10
**independently (1)**
108:12
**indicate (1)**
78:22
**indicated (1)**
130:2
**indicating (8)**
70:3,17;79:17;86:12;
96:7;97:20;109:5;115:13
**indications (1)**
122:8
**indicia (1)**
126:3
**indiv- (1)**
127:12
**individual (25)**
44:4;46:2;47:7,9;48:15;
52:23;53:11;54:2;79:11;
83:10;84:11,12,13,24;
100:25;107:1,4;112:15,17;

113:10,16;122:14;127:20,
25;131:5
**individuals (24)**
13:23;36:18;41:11;42:3,
5,22,24;43:13;45:6;47:10;
50:25;52:23;65:13;78:19;
79:1,7;81:24;101:22;
127:12;128:1,19;130:23,25;
131:13
**indulgence (6)**
23:7;35:1;75:24;81:7;
110:15;117:1
**influence (1)**
44:17
**influences (1)**
133:9
**informant (1)**
124:10
**informant's (1)**
124:19
**information (20)**
9:24;10:23,24;11:4,10,16,
17,18;16:20;29:23;36:16;
59:21;100:14,24;112:16;
113:10;119:3,24;123:15;
125:12
**initial (2)**
45:18;51:16
**initialed (1)**
78:16
**initially (3)**
43:2;46:18;123:17
**initials (11)**
49:2,3,5,15,22;52:11;
77:17;80:6;106:17,22,23
**in-law (1)**
86:18
**inside (3)**
28:2,10,15
**instructional (2)**
47:5;50:21
**instructions (8)**
44:10;47:1;86:2;104:17,
19,22;105:3,17
**intention (2)**
130:7,22
**interested (1)**
129:16
**interesting (1)**
129:20
**interview (2)**
10:21,22
**interviewed (1)**
10:13
**into (7)**
47:22;50:15;67:10;69:14;
72:9;83:23;95:15
**introduce (2)**
22:9;47:21
**inventory (1)**
40:3
**investigate (2)**
38:19;39:6

**investigation (5)**
39:24,25;40:10,13;53:14
**investigations (1)**
42:20
**involved (4)**
39:24,25;46:3;123:10
**issue (2)**
124:14;132:3
**items (2)**
8:20;62:24

## J

**Jackson (1)**
38:25
**James (15)**
5:21;9:14;10:11;40:19;
48:23;49:4,8,19,21,22;63:2,
11;72:5;90:9;95:22
**January (2)**
8:1;56:18
**JB (1)**
12:7
**jewelry (1)**
8:20
**Jheri (11)**
93:16,20;94:4;95:25;
97:10;98:13;111:24;
123:25;124:13;127:16;
128:4
**job (2)**
24:12,13
**jobs (1)**
8:6
**Judge (1)**
29:14
**Judicial (1)**
39:19
**July (23)**
7:18;8:9;11:1,3;34:2;
39:23;40:23;47:19;51:6;
52:18;56:19,20;57:1;62:3,4,
21;63:9;76:6;78:2;90:20;
91:20;103:19;105:24
**jump (1)**
14:16
**jumped (1)**
98:15
**jumper (1)**
109:8
**jumping (1)**
96:1,3
**June (1)**
39:2
**jurisdiction (1)**
12:12
**jurisdictional (1)**
39:15

## K

**keep (2)**
42:23;71:24

**keeps (1)**
32:4
**kept (1)**
72:12
**key (10)**
15:5,6,22;16:2,14;17:20;
29:13,18;102:12;133:21
**kind (21)**
36:3;64:8,16;66:13,14;
67:14,24;68:12,17;72:10,
13;88:1;93:17;94:10,12;
109:9;114:14,17,18,25;
132:16
**kitchen (3)**
69:13,13;72:6
**knew (7)**
57:16,19;83:20,23;88:20;
95:23;100:20,22;107:18;
123:4
**knock (1)**
71:7
**knocked (3)**
12:21;70:21,24
**knowledge (7)**
8:22;13:7;23:3,4;26:3;
30:6;102:19
**known (2)**
5:25;68:8
**knows (2)**
132:21,22

## L

**ladies (1)**
63:6
**laid (3)**
69:16;84:5,21
**later (10)**
10:25;14:5;19:1;21:24;
46:2;73:19;103:19;107:11;
109:25;127:13
**law (13)**
28:9;34:1,3;73:12;82:25;
83:1;101:19;110:12;111:7,
7,19;113:2;128:23
**lead (1)**
126:16
**leading (3)**
93:23;94:1;110:4
**learned (1)**
46:2
**least (2)**
28:19;133:6
**leave (1)**
27:13
**leaving (1)**
53:6
**Lee (2)**
90:16,17
**left (8)**
30:19,25;31:1,3;64:13;
65:1;98:9;99:9
**legal (4)**

**keeps (1)**
25:24;28:1,8,14
**legitimate (1)**
12:24
**length (1)**
130:12
**lengths (1)**
127:9
**less (5)**
29:12;74:3;93:8,9;104:4
**letterhead (1)**
46:8
**level (4)**
84:2,15;87:21;130:10
**license (53)**
9:2;13:14;18:14,15,17;
19:8;20:5;21:16,19,23;
22:3;31:14,18,24;32:17;
34:20;42:21;43:9,13;51:21,
25;53:19;57:1,21;62:18;
73:21,21;74:12,17;77:24;
78:6;102:21,23;103:6,8,19,
21;107:5,14,18;114:3;
121:24;124:2,22;125:11;
127:21;128:18;131:14;
132:6,10,12;133:5,13
**licensee (5)**
39:7;40:3;62:23
**licenses (1)**
43:11
**lick (1)**
34:23
**likelihood (1)**
130:4
**line (2)**
26:24;47:16
**lineup (24)**
22:24;27:2;34:13;40:14;
41:7;42:2,4;44:7;53:25;
57:5,8;59:14;105:21;
109:18;115:1;121:3;
125:17;127:3;132:15;
133:2,23,24;134:9,13
**lineups (12)**
42:19,24;43:21;44:1,2,
21;53:3;54:22,25;55:22;
85:22;110:11
**little (12)**
10:21;21:1;64:7,7;69:12,
18;71:13,14;80:21;98:6;
104:4,13
**Live (3)**
10:20;90:11,12
**lived (1)**
30:1
**located (5)**
13:16;16:17;17:10;29:20;
90:25
**location (1)**
11:11
**log (1)**
42:23
**Logan (1)**
64:12

**long (9)**
7:8,24;30:4;34:1;38:15;
54:19;93:16;94:5;104:11
**longer (1)**
34:7
**look (14)**
14:10;30:16;35:24;57:15;
66:12,14,19;77:3;82:5;
86:7;97:17;108:5,20;115:8
**looked (16)**
17:18;20:2;59:10,11;
64:9,11;67:2,3,25;70:18,25;
74:25;79:10;86:16;104:19;
105:9
**looking (26)**
16:5;28:4,13;29:12,15;
31:9;33:19;34:21;36:4,15;
55:17;56:16;67:22;68:4,9;
69:21;72:3;80:21;84:18;
85:1;93:6;107:14;114:17,
18;115:10;132:10
**looks (2)**
119:15,19
**loose (2)**
70:21,24
**loss (3)**
38:20;40:3,5
**lot (13)**
18:3;24:9;27:9;63:17;
64:2;69:6,11;72:6;90:24;
91:25;92:5;96:10,14
**lying (1)**
36:1

**M**

**makes (1)**
127:14
**making (1)**
21:25
**male (5)**
13:5;18:16;28:13;41:12;
75:10
**males (6)**
28:15,20;36:19;41:16;
42:14;92:4
**Malone (2)**
12:7,19
**man (7)**
57:16,20;77:14;79:19,20;
83:14;132:13
**manner (1)**
43:24
**many (4)**
41:2;82:16;84:6;105:5
**Mark (12)**
9:14;19:4;40:19;51:3,12;
52:10;60:24;78:11;95:19;
104:16;107:23;108:16
**marked (26)**
20:14;21:4;45:21,22;
46:6;48:4;50:2,10;52:7,9;
55:25;56:1;74:5;76:20;

78:13;86:24;87:2,5,11;
103:2;107:24;108:8,12;
116:8;125:20,21
**marking (1)**
116:3
**married (2)**
62:13;91:16
**match (2)**
110:11;132:23
**material (2)**
22:5,5
**math (2)**
34:8,9
**matted (4)**
33:13,14,16,16
**matter (3)**
24:7;100:20;131:7
**Mattson (1)**
130:16
**May (28)**
15:16;20:16;23:13,14;
31:9;34:3,25;36:24;38:2;
54:6;55:3;56:7;60:19;
81:13,14;88:10;90:2;
110:19,20;111:24,24;
116:16,25;117:2,4,6;
121:16,17
**maybe (5)**
12:4;16:3;25:9;99:21;
113:21
**McDonald's-type (1)**
24:12
**mean (17)**
16:1;19:21;25:18;66:23;
71:5,17;75:4,5;85:1;88:7,
10;95:3,4,9;114:13;115:22;
120:20
**meant (4)**
16:3;19:18;27:7;55:15
**meet (1)**
17:1
**memory (2)**
78:25;107:10
**men (2)**
58:22;114:11
**mentioned (2)**
63:6;98:11;100:11;
120:16
**met (3)**
17:3;43:20;101:10
**middle (1)**
52:7
**might (2)**
16:4;52:22
**mine (1)**
72:13
**minute (4)**
32:25;73:1,16;98:11
**minutes (1)**
65:3
**mirror (1)**
92:21
**misidentification (1)**

130:4
**Mississippi (12)**
7:23;11:11,23;23:25;
39:7,13,16,20;43:3,11;
74:12;91:1
**mistake (1)**
27:24
**moment (4)**
23:8;75:25;81:8;117:5
**Monday (2)**
40:1,7
**money (9)**
24:4,5,6;29:15;71:25;
96:5;98:15,17;123:14
**Monroe (5)**
7:7,10,13;16:8;90:15
**Montgomery (5)**
41:9,20;42:4;50:1;108:10
**Montgomery's (1)**
45:23
**more (7)**
24:8,13;67:22;68:1;95:5;
99:21;130:16
**morning (12)**
19:16;23:17,18;56:12,13;
63:24;68:22;75:22;81:17;
91:21;110:23,24
**mother (3)**
20:7,9;21:24
**motion (10)**
4:5,6;5:1;26:25;27:1;
121:20;132:2;133:1,15;
134:14
**motives (1)**
58:5
**move (7)**
22:9;47:21;48:11;87:1,4;
116:7;126:9
**moved (2)**
30:21;86:10
**much (4)**
27:20;29:12;84:14;
127:14
**myself (2)**
72:15;77:7

**N**

**name (19)**
7:3;12:9,25;13:4;14:1;
17:8;23:19;38:8;39:9;
47:13,15;56:14;62:10;
81:19;90:6,8;110:25;
112:21,23
**names (1)**
40:18
**nature (1)**
41:3
**need (3)**
67:18;117:8;133:11
**needed (3)**
40:9;44:3;63:23
**needing (1)**

123:14
**negative (2)**
67:8;68:10
**neighbors (4)**
30:24;31:6,9;100:9
**Neil (4)**
126:24;129:15;130:15,15
**nephew (2)**
64:10,20
**Nettleton (16)**
7:22;8:4,14,15;9:18;10:7;
22:23;39:7,13,18;40:8;
53:9;67:7;88:11;90:25;
122:25
**news (2)**
100:9,11
**next (7)**
19:15;55:1;60:22;70:4;
87:1,4;115:21
**night (2)**
22:4;35:16
**nobody (1)**
15:5
**nodded (8)**
14:20;15:15,18;38:4;
54:7;55:5;93:13;114:19
**None (1)**
28:17
**non-suggestive (1)**
43:24
**noon (2)**
117:7,20
**normally (1)**
95:6
**North (2)**
23:24;29:21
**Northern (1)**
39:19
**nose (1)**
70:20
**notice (5)**
45:10;56:17;75:14;85:14;
102:12
**noticed (3)**
66:13;85:13;108:19
**Number (23)**
4:4;17:19;20:14;21:9;
22:10,16;45:18;46:7;47:6,
22;48:9;50:3,16;51:10;
52:4,14;74:6;76:21;77:23;
78:10;80:5;103:2;105:14

**O**

**object (2)**
26:24;93:22
**objection (3)**
4:24;47:25;50:4
**objections (1)**
20:22
**obtain (3)**
29:23;42:18
**obtained (1)**

Case: 1:12-cr-00002-MPM-DAS Doc #: 50 Filed: 04/23/13 144 of 149 PageID #: 228

United States of America vs.                                              Proceeding
Ryan Hearn                                                         September 6, 2012

43:2
**obviously (2)**
58:13;111:3
**occasion (2)**
39:5;103:18
**occupation (5)**
7:6,20;38:12;90:13,22
**occur (1)**
39:12
**occurred (9)**
9:10,21;11:1;39:22;
75:22;80:9,12;100:16;
104:6
**off (6)**
75:1;84:3;97:14;98:7,8;
99:4
**offer (3)**
100:13,17;122:15
**offered (2)**
10:23;132:1
**offering (1)**
23:25
**offers (1)**
10:18
**office (15)**
38:24;39:3;40:1,6;63:16;
64:2;69:12;86:3;91:25;
92:5,24;96:10,14;115:5;
117:5
**officer (11)**
10:2,4,6,7,16;12:6,9;
53:24;74:18;124:21;132:5
**officers (5)**
8:6;11:22;12:5,20;101:19
**offices (3)**
63:13,25;91:4
**once (1)**
17:24
**one (56)**
5:19;10:12;11:19;12:4,
19,25;13:12,20,22;19:5;
23:8;24:21;32:5,25;33:22;
34:22;41:18,19;45:15;
53:22;54:20;55:9;59:2,7;
63:5,16,25;64:10;70:25;
75:25;79:7;81:8;86:3;
97:13,19;98:13;101:15;
106:9,21,25;108:7,12,23,
23;111:5;115:11,21,24;
117:5;123:19;124:8;
125:17,18;128:1;130:15;
133:6
**one-person (1)**
25:14
**ones (1)**
78:19
**only (8)**
15:4;32:24;125:8,11,12,
25;126:5;131:2
**onto (3)**
69:6;96:15,16
**open (5)**
69:17;71:21,22,23;72:1

**opened (4)**
17:22,24;97:1;124:21
**opening (1)**
102:17
**operating (1)**
9:1
**opinion (2)**
58:11;126:17
**opportunity (12)**
44:13;75:9;80:8;97:16;
108:20;109:19,24;127:10;
130:5,22;131:2,12
**opposite (2)**
122:12;127:14
**orange (6)**
14:16;79:19,20,21,22;
109:8
**orbit (1)**
70:21
**other's (2)**
54:2,3
**otherwise (1)**
20:23
**out (73)**
10:15;12:2,3,11,15,23;
14:5;15:9;20:2;21:20;26:1;
28:13,19,25;35:11;36:7,11,
12,15;38:21,24;39:3;40:5;
52:1;58:14;64:13;65:1,9,
14;66:12,17;67:4,16,23,24;
68:4;71:5,7;72:25;73:2,17;
77:14,15;80:18;86:8;88:14;
92:8,11,19;93:1,2,9;94:18;
95:11;96:6,15,16,17;97:11;
98:6,8;99:10,20;100:1;
107:10,13;109:23;120:19,
22;124:9;126:15;129:14;
132:9
**out-of-court (4)**
121:21,22;122:6;126:9
**outside (5)**
28:3,10,16;36:6,19
**over (28)**
17:18;48:11;64:8;70:20;
71:22;73:1;77:3;79:16;
86:6,11,14,15;94:15;95:12,
17;96:2,3,4;98:4,15;101:11;
102:1,4,4;109:4;110:5;
111:18;127:15
**overnight (1)**
19:15
**Overruled (1)**
27:3
**oversee (1)**
8:5
**owned (2)**
62:7;91:12
**owner (2)**
62:1,4
**Oxford (2)**
38:22;39:3

**P**

**packed (1)**
73:16
**page (26)**
41:10;44:21;46:18,19,20,
23,25;47:5,5,6,8;48:14,25;
49:13;50:19,21;51:9;52:3;
76:23;77:8;78:9;80:5;
95:22;106:8,20,25
**pages (2)**
50:18;76:22
**paid (3)**
109:23;123:7;125:13
**Panel (8)**
11:20,23;17:21;18:2,4,
12;35:18;101:20
**paper (1)**
105:10
**paperwork (1)**
69:5,20;86:6
**paragraph (1)**
51:19
**Pardon (3)**
90:7;98:1;106:14
**parked (3)**
96:16,17;120:22
**parking (2)**
93:6;99:24
**part (3)**
45:11;68:22;119:15
**participants (1)**
123:20
**particular (6)**
45:8;62:4;78:22;79:7;
95:2;127:25
**partner (2)**
62:9,15
**passed (6)**
12:15;26:4;67:23;75:19;
94:21;107:11
**passenger (4)**
66:16;67:20,23;94:17
**past (5)**
28:21,22;29:1,2;111:4
**patrol (3)**
7:14,14;43:7
**PAUSE (10)**
15:10,12;23:9;35:2;38:1;
76:1;81:9;110:17;117:3;
132:9
**pawn (13)**
8:19;63:18,20;64:8;
68:24;69:12,14;72:9;92:8;
95:12,15,17;99:10
**pawning (1)**
62:24
**pawns (1)**
8:19
**paying (2)**
84:16,19
**Payne (32)**

7:4,5,17;15:21;22:21;
23:17;35:9;53:7,17;56:22,
24;57:14;58:18,19,19;
59:13;73:20;74:18;76:5;
77:24;101:9,18;102:3,6,11;
107:6;113:9;114:2,6;119:1;
128:19;132:12
**Payne's (1)**
58:4
**payroll (1)**
8:7
**people (13)**
12:22;25:14,25;28:10;
73:8,17;84:7,8;88:4,8;
100:9,12;101:15
**perhaps (2)**
123:13;133:7
**period (2)**
85:3;104:11
**permission (1)**
4:18
**person (44)**
10:8;13:3,8;14:11;17:12,
13;18:18;22:17;24:7,11,20,
24,25;29:25;30:1,19;31:24,
25;74:21;75:17,18;78:13;
85:1;98:12;99:4;103:14;
108:22;111:11;113:18,21;
122:22,24;123:1,9,11,11,12,
13,19;124:7,10;126:6;
127:24;128:6
**persons (3)**
13:8;62:17;110:10
**phone (1)**
16:16
**phonetic (4)**
11:20;12:7;70:21;130:19
**photo (39)**
22:24,24,24;27:2;41:7,
18;42:2,4,19;44:19,21;45:5,
13,15,17,22,23;51:21;
52:24;53:14,25;55:22;57:5;
60:7,15;73:21;76:5;88:13;
103:21;109:17;110:11;
119:14;124:2;127:4;
131:15;133:23,24;134:9,13
**photocopy (6)**
20:10,11;21:11,25;74:17;
103:7
**photograph (62)**
18:19,21;21:19;22:18,19;
31:14,18;32:17,22,24;
34:20;43:16;45:9;46:1;
48:16,25;49:1,7,16,25;
51:13,17,24;52:6,7,9,12,23;
55:9;56:1;57:1,7,10;58:15;
59:2,8;74:13,20,21;75:18;
77:10,11;78:11,23;79:8;
80:4;85:9;86:24;87:2,5;
103:4,14;106:11,16;107:5;
108:8,9;109:16;119:10;
121:25;127:20;131:9
**photographic (13)**

34:13;40:14,14,21;52:19;
59:14;85:22;105:20;
109:18;115:1;125:17;
127:22;132:15
**photographs (27)**
34:21,22;41:10;43:1;
47:7,9;48:21;50:25;51:11;
55:18;76:7;77:9;79:4,6;
81:2;87:12;103:23;104:2,
20;106:9,21;114:22,25;
116:4,8;119:2,6
**photos (28)**
13:14;22:25;41:2,4,23;
42:5,18,21;43:9,12,13,18;
44:24;45:1,4,5,20;49:14;
53:5,12;55:25;78:10,18;
105:6;107:20;108:2,16;
131:11
**physical (1)**
110:9
**physically (2)**
115:6,9
**pick (5)**
44:5;77:14;86:8;88:13;
132:9
**picked (2)**
58:14;107:13
**picture (7)**
57:21;59:18;64:15;65:4;
75:6;83:19;84:12
**pictures (4)**
77:4;86:7;88:23;125:5
**piece (2)**
59:21;105:10
**pistol (1)**
73:6
**place (5)**
43:20;85:19;114:21;
115:24,25
**placed (3)**
54:22;108:2;115:9
**plaided (3)**
94:6,14;111:18
**Plantersville (4)**
17:6,7;102:1,8
**please (9)**
7:3;14:15;20:15;38:9;
54:13;90:6;109:3;117:25;
125:25
**pleases (5)**
117:23;121:13;122:3;
126:8,14
**PM (1)**
134:22
**pocket (3)**
18:3,11;124:23
**point (3)**
14:14;109:2;129:14
**pointed (5)**
12:1,3,15;28:25,25
**pointing (2)**
79:18;109:6
**Police (17)**

7:22;8:4;10:7;12:8,18;
17:3;22:23;40:8;53:8;
58:10;82:25;100:8;101:11;
119:1;122:25;132:12;
133:12
**ponytails (2)**
94:12,13
**position (1)**
131:7
**possibility (1)**
16:4
**pouring (1)**
15:9
**prepare (1)**
40:13
**prepared (1)**
41:6
**presence (2)**
54:2,4
**present (11)**
10:11;38:12;44:25;46:5;
49:9;51:12;52:5;57:14;
62:8;104:14;108:1
**presentation (1)**
121:24
**presented (9)**
31:13;40:21;41:4;43:23;
48:22;49:14;52:19;53:2;
127:7
**presenting (4)**
57:21;59:13;85:20,21
**pressure (1)**
44:8
**pretty (6)**
24:5,6;82:21;99:14;
112:9;119:19
**previously (6)**
35:21;47:2;77:22;78:7;
80:5,24
**primarily (3)**
38:19;85:8,13
**prior (9)**
5:19;43:25;57:4,8;59:13;
130:9;131:13;132:15;
133:23
**probably (6)**
10:14,14;80:13;86:20;
93:17;126:20
**procedure (8)**
34:19;58:10;59:5;121:23;
122:5;125:9;126:18;129:25
**proceed (9)**
5:2;15:17;23:13;38:2;
53:23;56:7;81:13;110:19;
121:16
**PROCEEDING (1)**
134:22
**PROCEEDINGS (1)**
117:22
**process (4)**
28:4;126:1;127:2;131:21
**profession (3)**
7:6,21;38:12

**promise (1)**
123:6
**proof (6)**
5:4;117:8;128:11,22,24;
132:1
**proper (2)**
59:5;125:17
**proposition (1)**
127:1
**propped (1)**
72:22
**prove (2)**
129:2,3
**proved (1)**
129:8
**provide (1)**
100:25
**provided (4)**
5:17;11:10;16:20;127:23
**Public (1)**
43:5
**pull (2)**
66:4;92:25
**pulled (9)**
20:1;65:4;66:8;80:18;
81:24;92:4;93:5;95:7;100:1
**pulls (3)**
64:8;65:10;66:10
**pursuant (3)**
119:3,24;124:18
**put (23)**
5:4;17:21;19:14;20:19;
22:15;27:9,11;32:2;34:20;
35:24;44:1;47:12;49:15;
70:20;77:17;83:7;115:4,4,
24,24;116:5;117:8;125:17

## Q

**Quarterman (1)**
130:18
**quick (2)**
66:18;73:14
**quickly (1)**
53:4
**quote (1)**
132:9

## R

**Race (1)**
42:12
**rail (1)**
65:16
**rarity (1)**
67:13
**rather (3)**
20:17;117:16;124:3
**reached (1)**
18:15
**reaction (1)**
31:17;35:22
**read (13)**

44:9,13,15,22;77:3,5,6,7;
86:6,14;105:2;106:6;132:1
**reading (2)**
52:3;106:1
**real (4)**
66:18;71:16;93:11,12
**realized (1)**
72:13
**really (7)**
33:22;60:11;68:18;75:16;
95:8;108:19;120:18
**rear (3)**
119:9,12;125:6
**reason (11)**
25:10;26:2;58:24;59:1;
60:12;95:2,4,5;107:21;
114:6;126:8
**recall (24)**
8:10;31:7,20;32:3,7;
40:20;45:20;76:6;82:15,18,
24;83:5,8,11;85:19;102:14;
105:5;111:19;112:1;
114:10,20;124:20;125:14;
133:7
**receive (2)**
9:20;11:4
**received (7)**
11:16,18;13:15;40:2,7;
50:14;124:11
**recently (2)**
38:21;130:17
**recess (4)**
117:7,17,20;134:21
**recliner (1)**
65:8
**recognize (16)**
14:7;18:18,22;21:10;
44:4;46:15;47:4,10;50:15;
74:21,23;75:17;76:23,25;
103:3;106:3
**recognized (1)**
35:11
**recollection (2)**
29:20;45:2
**record (8)**
5:17;7:3;14:22;38:8;
65:23;79:24;90:6;109:12
**recovered (1)**
22:3
**re-direct (6)**
35:5,7;59:25;60:3;87:16,
18
**refer (6)**
8:25;13:13;18:7;44:10;
93:20;128:17
**reference (1)**
133:16
**referred (4)**
40:13;80:5;127:15;131:3
**referring (4)**
41:15;103:11;105:16;
128:17
**reflect (4)**

14:22;65:23;79:24;
109:12
**regarding (3)**
11:4;23:1;112:2
**related (1)**
63:2
**relevancy (1)**
26:24
**reliability (1)**
123:3
**reliable (6)**
113:16,16;122:10;127:8;
129:24;131:12
**remain (1)**
4:23
**remainder (1)**
119:6
**remember (23)**
12:9;17:8;29:3;31:23;
69:8;70:4,7;71:19,20;
72:21;73:20,24;78:2;83:4;
102:13;104:22,24;105:8;
106:1;107:9;111:21;
112:24;114:7
**remembered (1)**
75:8
**repeatedly (1)**
32:5
**Report (1)**
40:5
**reports (2)**
10:4;35:13
**represent (4)**
23:19;56:14;81:20;
110:25
**represented (2)**
43:21;119:23
**request (3)**
4:18,22;43:10
**residence (4)**
12:21,22;15:3,4
**resident (2)**
38:22;40:6
**resolved (1)**
44:7
**respond (1)**
100:17
**responded (3)**
121:19;122:4;123:5
**response (18)**
5:4;9:7;11:15;18:20;
31:5;55:11;56:9;59:4;67:8;
68:10;69:1,22;91:8;99:2,
16;126:15,24;130:14
**rest (2)**
121:8,10
**rests (1)**
116:22
**RETAINED (2)**
21:5;48:5
**retrieve (1)**
102:20
**retrieved (1)**

19:7
**returned (1)**
21:24
**review (1)**
80:8
**reviewed (1)**
50:25
**reviewing (1)**
45:1
**revolver (1)**
82:13
**reward (10)**
10:19,23;16:23;24:1;
31:10;100:13,18;122:16;
123:6,10
**rewards (1)**
10:18
**Richmond (2)**
17:6;90:17
**Ricky (8)**
7:4;53:7,17;73:20;101:9,
18;102:3;107:6
**rife (1)**
58:1
**right (145)**
4:7,14;5:1,13;7:17;8:15;
10:25;11:3,13;12:17;14:3,
21,24;15:16;17:23;18:5;
19:21;21:8;23:12;24:1,20;
25:15,18;26:8;28:18,18,24;
32:3,14;33:4,8;34:5,12;
35:5;36:24;39:22;40:25;
41:2;46:23;50:14;51:4;
55:1;57:13;58:22;59:1,11,17,
20,25;60:16,25;62:3,17;
63:7,15,24;65:4,8,16,19,20;
66:4,6,8;67:19,21;68:8,23;
69:20,23;70:13,16,16,18;
71:13,14,21;72:23;73:19;
74:11;75:1,21;77:16;78:8;
79:5,16;81:12,21;82:7,10,
11,13,15;83:5,7,16;85:24;
86:10;87:16;88:1,3;90:14;
92:4,15;93:3;94:8,21,22,23;
95:9,9,10,11,14;96:3,10,11,
12;97:3,15;98:16,23;99:3,6;
100:11;101:3,13;102:19;
103:13,16;106:17;108:14;
109:14;111:10;112:1,6,11;
113:8;115:21;116:12;
120:5;126:12;129:7;
131:16,25;134:16
**right-hand (3)**
48:25;51:13;77:10
**rights (2)**
127:2;131:21
**Road (3)**
17:5,6,9
**Rob (2)**
4:16;34:16
**robbed (9)**
30:20;31:25;58:3;81:24;
102:24;110:12;114:12;

124:7;132:13
**robbers (2)**
108:23;124:16
**robbery (30)**
8:12;9:10,20;11:5;13:8;
15:24;23:2,22;25:12;28:5;
29:16;30:9;39:6;40:8,25;
45:6;46:3;76:4;78:3,15,20;
79:2;103:22;104:6;120:20;
122:18;123:20;124:5,25;
128:2
**Robbins (1)**
8:13
**rolled (1)**
98:8
**room (2)**
54:12;108:2
**round (1)**
67:4
**row (1)**
86:20
**run (6)**
17:19;90:14;95:24;96:9,
9;99:9
**running (3)**
72:16,17;80:15
**runs (2)**
17:6;73:2
**Ryan (13)**
4:5;14:6;18:17;21:16;
41:9;42:2;45:22;48:18;
51:20,22;56:15;79:8,12

**S**

**Safety (1)**
43:5
**sales (2)**
8:20;92:24
**same (14)**
30:14;31:9;42:10;45:25;
51:24;54:12;57:10,20;
106:20;107:1,4;108:1;
115:16;130:20
**satisfied (1)**
132:20
**saw (19)**
14:8;18:21;32:12;35:22;
36:6;77:2,15;83:19;84:11;
88:17,19,20,22;92:25;
98:11,21;107:2,17;125:5
**saying (1)**
68:15
**scale (3)**
80:13;83:17;84:15
**scalp (2)**
33:11,12
**scene (8)**
10:1,3,15;19:19,22,25;
100:7;102:10
**scooted (3)**
55:1;58:22;59:7
**screamed (1)**

95:22
**screen (7)**
20:21;21:8,15;50:19;
74:9;76:19;103:1
**search (7)**
19:8;25:19;26:9,12;
29:12,15,24
**searched (1)**
102:5
**seated (1)**
79:15
**second (9)**
46:19,20;47:5;48:14;
49:13;51:9;77:8;106:25;
130:6
**secure (1)**
10:3
**secured (2)**
10:1;19:14
**seeing (6)**
31:18;72:12;78:3;79:1;
107:9;120:22
**seems (3)**
29:19,19;132:2
**sees (1)**
119:23
**seized (2)**
52:1;124:18
**select (2)**
45:4;46:1
**selected (1)**
80:3
**selecting (1)**
79:3
**selections (2)**
55:21,21
**sell (1)**
8:23
**selling (1)**
62:24
**sent (1)**
16:7
**separate (1)**
41:19
**separated (5)**
54:24;58:24;87:8,10,11
**separately (1)**
54:1
**series (2)**
77:9;103:23
**serve (1)**
7:24
**served (1)**
7:8
**service (1)**
19:13
**set (7)**
18:14;63:13;78:10;
126:15;129:14;130:14;
132:16
**sets (3)**
127:1,1;130:19
**Setting (1)**

123:16
**seven (2)**
57:4;76:4
**several (4)**
12:22;42:21;83:2;126:3
**shade (1)**
120:23
**shaded (4)**
68:13,17,20,22
**shaved (4)**
13:6,9;32:13;124:5
**sheets (1)**
125:21
**Sheriff (1)**
7:7
**Sheriff's (3)**
7:13,16;16:8
**shirt (3)**
66:15;79:19,20
**shooting (1)**
112:2
**shop (14)**
8:19;63:19,20;64:9;
68:25;69:12,14;72:9;92:9;
95:13,15,17;99:10,10
**SHORT (11)**
15:10,12;23:9;35:2;38:1;
76:1;81:9;110:17;117:3,21;
132:9
**shortly (5)**
73:11,18;122:18,21;
124:25
**shot (2)**
82:22;112:9
**shots (7)**
73:6;82:19;99:11,13,19;
100:3;112:12
**show (24)**
18:24;19:1;20:13;22:24,
25;25:13,14;34:21;40:15;
47:8;50:2;53:25;74:5;
76:20;102:25;105:13;
115:5;125:16;126:4;127:4,
22;128:15,17,22
**showcase (4)**
96:4;115:12,19,20
**showcases (1)**
86:19
**showed (25)**
19:17;21:23;31:13;32:25;
53:15,24;56:25;60:5;73:12,
13,13,15;74:20;77:4,22;
79:6;81:1;88:23;101:1,4,
12;102:2,22;104:1;114:2
**showing (4)**
17:12;43:25;73:22;
114:21
**shown (30)**
52:22;53:11,15,18,18;
57:8;60:7,11;74:18;76:5,6;
77:22;78:6;103:8,18,21,22;
105:6;107:6,20;122:12;
125:11;127:21;128:18;

131:8,14;132:5,12;133:6,13
**show-up (1)**
131:9
**shut (1)**
67:24
**sic (1)**
57:22
**side (7)**
17:22;18:3;29:21;54:20;
63:20;70:16;115:11
**Side-by-side (2)**
91:6,7
**sidewalk (1)**
66:5
**sign (3)**
26:5;51:5,7
**signature (4)**
47:16;77:1;105:22;106:4
**signed (4)**
44:15;50:24;86:14;106:6
**similar (5)**
34:21;41:11,13;42:5,16
**simply (1)**
58:1
**single (1)**
121:24
**sit (1)**
131:19
**sitting (20)**
4:12,17;34:9;64:6,14,15;
65:5,7;68:3,9,23;69:3,7;
72:7;79:16;87:6;91:25;
92:24;93:6;99:24
**situation (1)**
58:1
**six (8)**
41:10;47:7,9;51:10;77:9;
105:7;106:9,21
**slender (2)**
13:5;41:12
**slid (1)**
125:20
**small (2)**
18:7,9
**sofa (2)**
65:6,6
**sold (1)**
91:15
**solely (1)**
44:7
**somebody (6)**
24:16;30:1,21;35:25;
44:5;95:6
**someone (2)**
16:20;63:10
**sometimes (1)**
35:25
**son-in-law (7)**
63:4;95:19;104:16;
115:11,16,19,25
**sorry (8)**
22:14;34:8;35:18;49:20;
62:12;64:18;81:4;119:12

**sort (1)**
33:15
**source (1)**
125:13
**space (2)**
93:6;99:24
**speak (3)**
58:4;59:19;117:4
**speaks (1)**
128:3
**Special (2)**
4:19;38:13
**specific (1)**
86:2
**specifically (2)**
36:19;121:23
**speed (1)**
58:13
**spoke (1)**
69:25
**sport's (1)**
18:9
**spot (1)**
71:14
**spread (2)**
45:15;57:11
**spreads (1)**
52:24
**Stallings (33)**
4:19;23:6;38:10,11;46:5;
56:12,16;60:5;76:7,16,16;
78:20;81:1;85:19,25;87:7,
10;103:24;104:18;107:21;
108:5,15;114:20;115:4,24;
116:4;117:24;120:16;
125:15,16;127:23;132:16;
133:4
**stand (2)**
65:19;117:24;132:8
**standing (6)**
54:20;71:12;72:10,15,21;
86:11
**staring (4)**
67:17,21;68:1;75:6
**start (2)**
84:18;117:20
**started (9)**
10:4;12:23;34:3;69:16;
84:6,22;92:8;95:17;96:6
**state (8)**
5:17;7:3;38:8;39:16,19;
43:11;90:6,8
**stated (3)**
36:9;94:20;132:8
**statement (5)**
32:4;83:7,9;112:2;114:8
**statements (6)**
10:16;105:19;111:3,6,6,
11
**States (2)**
4:4;126:25
**stating (1)**
16:17

**Station (1)**
17:4
**stay (5)**
86:23;101:21;115:18,19;
116:4
**stayed (1)**
87:11
**staying (1)**
27:18
**stays (1)**
71:22
**step (5)**
36:24;44:23;60:19;65:14;
116:16
**stepped (1)**
54:24
**Steve (2)**
10:2;12:6
**still (6)**
17:13;68:3;72:25;73:3;
99:23;129:20
**stitches (1)**
70:20
**store (15)**
30:20;58:3;62:22;66:1;
67:10;75:19;79:2;83:21,24;
90:14;101:16;107:2;
109:20;114:12;131:3
**store-type (1)**
24:12
**straddling (1)**
71:1
**Street (6)**
11:20,23;17:21;35:19;
96:16;101:20
**streets (1)**
7:15
**Strike (3)**
133:1,10,17
**struck (3)**
83:10;112:12;123:19
**struggle (1)**
107:11
**struggled (1)**
109:25
**stuff (2)**
8:7,20
**style (3)**
85:10;111:12;128:8
**sub- (1)**
58:1
**subject (1)**
121:10
**subjectivity (1)**
58:2
**submit (1)**
122:11
**sufficient (1)**
132:18
**suggest (3)**
44:18;78:21;108:15
**suggestive (12)**
121:25;122:1,5;125:10,

10;126:1,2,5,19;127:5;
130:1;133:9
**suggestiveness (1)**
58:2
**suit (4)**
14:17;79:21,22;109:9
**sun (3)**
68:19;119:15;120:17
**suppose (1)**
5:2
**Suppress (3)**
4:6;27:1;121:20
**suppressed (2)**
122:8;126:11
**Supreme (1)**
126:25
**sure (6)**
8:6;74:4;88:6,9,25;104:7
**surgery (2)**
71:2,3
**surprised (2)**
58:13,17
**suspect (5)**
28:5;29:9;30:1;105:6;
123:9
**suspects (8)**
11:19;13:20;24:22;41:6,
8,15;60:8;108:23
**Sustained (1)**
94:1
**SUV (2)**
18:7;64:7
**sworn (1)**
81:23

**T**

**table (3)**
4:13,17,23
**tackled (4)**
97:2,3;98:24;99:1
**tag (1)**
17:19
**talk (2)**
108:7;117:10
**talked (3)**
30:23;123:24,25
**talking (5)**
12:23;35:17;69:3;96:11;
132:21
**tampered (1)**
30:22
**television (2)**
23:23;122:18
**telling (2)**
104:25;111:19
**tells (1)**
122:19
**tender (5)**
23:10;53:20;81:10;
110:18;120:10
**territory (1)**
110:5

**testified (13)**
35:21;47:1;55:12;56:22;
58:12;80:24;81:23;82:7;
85:7;91:17;130:21,23;
132:11
**testify (7)**
56:24;74:16;81:23;120:2;
127:10;132:7;134:10
**TESTIMONY (21)**
21:5;47:24;48:5;50:11;
60:20;84:10,20;85:12,16;
87:9;114:1;116:18;122:2,7;
123:17;124:19;125:15;
127:7;132:24;134:7,12
**thanks (1)**
27:17
**theft (2)**
40:3,5
**thereafter (1)**
122:21
**thieves (1)**
120:3
**thin (1)**
93:17
**thinking (2)**
30:7;72:10
**third (7)**
29:25;46:23;47:8;78:9;
86:20;106:20;130:8
**though (7)**
28:8;33:1;99:24;122:4;
123:22;129:25;131:8
**thought (10)**
53:3;60:14;64:9,23;
83:16;101:15;108:9;112:8,
14;129:19
**three (3)**
50:18;65:3;76:22
**Throughout (1)**
42:20
**throwed (1)**
98:19
**times (4)**
18:4;27:9;83:2;84:7
**Timothy (4)**
41:9;42:4;45:23;50:1
**tinted (1)**
68:16
**Tobacco (2)**
4:20;38:14
**today (10)**
14:8;34:9;79:13;84:10;
87:9;122:12;123:23;127:7;
128:11;129:20
**together (7)**
33:16,17;47:12;58:23;
59:7;116:7;125:20
**told (18)**
11:18;15:23;23:24;29:8,
25;30:15;31:3;34:16;35:10;
86:6;100:20;101:9,25;
102:23;104:23;113:14;
114:5;125:1

**took (11)**
11:13;15:6;21:23;44:23;
55:22;84:3;101:1,5,11,13,
18
**top (7)**
44:1;46:9;48:25;51:13;
54:23;77:9;105:11
**totality (2)**
122:9;129:23
**towards (1)**
68:24
**town (1)**
80:16
**transpire (1)**
54:13
**transported (1)**
19:13
**trial (2)**
126:11;134:5
**truck (5)**
30:13,16,19;121:2
**true (4)**
33:8;111:2,10,13
**try (1)**
24:17
**trying (3)**
71:3;72:15;74:1
**turned (2)**
97:1;124:9
**TV (1)**
10:20
**TV4 (1)**
73:13
**TV9 (1)**
73:15
**two (15)**
9:9;41:6,24;44:2;58:22;
63:13;76:15;79:7;85:20,22;
87:10,11;92:4;127:12;
131:13
**two-weeks (1)**
24:13
**type (5)**
41:4;82:11;103:11,15;
131:9

**U**

**Uh-uh (2)**
67:8;68:10
**ultimately (1)**
123:7
**under (9)**
9:1;22:22,22;25:18;
27:10;28:9;49:15;52:11;
129:23
**unfortunate (1)**
133:12
**unfortunately (1)**
32:3
**unique (1)**
84:13
**unique- (1)**

**84:25
United (2)**
4:4;126:25
**unknown (3)**
122:22,23;125:13
**unless (1)**
127:3
**unnecessarily (2)**
121:25;122:5
**unnecessary (2)**
126:19;127:5
**unreliable (2)**
126:7;127:5
**unusual (5)**
8:10;84:13;92:1,6,10
**up (53)**
17:23;22:15;25:13,14;
36:6;38:21;42:21;54:6;
55:1;63:13;64:8;65:4;66:4,
6,8,16,18;69:11;70:5;71:21,
23;72:3,22;73:12,13,13,15,
18;75:18;80:18,22;81:24;
92:4,11,13,25;93:5;95:7,11;
96:9;97:21;98:10;99:9;
100:21;101:10;115:12;
119:19;120:3;124:17;
127:4,22;128:15,17
**upon (2)**
85:9,10
**use (1)**
42:24
**used (7)**
15:24;26:22;27:5;29:23;
42:19;79:3;125:9
**useful (1)**
84:23
**usual (2)**
53:4;64:4
**utility (1)**
18:9

**V**

**vehicle (55)**
10:9;13:15,16;15:23,24;
16:4,18;17:10,19;18:9;
19:9;64:16;65:10,14;66:10;
67:20;82:19;83:2,2;92:19;
93:1,2,5,10,15;94:18;
102:12,15,17,20;112:3,3,7,
13;114:11,11,14;119:2,12,
16,22;120:3,5,17;124:15,
16,18,20,23,24;125:2,4,6,7;
126:4
**Verona (14)**
11:11,20,23;12:8,9,18;
17:3,7;24:22;25:16;35:18;
101:6,7,10
**versus (3)**
4:4;126:24;130:16
**victims (7)**
9:9;10:12;19:5;40:15,17;
44:2;127:19

view (5)
54:25;105:20;127:11;
130:5;131:12
violated (2)
127:3;131:21
violations (1)
38:19
vocabulary (1)
27:24

**W**

wad (1)
96:5
wait (1)
95:20
Waking (1)
70:5
walk (4)
28:10;69:13;84:8;107:11
walked (14)
67:23;69:15;75:5;84:4,5,
21;86:5;93:3;94:21,24;
95:11,12,14,15
walking (4)
68:5,24;75:19;80:21
walks (1)
67:16
warrant (8)
19:15;25:19,21;26:9,10,
13;29:15,24
watching (5)
66:16;94:24;95:5,8;
107:10
water (2)
15:7,8
way (15)
5:2;30:22;35:24;44:17;
58:7,10;63:12;68:12;74:25;
78:21;86:10;98:8;108:15;
122:13;125:10
wear (1)
88:4
wearing (4)
14:15;109:3,7,8
week (3)
74:2,4;76:4
weeks (1)
104:9
weird (1)
68:12
weren't (4)
62:4;64:12;99:23,23
what's (12)
20:13;50:2;69:19;70:2;
71:2;73:3;74:5;76:20;
80:19,22;84:16;103:1
Whenever (1)
40:2
whereas (1)
33:13
WHEREUPON (4)
21:3;48:3;50:9;117:21

whose (5)
45:20;48:15;49:3,25;
51:19
wide (1)
71:16
wife (3)
62:8,9;63:8
wife's (1)
62:10
window (13)
64:15;65:4,7,8;66:2;68:4,
7,16;75:6,20;83:19;84:12;
94:21
within (3)
74:2,3;104:9
without (2)
107:13;132:10
withstand (1)
132:18
witness (46)
5:16,20,22;14:13,16,20,
22;15:7,11,15;21:5;23:11;
47:13;48:5;49:15;50:11;
51:7;53:20;54:3;65:23;
67:5;68:14;70:2,16;79:17,
24;81:10;86:11;93:13;94:2;
96:6;97:19;109:4,12;110:5,
18;114:19;115:13;116:17;
120:2,11;121:6;127:11;
130:5,11;132:20
witnesses (9)
5:19;116:20,24;124:15;
127:10,11,19;130:21;133:6
witness's (3)
47:23;130:7,8
woke (1)
71:20
wonder (1)
59:12
word (3)
9:20;26:21;27:5
words (3)
58:2;122:17,20
work (2)
24:14;38:24
worked (5)
38:21;62:6;63:20,21,22
working (8)
24:11;39:3;62:22;69:17;
84:6,8,18,22
world (1)
72:11
worry (1)
121:3
wrecker (1)
19:12
wrestled (1)
131:3
wrestling (1)
132:22
write (1)
69:8
written (1)

104:18
wrote (1)
132:8

**Y**

y'all (7)
64:5;91:24;97:15,23;
108:7;116:3;117:14
yard (4)
26:1;28:19;29:5,9
year (2)
7:11,18
years (4)
5:25;34:5,6;38:17
yonder (1)
109:4
young (2)
41:12,16

**1**

1 (9)
20:14;21:4,9;22:10,16;
74:6;77:23;80:13;103:2
1:00 (2)
117:8,20
1:12CR02 (1)
4:4
1:20 (1)
134:22
10 (6)
80:13;83:17,18;84:15;
93:8,9
10:00 (1)
4:2
10:50 (1)
60:20
100 (1)
99:22
11 (5)
40:24,24;76:3;103:21;
104:5
11:50 (1)
116:18
13th (4)
11:3;30:7,15;57:1
1972 (1)
126:25
1984 (1)
129:19
1996 (1)
34:4

**2**

2 (10)
46:7;47:6,22;48:4,9,25;
56:17;80:5;105:15;106:8
2002 (1)
130:18
2006 (1)
130:19

2008 (1)
8:1
2009 (22)
7:19;8:9;34:2,2;39:2,23;
40:23;47:19;51:6;52:18;
56:18,19,20;62:4,13,21;
63:9;76:6;90:20;91:20;
103:19;105:24
2010 (1)
8:2
20th (11)
40:23;47:19;51:6;52:18;
56:18,19,20;76:6;78:2;
103:19;105:24

**3**

3 (10)
50:3,10,16;51:10;52:3,4;
56:17;76:21;78:10;80:5

**4**

45 (1)
82:12

**5**

5 (2)
52:14;65:18
50 (1)
99:21

**6**

6 (3)
65:18,24;93:17

**7**

7 (1)
103:20
75 (1)
99:21

**8**

814 (2)
17:5,9

**9**

9 (6)
10:20;80:13;83:17,17,18;
84:15
911 (1)
7:15
9th (8)
7:18;8:9;11:1;39:23;
62:4;63:9;90:20;91:20