```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF MISSISSIPPI
 2

 3   UNITED STATES OF AMERICA        .        Cause No. 1:12CR02
                                     .
 4           Plaintiff              .        Oxford, Mississippi
                                     .             June 6, 2013,
 5             v.                    .                1:40 p.m.
                                     .
 6   RYAN DANDRE HEARN               .
                                     .
 7           Defendant              .
     . . . . . . . . . . . . . . . . .

 8

 9

10

11           SENTENCING AS TO COUNT 2 OF THE INDICTMENT
                BEFORE THE HONORABLE MICHAEL P. MILLS
12              UNITED STATES CHIEF DISTRICT JUDGE

13

14
     APPEARANCES:
15

16   For the Government:        United States Attorney's Office
                                Northern District of Mississippi
17                              BY:  ROB COLEMAN, ESQ.
                                900 Jefferson Avenue
18                              Oxford, Mississippi  38655-3608

19   For the Defendant:         HONORABLE ROBERT WAYNE DAVIS, JR.
                                Davis Law Firm
20                              542 Jefferson Avenue
                                Post Office Box 1525
21                              Tupelo, Mississippi 38802-1525

22   Court Reporter:            Rita Davis Young, FCRR, RPR, CSR
                                Post Office Box 933
23                              Pontotoc, Mississippi  38863
                                (662) 416-2038
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

# TABLE OF CONTENTS

|                               | PAGE |
| ----------------------------- | ---- |
| Style and Cause Number ........................... | 1 |
| Appearances ...................................... | 1 |
| Index List ....................................... | 2 |
| Exhibit List ..................................... | 2 |

WITNESSES:  DEFENDANT

|                | DIRECT | CROSS | REDIRECT |
| -------------- | ------ | ----- | -------- |
| VANESSA BERRY  | 4      |       |          |
| MICHAEL HEARN  | 12     |       |          |

## EXHIBITS

| EXHIBITS | DESCRIPTION  | MARKED | RECEIVED |
| -------- | ------------ | ------ | -------- |
|          | NONE MARKED  |        |          |

Court Adjourned...................................24

Court Reporter's Certificate......................24

1      (CALL TO ORDER OF THE COURT)

2          THE COURT:  Madam Clerk, would you call the docket,

3  please.

4          THE COURTROOM DEPUTY:  Court calls Cause No.

5  1:12CR02, *United States of America v. Ryan Dandre Hearn*.  This

6  is a continuation of the sentencing as to Count 2 of the

7  indictment.

8          THE COURT:  All right.  At the last proceeding, we

9  had a number of objections that were presented by the defendant

10  in this case.  I think I've ruled on all the objections.  I

11  announced to the parties that I was considering an upward

12  variance.

13      And, Mr. Davis, I guess it's up to you now or -- if you

14  have anything that you want to put on.

15          MR. DAVIS:  Your Honor, as the Court said, the Court

16  has ruled on all the objections.  There's been a new

17  presentence investigation report prepared, to which we filed no

18  objections.  If it please the Court, Your Honor, because the

19  Court announced that it was considering an upward variance, we

20  would have two witnesses to call in mitigation.

21          THE COURT:  All right.  Who would you call?

22          MR. DAVIS:  Call Vanessa Berry.

23      (THE WITNESS IS SWORN).

24          MR. DAVIS:  May I proceed, Your Honor.

25          THE COURT:  You may.

<u>VANESSA BERRY, DEFENDANT'S WITNESS, SWORN</u>

<u>DIRECT EXAMINATION</u>

BY MR. DAVIS:

Q.    Would you state your name, please, ma'am.

A.    My name is Vanessa Ruth Berry.

Q.    Okay.  Ms. Berry, I'm going to ask you to speak very loudly and clearly.  Okay?  Ms. Berry, where do you live?

A.    In New Albany, 1253 Martintown Road, New Albany, Mississippi.

Q.    All right.  That's in Union County, Mississippi.

A.    Yes.

Q.    And, Ms. Berry, how do you know Ryan Hearn?

A.    Ryan is my son.

Q.    All right.  Tell the Court how old Ryan is, please, ma'am.

A.    Ryan is 22.

Q.    All right.  Do you -- you understand your son's pled guilty to a federal offense?

A.    Yes.

Q.    Ms. Berry, you understand that this crime was committed -- and I don't say allegedly committed because he has pleaded guilty to it.  This crime was committed back in 2009; is that correct?

A.    That's right.

Q.    All right.  How old was your son at that time?

A.    He was 18.

1  Q.   All right.  Was there anything going on in your son's life

2  at that time that you believe could have led to some of his

3  deviant behavior?

4  A.   I believe Ryan was at a dark place in his life at that

5  point.  He had been estranged from his father for several

6  years.  Actually, the estrangement began in his preteen years.

7  It really affected Ryan because he and his father -- his father

8  was there with him from day one.  And then to not be in touch

9  with his father, it hurt him.  He was hurt.  He felt rejected.

10      Then he became angry as he grew older.  And he started

11  searching and seeking -- excuse me -- something to fill that

12  void that was in his life and -- although it was the wrong

13  things he was searching because he was trying to fill that

14  emptiness, like so many other young men in our society.  The

15  choices that he made, he fell through the cracks.

16  Q.   Now, Ms. Berry, since that time, to the best of your

17  knowledge, Ryan has not been charged with any more felonies,

18  has he?

19  A.   No.

20  Q.   He's had some misdemeanor problems, though, is that

21  correct?

22  A.   That's right.

23  Q.   All right.  Now, Ms. Berry, you are, of course, aware that

24  when -- that when Ryan was first arrested by the federal

25  officials -- now, he was arrested by Monroe County.  But I'm

1  talking about by the federal officials, when he was first

2  arrested; he was allowed to post bond.

3  A.    That's right.

4  Q.    And you're allowed -- you're aware that he's now been in

5  custody for some time; is that correct?

6  A.    That's right.

7  Q.    All right.  And you understand, and are aware of the fact,

8  that he's in custody because he tested positive for drugs while

9  out on pretrial release?

10  A.    Yes.

11  Q.    All right.  So we're not excusing that at all, correct?

12  A.    That's correct.

13  Q.    Now, how long has your son been in custody this last time?

14  A.    Since September of last year.

15  Q.    Since September of 2012?

16  A.    Right.

17  Q.    All right.  Now, Ms. Berry, are you here today to excuse

18  or explain away what Ryan did?

19  A.    There's no excuse.  The only thing I can think of is like

20  I said, the fact that he was searching and seeking and wanting

21  the love and attention that he was missing; and that's why he

22  did what he did.  So I don't believe there's no excuse.

23  Q.    But you're not here to say it's okay?

24  A.    That's right.

25  Q.    You're not here to say that it was okay that he was out

1  using drugs on pretrial release, are you?

2  A.    Of course not.

3  Q.    Now, have you expressed that attitude to your son?  Have

4  you told him that you were disappointed in him?

5  A.    Oh, yes.

6  Q.    All right.  Now, since your son has been incarcerated this

7  past time, these past eight or nine months, have you seen a

8  difference in your son?

9  A.    Yes.

10 Q.    All right.  Tell the Court about that.  Describe in detail

11 to the Court this -- what you have seen, how you seen it and

12 what that difference is you believe exists today.

13 A.    I feel like my son has, since this past September, had

14 time to do nothing but sit and think about his actions and the

15 error of his ways.  And I know my son.  He totally and

16 sincerely regrets what he did.  He's really sorry.

17 Q.    Has he told you that?

18 A.    Oh, yes.  Oh, yes.  He's told me that several times.  And

19 if he could go back to the day all this happened, it never

20 would have happened.  My son is not this hard criminal.  His

21 actions were totally out of character.  I was surprised when I

22 got the news.  It was out of character for him.

23       Ryan came from a family of love.  We go to church.  We

24 pray.  That's how he was born and raised.  His mind is set now

25 on coming home, getting back into church, getting back to work

1  and getting with his sons and being a productive member of

2  society rather than a liability, taking from.  He's ready to

3  give back.

4  Q.    Now, you believe that based on some conversations you've

5  had with him; is that right?

6  A.    Exactly.  Yes.

7  Q.    Now, do you believe sincerely that your son is regretful

8  and remorseful for what he did?

9  A.    Yes.

10  Q.    Do you believe sincerely that he's accepted responsibility

11  for what he did?

12  A.    Yes.

13  Q.    Now, Ms. Berry, I understand that Ryan changed jobs a

14  lot --

15  A.    Uh-huh (yes).

16  Q.    -- during the period of time between when this crime took

17  place and when he was prosecuted.  But was he employed most of

18  the time?

19  A.    Yes.

20  Q.    Your son has two children?

21  A.    That's right.

22  Q.    What are their names?

23  A.    Jaden and Dallas.

24  Q.    Two boys?

25  A.    Yes.

1  Q.    How old are his boys?

2  A.    Three and two.

3  Q.    Now, I understand that they live with their mother?  Is

4  that correct?

5  A.    That's right.

6  Q.    Until he was incarcerated, did Ryan pay child support?

7  A.    Yes.

8  Q.    Did he pay it on time?

9  A.    Yes.  It was payroll deducted.

10 Q.    All right.  And he had a job most of the time?

11 A.    Yes.

12 Q.    If you would, Ms. Berry, tell the Court, has -- does your

13 son have a relationship with these two children?

14 A.    Oh, yes.

15 Q.    Tell the Court about that relationship.

16 A.    He would go and visit with his kids, as well as he'd bring

17 them to our house.  They'd stay the night with us, and he'd do

18 things with them.  They'd go to the park, to the water park, to

19 the sportsplex, whatever it was going on that he felt like --

20 park along the river.  He was always doing something with them.

21 Q.    Now, I know you're not here today to ask the Court to send

22 Ryan home because you and I both know that's not going to

23 happen.  But are you here today to ask the Court to sentence

24 Ryan within the sentencing guidelines?

25 A.    I am.

1  Q.    And do you believe that if he were sentenced to some time

2  within those guidelines that he would come out of prison a

3  better person?

4  A.    Absolutely.

5  Q.    Do you believe that he would make use of that time in

6  prison to better himself?

7  A.    Absolutely.

8  Q.    Has he told you what his plans are when he goes to prison?

9  A.    Yes.

10 Q.    And what are those plans?

11 A.    His plans are, hopefully, he's sent to a facility that has

12 education and schooling.  He wants to take advantage of that.

13 He does have some college years behind him, but he did not

14 graduate.  He'd like to continue with his schooling.  He's

15 expressed a desire to take up cosmetology to become a barber,

16 as well as real estate, and to become an entrepreneur in the

17 car dealership business.

18 Q.    Do you believe that if the Court sentences Ryan to some

19 time within the sentencing guidelines that that would be -- do

20 you believe that that would deter him from any future criminal

21 conduct?

22 A.    Yes.

23 Q.    Go ahead.  You had --

24 A.    My son is a free-spirited person.  And being incarcerated

25 , this is not him.  He realizes this is not his life as he

1   knows it.  It wasn't the way he was born or raised.  And he

2   doesn't like being caged in like an animal.

3       So most definitely, he will do better because he doesn't

4   want to come down this road again.  He wants his past life

5   behind him so he can start anew doing and living the life that

6   God created him to live.

7   Q.   And has he expressed these thoughts to you?

8   A.   Exactly.

9           MR. DAVIS:  Please the Court, Your Honor, I tender

10  the witness.

11          MR. COLEMAN:  Your Honor, the Government has no

12  questions for the defendant's mother.

13          THE COURT:  All right.  You can step down.

14          THE WITNESS:  Judge Mills, may I please -- if it

15  pleases the Court, I would like to apologize to Mr. Burroughs

16  and Mr. Gillentine for my son's actions.

17          THE COURT:  Well, I think that's quite appropriate.

18          THE DEFENDANT:  Thank you.

19          THE COURT:  You can step down.

20      Who would you call next?

21          MR. DAVIS:  We would call Michael Hearn.

22      (THE WITNESS IS SWORN)

23          MR. DAVIS:  May I proceed?

24          THE COURT:  Uh-huh (yes).

25          MICHAEL HEARN, DEFENDANT'S WITNESS, SWORN

1                          DIRECT EXAMINATION

2    BY MR. DAVIS:

3    Q.    Would you state your name, please, sir.

4    A.    Michael Andrew Hearn.

5    Q.    And are you Ryan Hearn's father?

6    A.    Yes, I am.

7    Q.    Where do you live, please?

8    A.    I live in Memphis, Tennessee.

9    Q.    How long have you lived in Memphis?

10   A.    Basically all my life.

11   Q.    All right.  Now, Mr. Hearn, when did your wife and your

12   son move down to New Albany, Mississippi?

13   A.    About 19 -- about ten years.

14   Q.    About ten years?

15   A.    Yeah.

16   Q.    All right.  And was that during the period of time that

17   you and your son -- I know you didn't lose contact totally, but

18   was that during the period of time his mother described when

19   you were estranged?

20   A.    Yes.

21   Q.    All right.  Speak up for me just a little.

22   A.    Yes.

23   Q.    All right.  Now, Mr. Hearn, I don't want to go through

24   with you the same testimony that Ms. Berry provided for us; but

25   was there -- has there been a time in the recent past when you

1  visited Ryan here at the Lafayette County Jail?

2  A.    Yes, it has.

3  Q.    All right.  Do you recall approximately when that was,

4  specifically?

5  A.    I visited him at the jail, and I can't recall specifically

6  the time.

7  Q.    All right.  But did you have a very strong heart-to-heart

8  with Ryan at that time?

9  A.    Yes.  We both got a little emotional.

10 Q.    Tell the Court, if you would, about that conversation you

11 had with your son.

12 A.    We was just speaking of the situation he was in, and that

13 I didn't like to see him in that situation.  And I know a lot

14 of this came because of my -- because of me, myself, is the

15 reason, not being in his life at that period of time.

16 Q.    What was Ryan's reaction to that conversation?

17 A.    We both got emotional.

18 Q.    All right.  Do you -- based upon what you saw from Ryan

19 and based upon your interactions with him, in the recent past,

20 since he's been in incarcerated, do you believe his

21 incarceration has brought about a change in him?

22 A.    Yes, I do.

23 Q.    Tell the Court about that change and what makes you

24 believe that he has changed.

25 A.    Well, I think he has matured more.  The situation he's in,

```
 1  I'm sure he don't -- I know that he don't want to go back to

 2  that type of life again.  And like I said, I know he has

 3  matured.

 4  Q.   Has he expressed that to you, that he doesn't want to go

 5  back to that type life?

 6  A.   Yes, he has.

 7  Q.   All right.  What specifically has he said about that to

 8  you?

 9  A.   He was just saying that what he did was wrong.

10  Q.   So he acknowledged what he did?

11  A.   Right.  He knew it was wrong.  And he don't want to repeat

12  that type of life again.

13  Q.   All right.  Now, Mr. Hearn, just as I asked Ms. Berry,

14  you're not here to make an excuse for your son, are you?

15  A.   No, I'm not.

16  Q.   You're not here to ask the Court to let him walk out the

17  door today, are you?

18  A.   No, I'm not.

19  Q.   You and I both know he's going to have go to prison.

20  A.   Right.

21  Q.   Are you here today to ask the Court to sentence him within

22  the sentencing guidelines?

23  A.   Yes, I am.

24  Q.   Do you believe that a sentence within the guidelines would

25  detour Ryan from ever doing anything like this in the future?
```

1   A.    Yes.

2   Q.    Now, Mr. Hearn, you were telling me that you had something

3   you'd like to say on your son's behalf.

4   A.    Yes.  First of all, I want to apologize to the victims.

5   I'm truly, truly sorry that this happened; and to you, Your

6   Honor.  I know you control my son's future.  And I ask you, and

7   I beg you, to please, please have a little leniency.

8           MR. DAVIS:  Your Honor, if it please the Court, I

9   tender the witness.

10          THE COURT:  All right.

11          MR. COLEMAN:  No questions, Your Honor.

12          THE COURT:  You can step down.

13          MR. DAVIS:  Your Honor, those are all the witnesses

14  we have.

15          THE COURT:  Okay.  Does the Government have any

16  witnesses?

17          MR. COLEMAN:  No, Your Honor.

18          THE COURT:  All right.  Have we addressed all your

19  objections, Mr. Davis?

20          MR. DAVIS:  Yes, Your Honor.

21          THE COURT:  Are you ready for the sentencing?

22          MR. DAVIS:  Yes, Your Honor.

23          THE COURT:  If you would come forward, please.

24      (PARTIES COMPLYING).

25          THE COURT:  All right.  Mr. Hearn, on a previous day,

1  you entered a plea of guilty to Count 2 of the indictment,

2  which charged you with aiding and abetting the theft of

3  firearms.  You're now before the Court for sentencing.  Is

4  there anything you would like to say before sentencing?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  You may.

7            THE DEFENDANT:  First of all, I'd like to take the

8  time out to apologize to the victims, to you, to my family, and

9  everyone that's in attendance today.  When this incident took

10 place, Your Honor, it was four years ago.  I was 18 years old.

11 I was a kid.  I was -- I was highly influenced because my

12 charge partner was well over 30 years old.  I was misled.  And

13 I just really made the wrong -- the right -- the wrong

14 decision.  Since then, I've never been in any trouble.

15     The only thing I've ever caught was, like, a DUI

16 misdemeanor or something.  I've never been in any trouble, Your

17 Honor.  I retain two children that I love dearly.  I've been

18 engaged to a beautiful fiance that love me to death.  I have a

19 loving family.  I've always worked, always been a productive

20 citizen.

21     Your Honor, I just ask that you just -- I'm not asking for

22 a second or third chance, Your Honor; I'm just asking for one.

23 I'm just asking for one chance.  I just ask for some leniency,

24 Your Honor, because I'm truly sorry.  This won't never happen

25 again.

I've been incarcerated since September.  I done been
locked up almost a year, Your Honor.  And with all due respect,
it just don't take me that long to realize that I messed up
four years ago.  It don't.  And I just ask that you just show
some sympathy and just have some leniency on me.  That's all.
I'm sorry.

THE COURT:  Mr. Davis, you have anything to say?

MR. DAVIS:  Yes, Your Honor, if it please the Court.
I'm looking at the presentence -- the most recent presentence
investigation report that was prepared by probation.  Looking
specifically at Paragraph No. 30, which is on page 7, if it
please the Court, Your Honor, Paragraph 30 assigns four -- a
four-level increase because a dangerous weapon was otherwise
used.  I believe, Your Honor, the Court found as a matter of
fact that Mr. Gillentine, at least, was struck in the head with
a firearm.

Your Honor, Paragraph 31 assigns a five-level increase
because of a serious bodily injury.  I believe the Court,
again, found as a matter of fact that the injuries to
Mr. Burroughs, I believe, was -- constituted a serious bodily
injury, therefore earning the defendant the maximum number of
points, if you will, and the maximum level of increase as far
as the bodily injury goes.

Your Honor, Mr. Hearn has one criminal history point.  I
believe the presentence investigation report as it stands today

1  takes into account Mr. Hearn's conduct.  It takes into account

2  Mr. Gillentine being struck with a gun.  It takes into account

3  the injuries to both Mr. Burroughs and Mr. Gillentine.  It

4  takes into account Mr. Hearn's criminal history.  It takes into

5  account the aspects of the aggravated assault, because that's

6  where the cross-reference came from.

7       I believe, if it please the Court, the presentence

8  investigation report is an accurate and true reflection of what

9  happened.  And we would respectfully request that this Court

10 sentence Mr. Hearn to some amount of time within that guideline

11 range.

12            THE COURT:  All right.

13      Does the Government have anything?

14            MR. COLEMAN:  Yes, Your Honor.  Your Honor, due to

15 the nature and circumstances of this crime, and also the extent

16 of the injuries inflicted upon -- especially the victim

17 Mr. Burroughs and also the defendant's disregard for the law as

18 evidenced by his conduct and use of drugs while he was on

19 pretrial release, the Government is of the opinion that any

20 sentence imposed up to the maximum allowable sentence would be

21 appropriate in this case; and the Government would request an

22 upward variance in this matter, Your Honor.  I would also point

23 out to the court that one of the victims, Mr. Burroughs, is

24 present in the courtroom.

25            THE COURT:  All right.  Anything further?

1          MR. COLEMAN:  No, Your Honor.

2          THE COURT:  All right.  Well, I'm about to state the

3   reasons for your sentence, Mr. Hearn.  Under the presentence

4   investigation report, there are presently no objections; so I

5   will adopt that report as it's presently written.  I find that

6   no count of conviction carries a mandatory minimum sentence.

7      If I went under the statute, you could receive zero up to

8   ten years imprisonment, zero up to three years supervised

9   release; a $250,000 fine; and a $100 special assessment.

10      Under the guidelines, you have a total offense level of

11   20, a criminal history category of Roman Numeral I.  The

12   guidelines provide for an imprisonment range of 33 to

13   41 months, a supervised release range of one to three years,

14   and a fine of 7500 up to $75,000.

15      The sentence that I am going to impose will be above the

16   advisory guideline range.  I intend for the sentence in this

17   case to reflect the nature and consequences of the offense and

18   the history and characteristics of this defendant, to reflect

19   the seriousness of the offense, to promote respect for the law,

20   to provide just punishment for the offense, and to afford

21   adequate deterrence to criminal conduct, and to protect the

22   public from further crimes from this defendant.

23      Also, I also want to avoid unwarranted sentencing

24   disparities among defendants.  And in your case, before you

25   committed this crime, you had a DUI at the age of 18,

1  possession of whiskey in New Albany in 2010.  That was February

2  of 2010.  July of 2010, you had a DUI.  And then June the 13th,

3  2012, failure to obey and disorderly conduct, open container

4  DUI second; it says here.

5      And then while you were out on bond in this particular

6  case, you had a drug offense -- or you were tested positive, I

7  think, for drugs.

8      Is that correct, Mr. Fountain?

9          MR. FOUNTAIN:  Yes, sir.

10          THE COURT:  And that's why you've been in custody

11  since last September.  In this case, you and your partner,

12  Mr. Montgomery, brazenly, in broad daylight, committed a

13  robbery of a pawnshop where two employees were assaulted.  One

14  was struck in the head resulting in serious bodily injury.  The

15  other one was involved in an altercation.  He was also struck

16  in the head with a firearm and placed in fear of his life.

17      After the two of you got in your vehicle trying to get

18  away from the people that you had attacked in broad daylight,

19  the other fellow, Mr. Montgomery, I believe, directed you to

20  run over the employee if he was still on the ground.

21      I think an upward variance is warranted due to the violent

22  nature of this crime.  I think the public has a right to be

23  protected from you.  I owe it to the public to see that you

24  don't have another opportunity anytime soon to go out and

25  attack anyone innocently.

1      And I do note that your co-defendant, Mr. Montgomery, got

2   120 months.  So I think I have to take that into consideration

3   also, that you were equally at fault with him.  There's a good

4   chance somebody could be dead in this case.  And I think the

5   public needs to know that this sort of behavior will not be

6   condoned in the federal courts of the Northern District of

7   Mississippi.

8      In your case, the total amount of restitution is

9   $11,741.85.  In imposing the sentence, I have considered the

10   advisory guideline range, the statutory penalties and the

11   sentencing factors enumerated in 18 U.S.C. Section 3553(a).

12      I think that imposing the sentence outside the advisory

13   guideline system pursuant to 18 U.S.C. Section 3553(a) will

14   better achieve the statutory purposes of sentencing.  So this

15   will be your sentence:  Pursuant to the Sentencing Reform Act

16   of 1984, as modified by *U.S. v. Booker*, it is the judgment of

17   the Court that the defendant, Ryan Dandre Hearn, is hereby

18   committed to the custody of the Bureau of Prisons to be

19   imprisoned for a term of 90 months on Count 2.

20      Upon release from imprisonment, the defendant shall be

21   placed on supervised release for a term of three years.  He

22   shall comply with the following mandatory conditions:  You

23   shall not possess a firearm, ammunition, destructive device or

24   any other dangerous weapon.  You shall cooperate in the

25   collection of DNA.

1    You shall comply with the standard conditions that have

2  been adopted by this Court and the following special

3  conditions:  You shall participate in a program of testing and

4  treatment for substance abuse as directed by the probation

5  officer.

6    You shall submit your person, property, house, residence,

7  vehicle, papers, computers, and other electronic communications

8  or data storage devices or media to a search conducted by the

9  U.S. Probation Officer.

10    You shall warn other occupants that the premises may be

11  subject to searches.  An officer may conduct a search only when

12  reasonable suspicion exists that you have violated a condition

13  of your supervision.

14    You shall provide the probation officer with access to any

15  requested financial information.  You shall not incur new

16  credit charges or open additional lines of credit without

17  approval of the probation officer.

18    Restitution in the amount of $11,741.85 shall be made

19  directly to the U.S. District Court Clerk's Office, Northern

20  District of Mississippi, for disbursement to the victim; 7300

21  to The Gold Exchange Pawnshop; $4,441.85 to the Mississippi

22  Victims Compensation Fund.  Restitution in this case is ordered

23  jointly and severally with Timothy Rydell Montgomery.

24    No fine is being ordered because of your inability to pay.

25  However, you shall pay to the U.S. District Court Clerk's

1  Office, Northern District of Mississippi, a special assessment

2  of $100 for each count of conviction for a total of $100 which

3  is due immediately.

4      You have the right to appeal any sentence imposed

5  illegally or as a result of a miscalculation of the guidelines

6  or outside the guideline range or one that is plainly

7  unreasonable.  If you're unable to pay for the cost of an

8  appeal, you may request the Court to waive such cost and/or

9  appoint you an attorney.

10      Do you understand the sentence that I've just stated?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  All right.  Is there anything further?

13          MR. COLEMAN:  Your Honor, only that the victim is

14  present.  I'm not sure if he desired to speak or not or --

15          THE COURT:  Well, I don't think that'd be helpful at

16  this point.

17          THE COURTROOM DEPUTY:  There are remaining counts.

18          THE COURT:  Do you have any other counts, Mr.

19  Coleman?

20          MR. COLEMAN:  Yes, Your Honor; and the Government

21  would move to dismiss those counts at this time.

22          THE COURT:  All right.  That'll be dismissed.

23      Anything from the defendant?

24          MR. DAVIS:  Yes, Your Honor.  If it please the Court,

25  I believe the Fifth Circuit has told us that if we don't object

1    to the reasonableness at this stage we waive that objection.

2    And therefore, we'd like to preserve that objection and object

3    to the reasonableness of the sentence.

4            THE COURT:  All right.  You're now remanded to the

5    custody of the U.S. Marshal Service.  Court will be in recess.

6                (THE HEARING ENDED AT 2:09 p.m.)

7

8                    C E R T I F I C A T I O N

9        "I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter, July

11   11, 2013."

12

13                /s/ Rita Davis Young
                  RITA DAVIS YOUNG, FCRR, RPR, BCR, CSR #1626
14                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25